UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL PRESS CLUB JOURNALISM
INSTITUTE, et al.,

      Plaintiffs,

v.                                                        Civil Action No. 18-2932 (RC)

U.S. IMMIGRATION AND CUSTOM
ENFORCEMENT, et al.,

      Defendants.

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND
<u>MEMORANDUM IN SUPPORT THEREOF</u>**

## TABLE OF CONTENTS

INTRODUCTION.................................................................................................................... 1

LEGAL STANDARD ............................................................................................................. 1

ARGUMENT ........................................................................................................................... 2

I.     Defendants Performed Adequate Searches................................................................ 2

        i.    ICE ...................................................................................................... 2

        ii.   USCIS ................................................................................................. 7

II.    Defendants Applied Redactions Properly ................................................................ 8

    A.   Exemption 5 ..................................................................................................... 8

       1.    Deliberative Process Privilege ........................................................ 8

           i.    ICE .................................................................................... 9

           ii.   USCIS .............................................................................. 12

       2.    Attorney Client Privilege and Work Product Doctrine.................... 13

           i.    ICE .................................................................................. 14

           ii.   USCIS .............................................................................. 15

    B.   Exemption 6 ....................................................................................................16

        i.    ICE .................................................................................. 16

        ii.   USCIS .............................................................................. 19

    C.   Exemption 7 - Law Enforcement Threshold.................................................19

        i.    ICE .................................................................................. 20

        ii.   USCIS .............................................................................. 22

    D.   Exemption 7(C).............................................................................................24

        i.    ICE .................................................................................. 24

        ii.   USCIS .............................................................................. 26

    E.   Exemption 7(E).............................................................................................26

    i.    ICE ................................................................................................... 27

    ii.    USCIS ............................................................................................... 30

          a.    TECS ...................................................................................... 30

          b.    Records from a Non-Federal Entity Database Containing Law Enforcement Information on Individuals ...................................... 31

          c.    US-VISIT Arrival Departure Information System ...................... 32

          d.    Customs and Border Protection (CBP) NNSV Database ............. 33

          e.    Screen-Prints of FBI Identification Record Queries .................... 35

          f.    Foreseeable Harm ................................................................... 35

III.    Defendants Reasonably Segregated All Nonexempt Information ...................................... 36

**CONCLUSION** ....................................................................................................... **36**

# TABLE OF AUTHORITIES

## Cases

*Advancement Project v. Dep't of Homeland Sec.*,
549 F. Supp. 3d 128 (D.D.C. 2021) ................................................................................ passim

*Amiri v. Nat'l Sci. Found.*,
Civ. A. No. 20-2006 (TNM), 2021 WL 4438910 (D.D.C. Sept. 28, 2021) .................................... 8

*Anand v. Dep't of Health & Hum. Servs.*,
Civ. A. No. 21-1635 (CKK), 2023 WL 2646815 (D.D.C. Mar. 27, 2023) ............................ 25, 26

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ................................................................................................................ 1

*Bayala v. Dep't of Homeland Sec.*,
264 F. Supp. 3d 165 (D.D.C. 2017) ...................................................................................... 7, 19

*Blackwell v. FBI*,
646 F.3d 37 (D.C. Cir. 2011) ................................................................................................ 27

*Boyd v. Dep't of Just.*,
475 F.3d 381 (D.C. Cir. 2007) .............................................................................................. 2

*Citizens for Resp. & Ethics in Washington v. Dep't of Just.*,
854 F.3d 675 (D.C. Cir. 2017) .............................................................................................. 16

*Coastal States Gas Corp. v. Dep't of Energy*,
617 F.2d 854 (D.C. Cir. 1980) .............................................................................................. 8

*Ecological Rts. Found. v. Env't Prot. Agency*,
Civ. A. No. 19-980 (BAH), 2021 WL 535725 (D.D.C. Feb. 13, 2021) ...................................... 15

*Emuwa v. DHS*,
Civ. A. No. 20-1756 (TNM), 2022 WL 1451430 (D.D.C. May 9, 2022) ............................ 11, 13

*Evans v. Fed. Bureau of Prisons*,
951 F.3d 578 (D.C. Cir. 2020) .............................................................................................. 2

*Hussain v. Dep't of Homeland Sec.*,
674 F.Supp.2d 260 (D.D.C. 2009) ........................................................................................ 8

*Jud. Watch, Inc. v. Dep't of Just.*,
432 F.3d 366 (D.C. Cir. 2005) .............................................................................................. 13

*Judicial Watch, Inc. v. Dep't of Treasury*,
802 F.Supp.2d 185 (D.D.C. 2011) ........................................................................................ 13

*Kendrick v. FBI*,
Civ. A. No. 20-2900 (TNM), 2022 WL 4534627 (D.D.C. Sept. 28, 2022) .......................... passim

*Louise Trauma Ctr. LLC v. DHS*,
Civ. A. No. 20-1128 (TNM), 2022 WL 1081097 (D.D.C. Apr. 11, 2022) ...................... 15, 18, 19

*Mayer Brown LLP v. IRS*,
562 F.3d 1190 (D.C. Cir. 2009) .................................................................................... 27

*Mezerhane de Schnapp v. USCIS*,
67 F. Supp. 3d 95 (D.D.C. 2014) ................................................................................. 31

*NARA v. Favish*,
541 U.S. 157 (2004) .................................................................................................... 24

*New Orleans Workers' Ctr. for Racial Just. v. USCIS*,
373 F. Supp. 3d 16 (D.D.C. 2019) ................................................................................ 20

*Oglesby v. Dep't of Army*,
920 F.2d 57 (D.C. Cir. 1990) ......................................................................................... 2

*Ortiz v. Dep't of Just.*,
67 F. Supp. 3d 109 (D.D.C. 2014) ................................................................................ 28

*Parker v. USCIS*,
238 F. Supp. 3d 89 (D.D.C. 2017) ................................................................... 24, 28, 29

*Perioperative Servs. & Logistics, LLC v. Dep't of Veterans Affs.*,
57 F.4th 1061 (D.C. Cir. 2023) .................................................................................... 36

*Petroleum Info. Corp. v. Dep't of Interior*,
976 F.2d 1429 (D.C. Cir. 1992) ..................................................................................... 8

*Pinson v. Dep't of Just.*,
245 F. Supp. 3d 225 (D.D.C. 2017) .............................................................................. 25

*Pinson v. Dep't of Just.*,
313 F. Supp. 3d 88 (D.D.C. 2018) .................................................................... 16, 18, 19, 27

*Porup v. CIA*,
997 F.3d 1224 (D.C. Cir. 2021) ................................................................................... 36

*Prison Legal News v. Samuels*,
787 F.3d 1142 (D.C. Cir. 2015 ..................................................................................... 16

*Reps. Comm. for Freedom of the Press v. CBP*,
567 F. Supp. 3d 97 (D.D.C. 2021) ............................................................................... 14

*Rojas-Vega v. USCIS,*
132 F. Supp. 3d 11 (D.D.C. 2015) ............................................................................. 23

*Rojas-Vega v. USCIS,*
302 F. Supp. 3d 300 (D.D.C. 2018) ........................................................... 21, 22, 28, 29

*Roseberry-Andrews v. Dep't of Homeland Sec.,*
299 F. Supp. 3d 9 (D.D.C. 2018) ............................................................................... 13

*Shapiro v. Dep't of Just.,*
40 F.4th 609 (D.C. Cir. 2022) ...................................................................................... 2

*Skinner v. DOJ,*
806 F. Supp. 2d 105 (D.D.C. 2011) ........................................................................... 31

*Tax Analysts v. IRS,*
294 F.3d 71 (D.C. Cir. 2002) ..................................................................................... 20

*Wash. Post Co. v. Special Inspector Gen. for Afghanistan Reconstruction,*
Civ. A. No. 18-2622 (ABJ), 2021 WL 4502106 (D.D.C. Sept. 30, 2021) ................... 26

**Statutes**

5 U.S.C. § 552 .............................................................................................................. 1

5 U.S.C. § 552(b)(5) ..................................................................................................... 8

5 U.S.C. § 552(b)(6) ................................................................................................... 16

5 U.S.C. § 552(b)(7)(C) .............................................................................................. 24

5 U.S.C. § 552(b)(7)(E) .............................................................................................. 26

**Rules**

Fed. R. Civ. P. 26 ....................................................................................................... 13

Fed. R. Civ. P. 56 ......................................................................................................... 1

**Other**

Clark Decl. .................................................................................................................... 4

ICE *Vaughn* ........................................................................................................... passim

Munita Decl. ................................................................................................................. 7

Pineiro Decl. ......................................................................................................... passim

USCIS Ex. 13 - *Vaughn* ..................................................................................... 12, 15, 30

USCIS Ex. 14 - *Vaughn* ............................................................................. 23, 26, 33, 36

## INTRODUCTION

This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. The

National Press Club Journalism Institute and Kathy Kiely ("Plaintiffs") submitted the following

request to U.S. Immigration and Customs Enforcement ("ICE"):

1.     All records, including but not limited to emails, memos, text messages, and other communications, since January 1, 2017, that mention Emilio Gutierrez-Soto (aka Emilio Gutierrez Soto) or his son, Oscar Gutierrez-Soto (aka Oscar Gutierrez Soto):

2.     All records of ICE facilities and/or personnel in El Paso, Texas, including but not limited to communications (e.g., emails, memos, text messages) and any mechanisms used to limit or block phone calls from detainees at ICE's El Paso facilities, since March 1, 2018, that mention or contain any of the following:

        a.     [redacted]
        b.     [redacted]
        c.     Eduardo Beckett;
        d.     Beckett Law Firm.

*See* FOIA Request, ECF No. 1-1 at 2-3. ICE received the request on June 7, 2018. *See* ICE

Acknowledgement Letter (June 14, 2018), ECF No. 1-2 at 4. After a lengthy procedural history,

which involved referring a portion of the request to U.S. Citizenship and Immigration Services

("USCIS"), ICE and USCIS ("Defendants") now file this Motion for Summary Judgment under

Federal Rule of Civil Procedure ("Rule") 56.

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). A dispute is genuine if a reasonable factfinder could return a verdict for the

nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if

it might affect the outcome of the suit under the governing law. *Id.* Although all inferences are

taken in a light most favorable to the nonmoving party, a party opposing summary judgment may

not rest on allegations or denials from its pleadings but "must set forth specific facts showing that there is a genuine issue[.]" *Id.* at 255-56. In a FOIA case, summary judgment may be granted "on the basis of agency affidavits if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith." *Evans v. Fed. Bureau of Prisons*, 951 F.3d 578, 584 (D.C. Cir. 2020) (citation omitted).

## ARGUMENT

### I.   Defendants Performed Adequate Searches

"To prevail on summary judgment, an 'agency must show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested,' which it can do by submitting '[a] reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched.'" *Shapiro v. Dep't of Just.*, 40 F.4th 609, 612-13 (D.C. Cir. 2022) (citations omitted). "In a FOIA case, a district court is not tasked with uncovering 'whether there might exist any other documents possibly responsive to the request,' but instead, asks only whether 'the search for [the requested] documents was adequate.'" *Id.* at 613 (citation omitted). "[T]he fact that a particular document was not found does not demonstrate the inadequacy of a search." *Boyd v. Dep't of Just.*, 475 F.3d 381, 391 (D.C. Cir. 2007). "There is no requirement that an agency search every record system[,]" only the systems that are "reasonably expected to produce the information requested." *Oglesby v. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990).

#### i.   ICE

Here, ICE performed an adequate search for responsive records. As detailed by the declaration of Fernando Pineiro, it is a multi-step process. First, when ICE receives a FOIA

request, the intake staff evaluates it to determine if it is a proper request. *See* Pineiro Decl. ¶ 12. Generally, this means the request must reasonably describe the records sought and the records must be under the purview of ICE. *Id.* If the requester has failed to reasonably describe the records sought, ICE will contact the requester to try and clarify the request. *Id.* ¶ 13. If ICE does not possess the records sought, but another component of the Department of Homeland Security ("DHS") does, ICE will refer the request to the other component to respond directly to the requester. *Id.*

If a requester submits a proper request, ICE enters it into a database known as FOIAXpress and assigns it a tracking number. *Id.* ¶ 14. ICE will identify which program offices, based on its experience and knowledge of ICE's program offices, if any, are reasonably likely to possess records responsive to the request and task the relevant offices with searches. *Id.* ¶ 16. Once ICE determines the appropriate program offices for a request, it provides a point of contact within each office with a copy of the request and instructs them to conduct a search for responsive records. *Id.*

The point of contact reviews the request, along with any case-specific instructions that may have been provided and based on their experience and knowledge of their program office practices and activities, forwards the request and instructions to the individual employee(s) or component office(s) within the office that they believe are reasonably likely to have responsive records, if any. *Id.* ¶ 17. In conformity with the FOIA office's instructions, the individuals and program offices are directed to conduct searches of their file systems, including both paper files and electronic files, which in their judgment, based on their knowledge of the way they routinely maintain records, would most likely be the places to contain responsive documents. *Id.* Once those searches are completed, the individuals and offices provide any potentially responsive records to the point of contact, who in turn provides the records to the FOIA office. *Id.* The FOIA office then reviews the collected records for responsiveness and the application of appropriate exemptions. *Id.*

For e-mail records of a former ICE employee, the search is accomplished by the Office of the Chief Information Officer upon submission of a Request for Electronic Documentation ("RED"). *See* Clark Decl. ¶ 7. The RED system is where a request for electronic data, such as old emails, is submitted. *Id.* The Office of the Chief Information Officer will use the Symantec Discovery Accelerator tool to perform retrieval of emails from the Enterprise Vault Email Journaling System based on the time frame and custodian names. *Id.*

For text messages, there is no similar archival and journaling system that allows ICE to search ICE-issued iPhones. *Id.* ¶¶ 11-19. ICE must perform a forensic analysis of the specified device to get the messages. *Id.* ICE expects its employees to move relevant text messages to a more appropriate system that meets federal record keeping requirements and DHS Policy Guidance 141-03. *Id.*

After receiving Plaintiffs' FOIA request, ICE determined that Enforcement and Removal Operations ("ERO") would likely have responsive records, if any existed. *See* Pineiro Decl. ¶ 24. ERO submitted the request to its Information Disclosure Unit, which determined that (1) the Field Operations Division, (2) the El Paso Field Office, and (3) ICE Health Services Corp. would likely have responsive records. *Id.* ¶¶ 26-27. The Field Operations Division determined, based on its experience and knowledge of the office's practices and activities, that tasking should be referred to the El Paso Field Office, which exercised operational oversight of Emilio Gutierrez-Soto and his son while they were detained. *Id.* ¶¶ 28-29.

Four individuals from the El Paso Field Office performed searches for potentially responsive records: (1) the Acting Field Office Director, (2) the Deputy Field Office Director, (3) a deportation officer, and (4) a program analyst. *Id.* ¶ 30. The Acting Field Office Director and deportation officer searched their email using the following terms: "Emilio Gutierrez Soto,"

"Emilio Gutierrez-Soto," "Oscar Gutierrez Soto," "Oscar Gutierrez-Soto," "(915) 772-4204," "(915) 772-4215," "Eduardo Beckett," and "Beckett Law Firm." *Id.* ¶ 31. The Acting Field Office Director searched his computer using the same terms. *Id.* The Deputy Field Office Director searched and located records in her Outlook folder titled "Gutierrez-Soto, Emilio & Son." *Id.* ¶ 32. She also searched her email for "Gutierrez Soto" and "Gutierrez-Soto." *Id.* The program analyst searched the Central Index System database and the Enforcement Alien Removal Module ("EARM") case management system. *Id.* ¶ 33. He used the following terms for EARM: "Gutierrez Soto," "Oscar," "Emilio," "***-**4-970,"[1] "*/*/1993," "Mexico," "*/*/1963," and "***-**1-780." *Id.*

Further, ICE Health Services Corp. had a medical records technician/referral coordinator conduct a database search using these terms: "Emilio Gutierrez Soto", "***-**1-780", and "*/*/1963". *Id.* ¶¶ 36-39. She forwarded any potentially responsive records to the FOIA office for review and processing. *Id.* ¶ 39.

Throughout this litigation, ICE repeatedly attempted to confer with Plaintiffs about these searches. For example, on May 1, 2020, in efforts to narrow the issues in dispute, ICE produced a detailed search summary of the searches ICE conducted in response to Plaintiffs' FOIA request. *Id.* ¶ 49. Plaintiffs were dissatisfied. Nonetheless, without conceding any defect with the prior searches, ICE offered to perform supplemental searches to locate additional records. *Id.* ¶ 52. During the month of June 2020, the parties negotiated and agreed to a list of custodians and search terms for supplemental searches pertaining to text messages and e-mails. *Id.* ICE agreed to have

---

[1]     Defendants have substituted the actual numbers used in searches with asterisks throughout this brief to comply with Rule 5.2. Although Emilio and Oscar Gutierrez-Soto did not have social security numbers, Defendants redact herein their alien registration numbers out of an abundance of caution.

31 individuals search their iPhones for text messages from January 1, 2017, to the date of the search, that reference: Emilio Gutierrez-Soto (aka Emilio Gutierrez Soto) or Oscar Gutierrez-Soto (aka Oscar Gutierrez Soto). *Id.* ¶¶ 55-56. Additionally, ICE agreed to have 28 individuals search their emails for the following specific terms:

- Emilio Gutierrez-Soto
- Emilio Gutierrez Soto
- Emilio Gutierrez
- ***-**1-780
- *** **1 780
- Oscar Gutierrez-Soto
- Oscar Gutierrez Soto
- Oscar Gutierrez
- ***-**4-970
- *** **4 970

*Id.* ¶¶ 57-58. Additionally, ICE attempted to confer with Plaintiffs to clarify the second part of their FOIA request about "any mechanisms used to limit or block phone calls." *Id.* ¶ 53. ICE was unable to reasonably ascertain the records Plaintiffs sought in this part of the request and sought clarification from Plaintiffs. *Id.* Plaintiffs proposed ICE provide a sworn declaration about whether mechanisms exist for blocking or limiting phone calls from detainees at the El Paso facilities, but doing so would entail creating a record, which is outside the scope of FOIA, so ICE declined. *Id.* ICE offered to allow Plaintiffs to revise the second part of the request to make it clear what they were requesting within the parameters of the original FOIA request. *Id.* Plaintiffs declined. *Id.*

All told, ICE searched for and processed about 11,803 pages of records. Around 735 pages were re-processed after Plaintiffs submitted proper Privacy Act waivers. ICE identified the components and individuals likely to contain responsive information and tasked them with performing searches. ICE performed successive searches at Plaintiffs' request and tried numerous times to confer with Plaintiffs about clarifying their request. There can be no genuine dispute that ICE has adequately searched for the records responsive to Plaintiffs' request.

ii.     USCIS

Here, USCIS likewise performed an adequate search for responsive records. Like ICE, USCIS follows standard procedures when responding to a FOIA request. *See* Munita Decl. ¶ 5. These procedures involve evaluating the request to make sure that it is a proper one, cataloging it in a system that tracks it and makes sure it is processed properly, reaching out to the requesters to notify them that it received the request and is processing it, identifying the components and individuals likely to have records responsive to the request, tasking those components and individuals with searching for responsive records, and returning the responsive records to the USCIS FOIA office. *Id.*

ICE referred to USCIS the first part of Plaintiffs' request seeking "all records . . . that mention Emilio Gutierrez-Soto . . . or his son, Oscar Gutierrez-Soto" on January 11, 2018, as to Emilio, and on June 14, 2018, as to Oscar. *Id.* ¶¶ 7, 19. For each, staff entered the subject's alien file numbers into the USCIS RAILS alien file ("A-File") tracking database. *Id.* ¶¶ 9-11, 21-23. They also queried the Enterprise Document Management System database, the Person Centric Query System database, and the Electronic Immigration System database for responsive records. *Id.* These searches allowed USCIS to locate all responsive records in paper and electronic format. *Id.* ¶¶ 11, 23. Cynthia Munita attests in her declaration: "All agency files likely to contain responsive records were searched." *Id.* The records were then uploaded to the FIRST processing system, reviewed, and processed pursuant to FOIA and the DHS implementing regulation for FOIA. *Id.* ¶¶ 10-11, 22-24.

There can be no genuine dispute that USCIS performed an adequate search in this case. Cases involving similar records support USCIS's search. *See Bayala v. Dep't of Homeland Sec.*, 264 F. Supp. 3d 165, 172 (D.D.C. 2017) (finding all records located in an asylum applicant's alien file sufficient for a search); *Hussain v. Dep't of Homeland Sec.*, 674 F.Supp.2d 260, 267 (D.D.C.

2009) ("There can be no question that the search terms used to locate plaintiff's A-File were adequate, because USCIS succeeded in locating the A-File; no other responsive documents are in the possession of USCIS.").

## II.   Defendants Applied Redactions Properly

### A.   Exemption 5

Exemption 5 protects "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency[.]" 5 U.S.C. § 552(b)(5). "Put differently, the exemption protects documents that would be privileged in ordinary civil litigation." *Advancement Project v. Dep't of Homeland Sec.*, 549 F. Supp. 3d 128, 136 (D.D.C. 2021).

#### 1.   *Deliberative Process Privilege*

"To fall under the deliberative process privilege, a document must be predecisional and deliberative." *Id.* "A document is predecisional if it was 'prepared in order to assist an agency decisionmaker in arriving at his decision,' rather than to support a decision already made." *Id.* (quoting *Petroleum Info. Corp. v. Dep't of Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992)). "It is deliberative if 'it reflects the give-and-take of the consultative process.'" *Id.* (quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980)). "Together, the two requirements delineate between documents that set out a final agency decision and documents meant to help the agency develop its position by expressing just the author's opinion." *Id.* at 137. To meet the foreseeable harm standard under the deliberative process privilege, the agency explanation must be "focused and concrete" about why disclosure will "in the specific context of the agency action at issue, actually impede" agency deliberations going forward. *Amiri v. Nat'l Sci. Found.*, Civ. A. No. 20-2006 (TNM), 2021 WL 4438910, at *7 (D.D.C. Sept. 28, 2021), *aff'd*, No. 21-5241, 2022 WL 1279740 (D.C. Cir. Apr. 28, 2022).

                i.      ICE

Here, ICE adequately applied the deliberative process privilege. The Pineiro declaration states that ICE determined that the deliberative process privilege applied to numerous internal communications between ERO officers and Public Affairs Officers. *See* Pineiro Decl. ¶ 69. ICE withheld pre-decisional, deliberative internal discussions, deliberations, and recommendations regarding Emilio and Oscar Gutierrez-Soto's detention status in response to congressional inquiries, immigration proceedings, and habeas litigation. *Id.* ¶ 71. The *Vaughn* index further shows information redacted under the deliberative process privilege. For example, the first entry about the deliberative process privilege, on pages 15-16, describes whether "emails between ICE [Public Affairs and Enforcement and Removal Operations] contemplate whether certain information from the Immigration Judge's opinion from an active immigration removal hearing concerning the denial of Mr. Gutierrez's asylum application should be disclosed in an ICE Press Release. The email contains recommendations for agency action[.]" *See, e.g.*, ICE *Vaughn* at 15-16. "The agency contractors, officers and/or employees are making editorial comments, recommendations, or judgments, such as decisions to insert or delete material, and have a vested authority in their job duties and are in the chain of command of the parties involved in making the suggestions." *Id.*

ICE further detailed how "release of the draft material would serve to profoundly chill the decision-making process across ICE because it would discourage the expression of candid opinions and inhibit the free and frank exchange of information and ideas between agency personnel, and also ensure personnel would be less inclined to produce and circulate materials for the consideration and comment of their peers." Pineiro Decl. ¶ 74. "Additionally, since these documents contain proposals for agency action, release of these documents may create confusion regarding what positions have actually been adopted by the agency." *Id.* "Should internal

deliberations between ICE employees and officials be released to the public, this could cause a great likelihood of harassment and annoyance by members of the public." *Id.* "This could hinder ICE employees from conducting their official duties and could disrupt their private lives; could place them in danger as targets of law enforcement investigations and could minimize the ability to effectively conduct future investigations." *Id.*

Case law supports the redactions ICE applied. For example, regarding the deliberative process redactions for what to include in an ICE press release, this Court stated: "Determining how to explain an agency decision in response to inquiries from the press, Congress, or members of the public is itself a privileged deliberative process." *Advancement Project*, 549 F. Supp. 3d at 138. Similarly, here, all redactions in the *Vaughn* index identifying inquiries from Congress have likewise been appropriately redacted. Internal discussions and emails about immigration proceedings and habeas litigation are likewise classic examples of the "the give-and-take of the consultative process" "to assist an agency decisionmaker in arriving at his decision." *Id.* at 136. Plaintiffs and the Court can look at the *Vaughn* index and see that, withholding by withholding, ICE applied the deliberative process privilege properly throughout.

Here, ICE also has suitably "focused and concrete" explanations of reasonably foreseeable harm. For example, throughout the *Vaughn* index, there are examples of inquiries from the press about Oscar and Emilio Guiterrez Soto's case. Personnel at ICE would discuss what should be included in press releases. By knowing that their communications were not going to be shared with the public, the personnel could talk freely about what to include in a press release, delivering a clear, coherent, communication or position from the agency. *See, e.g.*, ICE *Vaughn* at 15-16. It allowed the spokesperson or the ultimate drafter of the press release to ask questions and get accurate information from those who he or she needed to get information from in order to inform

the public. *Id.* If personnel at ICE were not allowed to talk freely about this case because of a fear that their internal communications and deliberations would become public, Plaintiffs—and the public—likely would not have gotten press releases and communications from the agency with as much detail as they did, because agency employees would not have been able freely to discuss the matter. *Id.* That is a foreseeable harm.

In another example, on page 17 of the *Vaughn* index, the Court can see the withholding of an email exchange between a supervisory detention officer and a detention officer about whether Emilio Guitierrez Soto's request for parole should be granted. *See* ICE *Vaughn* at 17. Whether to grant parole involves many considerations, like whether the individual has any evidence of criminal history or previous immigration violations, whether there was any participation in fraud, and evidence of character. Ultimately, the individual learns what the final decision is, but not necessarily all the deliberations along the way. If individuals within an agency were unable to freely discuss such matters, they would not be able to reach an informed decision about the best course of action for an individual's request for parole. A dangerous person could be granted asylum in the United States, or a safe person might be denied parole. The *Vaughn* index shows that there were discussions about Emilio Guitierrez Soto's parole request. *Id.* If ICE had to disclose those conversations here, it would affect how informed future decisions about parole are, because agency employees would feel inhibited from engaging in frank, complete discussions. *Id.* That is a reasonably foreseeable harm. Case law, further, supports foreseeable harm in an asylum application context. *Emuwa v. DHS*, Civ. A. No. 20-1756 (TNM), 2022 WL 1451430, at *3 (D.D.C. May 9, 2022) (finding that DHS provided "robust explanations" about the foreseeable harm of disclosing Assessments to Refer from the asylum process under the deliberative process privilege).

For the foregoing reasons, ICE has successfully invoked the deliberative process privilege.

ii.    USCIS

USCIS applied the deliberative process privilege primarily to parts of "the Credible Fear worksheets that appear on the pages of Plaintiff Emilio Gutierrez Soto's immigration records that are listed in this index entry." USCIS Ex. 13 - *Vaughn* ¶ 4. According to USCIS, "[t]he Credible Fear Findings Section documents the Asylum Officers' analysis and recommendations, on whether the applicant has sufficiently met the credible fear standard for an asylum determination." *Id.* "The Officers' recommendations, as evidenced in these worksheets, are reviewed by Supervisory Asylum staff before USCIS makes a final decision on an applicant's asylum case, as to whether the applicant meets the credible fear standard." *Id.* "The withheld portions of these worksheets contain the Asylum Officers' impressions, opinions, and recommendations to superiors about how the agency should adjudicate and enforce the Immigration and Nationality Act (INA) with respect to the interviewed asylum applicant." *Id.* "The withheld portions are predecisional and deliberative because they evidence the officers' deliberations and recommendations on how USCIS should ultimately enforce the INA with regard to a particular individual asylum applicant." *Id.* The deliberative process privilege thus applies.

Moreover, there is reasonably foreseeable harm that would result from disclosing this type of information. For example, if USCIS were forced to disclose its impressions, opinions, and recommendations of asylum officers about credible fear determinations, in the future they likely would not have as robust internal deliberations about whether a person satisfied the standard. *Id.* The less conversation and discussion that is had, the less informed future decisions about whether someone satisfied the credible fear standard would be. *Id.* This would lead to a decrease in the effectiveness of the asylum system through credible fear screening, because agency employees would not want to have a full and frank discussion. *Id.* Further, as stated in the *Vaughn*, "[r]elease

of the deliberative information in these worksheets interviews to tailor their interviews and applications in such a way as to obtain immigration benefits – asylum – for which they may not be eligible. Insight into how Asylum Officers analyze an applicant's asylum interview and determine whether it meets the INA's requirements would enable individuals to "game" the asylum interview process in future cases in order to obtain asylum would reveal information that individuals can use in future asylum." *Id.* That is reasonably foreseeable harm. As stated before, case law supports this. *Emuwa*, 2022 WL 1451430, at *3 (finding that DHS provided "robust explanations" about the foreseeable harm of disclosing Assessments to Refer from the asylum process under the deliberative process privilege).

Thus, USCIS properly invoked the deliberative process privilege as a withholding basis.

### 2. *Attorney Client Privilege and Work Product Doctrine*

"The attorney-client privilege protects confidential communications between an attorney and his client relating to a legal matter for which the client has sought professional advice." *Roseberry-Andrews v. Dep't of Homeland Sec.*, 299 F. Supp. 3d 9, 26 (D.D.C. 2018) (cleaned up). "In the FOIA context, the agency is the 'client' and the agency's lawyers are the 'attorneys' for the purposes of attorney-client privilege." *Id.* (citing *Judicial Watch, Inc. v. Dep't of Treasury*, 802 F.Supp.2d 185, 200 (D.D.C. 2011)). "To be privileged, a communication must be 'for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding.'" *Id.* (citation and quotation omitted). "The purpose of the privilege is to ensure that a client's confidences are protected, encouraging clients to be honest with their attorneys." *Id.*

The work-product doctrine shields materials "prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." *Jud. Watch, Inc. v. Dep't of Just.*, 432 F.3d 366, 369 (D.C. Cir. 2005) (citing Fed. R. Civ. P. 26(b)(3)).

For privileges other than the deliberative process privilege, such as the attorney client privilege and the work product doctrine, "agencies can more easily meet their foreseeable harm burden when invoking exemptions 'for which the risk of harm through disclosure is more self-evident.'" *Kendrick v. FBI*, Civ. A. No. 20-2900 (TNM), 2022 WL 4534627, at *4 (D.D.C. Sept. 28, 2022) (quoting *Reps. Comm. for Freedom of the Press v. CBP*, 567 F. Supp. 3d 97, 120 (D.D.C. 2021)). "[E]ven without a sufficient explanation from the agency, the 'context and purpose' of withheld information can support a finding of foreseeable harm." *Id.* "[F]ulfilling the terms of other privileges or exemptions goes a long way to meeting the foreseeable harm requirement." *Reps. Comm.*, 567 F. Supp. 3d at 127.

i.   ICE

Here, ICE applied both privileges correctly. It can be seen throughout the *Vaughn* index that Office of the Principal Legal Advisor ("OLPA") attorneys were communicating with others in the agency about these cases, *e.g.*, ICE *Vaughn* at 12: "E-mail communications with corresponding attachments between an ERO personnel (an Assistant Field Operations Director and a Supervisory Deportation Officer) and an OPLA attorney pertaining to the BIA's interim order in Emilio Gutierrez's immigration removal hearing." Such substantive legal communications are protected by the attorney client privilege, and ICE appropriately applied it, as shown throughout the *Vaughn* index. As for the work product doctrine, ICE prevented "disclosure [of] draft court filings" that were "prepared for the purpose of advancing the pending litigation and contain[ ] thoughts, strategy, and analysis." Pineiro Decl. ¶ 70. "Disclosure of these records would inhibit the candid discussion of issues between an attorney and his or her client, relating to a legal matter for which the client has sought professional advice, and would also hinder the ability of the OPLA attorneys to be fully informed about legal issues arising before the immigration courts and federal courts, as well as [would] inhibit their ability to assess any future litigation risks." *Id.* ¶ 78. Where,

as here, these privileges are properly invoked, foreseeable harm is simultaneously established. *Ecological Rts. Found. v. Env't Prot. Agency*, Civ. A. No. 19-980 (BAH), 2021 WL 535725, at *32 (D.D.C. Feb. 13, 2021) ("When invoking the attorney-client privilege, then, an agency likely does not need to reach far beyond the fact of disclosure to show foreseeable harm."), *opinion vacated in part on reconsideration*, 541 F. Supp. 3d 34 (D.D.C. 2021). The same goes for proper invocations of the attorney work product doctrine. *Louise Trauma Ctr. LLC v. DHS*, Civ. A. No. 20-1128 (TNM), 2022 WL 1081097, at *6 (D.D.C. Apr. 11, 2022) ("[T]he 'context and purpose' of attorney work product makes self-evident the harm from its disclosure.").

ii.     USCIS

USCIS likewise applied the work product doctrine appropriately. For example, on page 16 of the USCIS Ex. 13 - *Vaughn* index: "These pages of Plaintiff Emilio Gutierrez Soto's immigration records (69-96) were prepared by an Immigration and Customs Enforcement (ICE) attorney. The records include country conditions information and various media reports relative to Plaintiff's asylum claim and include[ ] notes prepared by the ICE attorney that analyze the country conditions and media reports that had relevance to ICE's determination about the merits of Plaintiff's asylum claim, and indicate[ ] the attorney's thought processes as he/she analyzed Plaintiff's asylum claim. The record was prepared for litigation purposes for use by ICE during removal hearings related to Plaintiff." USCIS Ex. 13 – *Vaughn* at 16. This is exactly what the work product doctrine covers, and USCIS applied the exemption appropriately throughout, as well. And, as shown above, the foreseeable harm requirement is readily satisfied, given the proper invocation of the privilege. *See Louise Trauma Ctr.*, 2022 WL 1081097, at *6 ("[T]he 'context and purpose' of attorney work product makes self-evident the harm from its disclosure.").

B.     Exemption 6

Exemption 6 protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6).[2] "The exemption has been interpreted broadly to protect 'bits of personal information, such as names and addresses.'" *Pinson v. Dep't of Just.*, 313 F. Supp. 3d 88, 110 (D.D.C. 2018) (quoting *Prison Legal News v. Samuels*, 787 F.3d 1142, 1147 (D.C. Cir. 2015)). "The information in the file 'need not be intimate' for the file to satisfy the standard, and the threshold for determining whether information applies to a particular individual is minimal." *Id.* (quotations omitted). "Private information must also implicate a 'significant privacy interest' to trigger protection." *Id.* "This standard, however, 'means less than it might seem,' as a significant interest is 'anything greater than a *de minimis* privacy interest.'" *Id.* "Something, even a modest privacy interest, outweighs nothing every time under the balancing test." *Id.* (cleaned up).

i.     ICE

Here, ICE appropriately redacted information under Exemption 6. According to the Pineiro declaration, ICE redacted "names, initials, signatures, phone numbers, email addresses, and suite numbers of federal law enforcement officers and other government employees that are found in the documents" Pineiro Decl. ¶ 87. ICE also redacted, "[n]ames, phone numbers, and email addresses of non-ICE individuals, such as DOJ attorneys[.]" *Id.* ¶ 90. ICE determined that "federal employees have privacy interests in not becoming targets of harassment by individuals who may

---

[2]     When an agency asserts a redaction under both Exemptions 6 and 7(C), the court typically only analyzes the redactions under Exemption 7(C) because "it provides broader privacy protection than Exemption 6 and thus establishes a lower bar for withholding material.'" *Citizens for Resp. & Ethics in Washington v. Dep't of Just.*, 854 F.3d 675, 681 (D.C. Cir. 2017). Many of the redactions at issue fall under both 6 and 7(C), but to the extent that the Court finds that Exemption 7(C) does not apply, the redactions are still appropriate under Exemption 6.

begrudge them and in remaining free of interference in the performance of their duties by persons

who are currently of interest to law enforcement or who oppose the ICE mission." *Id.* ¶ 88. "Public

identification of these employees could also result in them being subjected to personal requests for

access to law enforcement information or requests for information about ongoing or closed

investigations." *Id.* ¶ 89. Further, "[t]he disclosure of such third-party information could constitute

an unwarranted invasion of personal privacy and similarly subject these individuals to harassment,

and undue public attention." *Id.* ¶ 90.

These concerns are not speculative. A review of current events shows that ICE's assertions

are legitimate. For example, law enforcement officers are often the target of threats or physical

attacks. *See* Meryl Kornfield et al., *Gunman Killed After Trying to Breach FBI Office in Ohio,*

*Authorities          Say*,          Wash.          Post          (Aug.          11,          2022),

https://www.washingtonpost.com/nation/2022/08/11/fbi-building-breach-armed/.          If          employee

email addresses are disclosed, they would be subjected to increased cyber threats. *See* Rachel

Pannett, *FBI Email System Compromised by Hackers Who Sent Fake Cyberattack Alert*, Wash.

Post (Nov. 14, 2021), https://www.washingtonpost.com/nation/2021/11/14/fbi-hack-email-

cyberattack/. Nor should the names and contact information of third parties be released to the

public unless they have provided consent. Many Americans have received phone calls and

phishing emails, supposedly from the IRS, telling them how many thousands of dollars in back

taxes they owe, which must be paid in cryptocurrency. *See* Michelle Singletary, *Don't be Fooled*

*by     Fake     IRS     Calls     or     Emails*,     Wash.     Post     (Jan.     29,     2018),

https://www.washingtonpost.com/news/get-there/wp/2018/01/29/dont-be-fooled-by-fake-irs-

calls-or-emails/.

Case law supports such redactions. There is no public interest in disclosing signatures. *See Pinson*, 313 F. Supp. 3d at 111 ("[T]his Court finds that the public interest in discovering what the government is up to is not served by disclosing the name and signature of the plaintiff in a lawsuit against BOP[.]"). This Court specifically has found that work telephone numbers and email addresses constitute "similar files," and therefore the Court must balance "the privacy and public interests at stake." *Id.* at 112. Like in *Pinson*, where this Court found that BOP employees would suffer "harassment . . . if their direct work contact information [were] divulged," here too, government employees would suffer harassment—at the very least—if their direct work contact information and other information were divulged to the public. *Id.* And although this Court found in *Pinson* that the BOP did not articulate why disclosing the name of a third-party individual would constitute a clearly unwarranted invasion of personal privacy, *id.* at 112-13, here, not just names but other information like "phone numbers and email addresses of non-ICE individuals" have been withheld, as well. Pineiro Decl. ¶ 90. These individuals have a privacy interest in being free from "harassment, and undue public attention." *Id.*

The foreseeable harm of disclosing this information is readily shown. As stated earlier, "context and purpose" of withheld information can establish foreseeable harm, and "agencies can more easily meet their foreseeable harm burden when invoking exemptions 'for which the risk of harm through disclosure is more self-evident.'" *Kendrick*, 2022 WL 4534627, at *4. Fulfilling the terms of Exemption 6 "goes a long way to meeting the foreseeable harm requirement." *Id.* at *6. Here, withholding the names and contact information of individuals to protect them from unwanted contact and harassment is necessary to avoid the same foreseeable harm that Exemption 6 was designed to prevent. *See Louise Trauma Ctr.*, 2022 WL 1081097, at *7 (disclosing names of

USCIS trainers who teach asylum officers would subject them to harassment and would constitute

a foreseeable harm under Exemption 6).

For the foregoing reasons, ICE appropriately applied redactions under Exemption 6.

        ii.     USCIS

USCIS also appropriately redacted information under Exemption 6. Rather than repeat the

arguments above, counsel incorporates them here for efficiency, as the USCIS records involve

similar information. USCIS likewise redacted the names and contact information of government

employees, which are appropriately redacted under Exemption 6. *Pinson*, 313 F. Supp. 3d at 110.

Third party information has been appropriately redacted as well, such as, for example, the name

and vital statistics on an individual's voter registration card or passport. USCIS Ex. 13 – *Vaughn*

¶ 5. In another example, the "name, place of employment, address, telephone number and email

address" of an interpreter who translated Emilio Gutierrez Soto's asylum application adjudication

was redacted. *Id.* ¶ 3. If the interpreter's name and contact information were disclosed, others could

unwelcomely try to contact the interpreter about Gutierrez Soto's case, under the supposition that

the interpreter has extra information. *Cf. Bayala*, 264 F. Supp. 3d at 177-78 (finding an interpreter's

home address and driver's license exempt). There is no countervailing public benefit to disclosing

the information redacted. And as above, fulfilling the terms of Exemption 6 "goes a long way to

meeting the foreseeable harm requirement." *Kendrick*, 2022 WL 4534627, at *6; *see also Louise*

*Trauma Ctr.*, 2022 WL 1081097, at *7 (disclosing names of USCIS trainers who teach asylum

officers would subject them to harassment and be a foreseeable harm under Exemption 6).

In sum, USCIS correctly applied Exemption 6.

C.     <u>Exemption 7 - Law Enforcement Threshold</u>

"An agency whose 'principal function is law enforcement' is entitled to deference when it

claims that records were compiled for law enforcement purposes." *Advancement Project*, 549 F.

Supp. 3d at 143. To make the threshold showing, an agency "must establish that (1) a withheld record's creation was related to the enforcement of federal laws or to the maintenance of national security and (2) the nexus between the record's creation and the agency's law enforcement duties is based on information sufficient to support at least a colorable claim of its rationality." *Id.* (citations omitted; internal quotation marks omitted). "Notably, a record may be compiled for law enforcement purposes even if it relates to guidelines, techniques, and procedures for law enforcement investigations and prosecutions outside of the context of a specific investigation." *Id.* (cleaned up) (quoting *Tax Analysts v. IRS*, 294 F.3d 71, 78 (D.C. Cir. 2002)).

Further, "an agency need not show that a document from which information is redacted under Exemption 7 was itself compiled for a law enforcement purpose." *New Orleans Workers' Ctr. for Racial Just. v. USCIS*, 373 F. Supp. 3d 16, 64 (D.D.C. 2019). "Exemption 7 applies to 'records *or information* compiled for law enforcement purposes,' and an agency may properly redact information from 'records [that] were not themselves compiled for law enforcement purposes' so long as the 'information [itself] was compiled for law enforcement purposes[.]'" *Id.* (citations omitted; emphasis in original).

i.    ICE

Here, the Pineiro declaration establishes that the Secretary of Homeland Security is "charged with the administration and enforcement of laws relating to the immigration and naturalization of aliens" under the Immigration and Nationality Act, codified under Title 8 of the U.S. Code. Pineiro Decl. ¶ 80. "ICE is the largest investigative arm of DHS and the second largest investigative agency in the federal government." *Id.* "ICE is responsible, among other duties, for identifying and eliminating vulnerabilities within the nation's borders." *Id.* "Created in 2003 through a merger of the investigative and interior enforcement elements of the U.S. Customs Service and the Immigration and Naturalization Service, ICE now has more than 20,000 employees

and offices in all 50 states and 48 foreign countries." *Id.* "ICE is responsible for enforcing the nation's immigration laws and identifying and eliminating vulnerabilities within the nation's borders."

More specifically, in this case, the main program office tasked with searching for records was Enforcement and Removal Operations. "The ICE ERO directorate oversees programs and conducts operations to identify and apprehend removable aliens, to detain these individuals when necessary, and to remove illegal aliens from the United States." *Id.* ¶ 81. "Within ICE, ERO has broad authority and prioritizes the apprehension, arrest, and removal of convicted criminals." *Id.* "ERO manages all logistical aspects of the removal process, including domestic transportation, detention, alternatives to detention programs, bond management, and supervised release." *Id.* These are textbook examples of law enforcement.

A review of the *Vaughn* index shows that the information redacted under Exemption 7 was compiled for law enforcement purposes. For example, the first entry of the *Vaughn* index mentions the ENFORCE Alien Removal Module ("EARM"). *See* ICE *Vaughn* at 1. Specifically, the entry pertains to records and screen shots from EARM about Emilio and Oscar Gutierrez-Soto, the subjects of Plaintiffs' FOIA request. *Id.* As detailed in *Rojas-Vega v. USCIS*, the declaration of the Acting Deputy FOIA Officer of USCIS stated at the time:

> EARM is a web-based application that supports ICE's processing and removal of aliens from the United States. EARM includes personal identifiers, photographs, and details of removal case proceedings to aid ERO in carrying out the removal of aliens from the United States, in accordance with the law. Through EARM, ERO accesses records related to the investigation, arrest, booking, detention, and removal of persons encountered during immigration and criminal law enforcement investigations and operations conducted by ICE, U.S. Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS), the three agencies within DHS immigration enforcement responsibilities.

*Rojas-Vega v. USCIS*, 302 F. Supp. 3d 300, 307 (D.D.C. 2018). From looking at the Pineiro declaration, the first entry of the *Vaughn* index, and the records themselves, Plaintiffs can see that,

for instance, the information redacted under Exemption 7 in the first entry was compiled for law enforcement purposes. The same is true throughout the *Vaughn* index for the other records, and the Pineiro declaration similarly supports ICE's Exemption 7 redactions throughout.

In *Rojas-Vega*, for example, the Court found that ICE met the threshold of showing that the withheld information was compiled for law enforcement purposes by submitting a declaration like the one ICE submitted in this case. *Rojas-Vega*, 302 F. Supp. 3d at 309 ("The declarant explains that ICE 'is the largest investigative arm of DHS . . . tasked with preventing . . . activities . . . threaten[ing] national security and public safety by investigating the people, money, and materials . . . support[ing] illegal enterprises.' . . . ICE meets its threshold requirement by demonstrating that the responsive records were compiled for law enforcement purposes."). Here, it is worth noting that Plaintiffs' entire FOIA request centers around the detainment and removal proceedings of two individuals. As this Court stated in *Advancement Project*, "[t]he connection between ICE's law enforcement duties and records created to manage its efforts to detain and remove noncitizens is self-evident." *Advancement Project*, 549 F. Supp. 3d at 144. And to the extent that there is any uncertainty, ICE is entitled to deference because its central mission is to enforce immigration law. *Id.* ("ICE's central mission is to enforce immigration law, so its claims about the purpose of withheld records deserve deference.").

ii.   USCIS

USCIS likewise has made the threshold showing that any information withheld under Exemption 7 was compiled for a law enforcement purpose. For example, when looking at the *Vaughn* index for Oscar Gutierrez Soto—Ex. 14—USCIS states on the first page: "USCIS is a law enforcement agency, its immigration benefits adjudications and their associated records are involved with the enforcement of a statute, Immigration and Nationality Act (INA), 8 U.S.C. § 1101 et seq., and USCIS' immigration adjudication records are compiled for the law

enforcement purpose of enforcing the INA." *See* USCIS Ex. 14 – *Vaughn* at 1. The second entry pertains to screen-prints from the "TECS law enforcement database." *Id.* at 2. At the bottom of the page, USCIS explains that "TECS . . . is a federal law enforcement computer-based system owned and operated by the Department of Homeland Security (DHS), Customs and Border Protection (CBP) component. Through the TECS database, law enforcement users are able to input, access, and/or maintain law enforcement, inspection, intelligence-gathering, and operational records." *Id.* USCIS then provides a website explaining the system to the public: https://www.dhs.gov/publication/dhscbppia-021-tecs-system-platform. *Id.* This readily shows that the information was compiled for a law enforcement purpose.

Interestingly, here, the records at issue are identical to those in *Rojas-Vega v. USCIS*, 132 F. Supp. 3d 11, 18-19 (D.D.C. 2015), *aff'd*, 650 F. App'x 36 (D.C. Cir. 2016). As stated in the Munita declaration, many of the records at issue pertain to the A-Files of Emilio and Oscar Gutierrez-Soto, and as stated in *Rojas-Vega*:

> All of the records deemed responsive to plaintiff's FOIA request were located in his A-File, that is, "the official government record" of plaintiff's "pass[age] through the U.S. immigration and inspection process." "Although USCIS is the official custodian of all A-Files," the files "are shared with [ICE] and U.S. Customs and Border Protection, all of which create and contribute documents to A-Files."
>
> . . . .
>
> As have others, *see, e.g.*, *Gosen v. [USCIS]*, 75 F.Supp.3d 279, 288 (D.D.C.2014) (recognizing records concerning the enforcement of a statute or regulation within USCIS's authority, whether for adjudication or enforcement, as law enforcement records for purposes of Exemption 7), this Court concludes that the responsive records, all of which are maintained in plaintiff's A-File, were compiled for law enforcement purposes.

*Rojas-Vega*, 132 F. Supp. 3d at 18-19. USCIS similarly has shown that the information redacted under Exemption 7 was compiled for law enforcement purposes. And to the extent that the Court is uncertain, USCIS is entitled to deference. *See Advancement Project*, 549 F. Supp. 3d at 144.

D.   Exemption 7(C)

Exemption 7(C) protects "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy[.]" 5 U.S.C. § 552(b)(7)(C). "A court first determines if there is a privacy interest in the information to be disclosed, and then balances the individual's privacy interest against the public interest, considering only the public interest that focuses on the citizen's right to be informed about what their government is up to[.]" *Parker v. USCIS*, 238 F. Supp. 3d 89, 99 (D.D.C. 2017) (citations and internal quotation marks omitted). "It is a FOIA requester's obligation to articulate a public interest sufficient to outweigh an individual's privacy interest, and the public interest must be significant." *Id.* (citing *NARA v. Favish*, 541 U.S. 157, 172 (2004)).

i.   ICE

Here, ICE performed this balancing test for all redactions under Exemption 7(C). *See* Pineiro Decl. ¶ 86. ICE redacted "names, initials, signatures, phone numbers, email addresses, and suite numbers of federal law enforcement officers and other government employees that are found in the documents" *Id.* ¶ 87. ICE also redacted, "[n]ames, phone numbers, and email addresses of non-ICE individuals, such as DOJ attorneys[.]" *Id.* ¶ 90. ICE determined that "federal employees have privacy interests in not becoming targets of harassment by individuals who may begrudge them and in remaining free of interference in the performance of their duties by persons who are currently of interest to law enforcement or who oppose the ICE mission." *Id.* ¶ 88. "Public identification of these employees could also result in them being subjected to personal requests for access to law enforcement information or requests for information about ongoing or closed investigations." *Id.* ¶ 89. Further, "[t]he disclosure of such third-party information could constitute

24

an unwarranted invasion of personal privacy and similarly subject these individuals to harassment, and undue public attention." *Id.* ¶ 90.

Case law supports these redactions. "It is well settled that law enforcement personnel and government employees have a substantial interest in anonymity." *Anand v. Dep't of Health & Hum. Servs.*, Civ. A. No. 21-1635 (CKK), 2023 WL 2646815, at *22 (D.D.C. Mar. 27, 2023). This is to protect them from harassment or embarrassment as well as undue public attention. *Id.* The targets of investigations and others appearing in law enforcement files have similar interests. As stated in *Pinson*:

> Courts have "long recognized" that a "mention of an individual's name in a law enforcement file will engender comment and speculation and carries a stigmatizing connotation." For those reasons, an agency may withhold the identities of targets of a law enforcement investigation, witnesses, informants, and law enforcement officers under Exemption 7(C). In fact, the D.C. Circuit has adopted "a categorical rule permitting an agency to withhold information identifying private citizens mentioned in law enforcement records, unless disclosure is 'necessary in order to confirm or refute compelling evidence that the agency is engaged in illegal activity.'" The D.C. Circuit has extended this protection to the names of agency employees for similar, if not identical, reasons.

*Pinson v. Dep't of Just.*, 245 F. Supp. 3d 225, 250-51 (D.D.C. 2017) (citations omitted).

These determinations are readily apparent throughout the *Vaughn* index, as well. For example, ICE routinely justified not disclosing information about agents, officers, and other third parties because of "(1) conceivably subjecting law enforcement personnel to harassment and annoyance in conducting their official duties and in their private lives; (2) potentially placing them in danger as targets of law enforcement investigations may begrudge personnel for an indefinite time period and seek revenge; and (3) possibly minimizing their ability to effectively conduct future investigations." *See, e.g.*, ICE *Vaughn* at 1. "And courts in this district have held that 'when invoking Exemption 7(C), an agency need not establish much more than the fact of disclosure to

establish foreseeable harm.'" *Wash. Post Co. v. Special Inspector Gen. for Afghanistan Reconstruction*, Civ. A. No. 18-2622 (ABJ), 2021 WL 4502106, at *22 (D.D.C. Sept. 30, 2021).

For the reasons above, ICE properly withheld information under Exemption 7(C).

ii.   USCIS

As shown in the *Vaughn* index, USCIS likewise properly has redacted information under Exemption 7(C). Rather than repeat the arguments above for ICE, counsel incorporates them here for USCIS, as the USCIS records involve similar information. USCIS redacted "the identities, including names and badge numbers, of the CBP officers" appearing on documents. *See, e.g.*, USCIS Ex. 14 – *Vaughn* ¶ 6. "It is well settled that law enforcement personnel and government employees have a substantial interest in anonymity." *Anand*, 2023 WL 2646815, at *22. USCIS also redacted "names and other PII of third-party individuals appearing in" documents. *See, e.g.*, USCIS Ex. 13 – *Vaughn* ¶ 10. "[T]he identification of a third party individual such as a witness 'in a law enforcement file will engender comment and speculation and carries a stigmatizing connotation,'" and is therefore properly withheld. *Anand*, 2023 WL 2646815, at *22. By simply establishing that the agency has met the requirements of the exemption, furthermore, it has shown foreseeable harm under 7(C). *Wash. Post Co.*, 2021 WL 4502106, at *22.

In sum, USCIS properly withheld information under Exemption 7(C).

E.   Exemption 7(E)

Exemption 7(E) protects "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law[.]" 5 U.S.C. § 552(b)(7)(E). "The D.C. Circuit has 'set[ ] a relatively low bar for the agency to justify

withholding.'" *Pinson*, 313 F. Supp. 3d at 117 (quoting *Blackwell v. FBI*, 646 F.3d 37, 42 (D.C. Cir. 2011)). "Such information may be withheld 'not just for circumvention of the law, but for a risk of circumvention; not just for an actual or certain risk of circumvention, but for an expected risk; not just for an undeniably or universally expected risk, but for a reasonably expected risk; and not just for certitude of a reasonably expected risk, but for the chance of a reasonably expected risk.'" *Id.* (quoting *Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1193 (D.C. Cir. 2009)). "Moreover, the first clause of Exemption 7(E) affords categorical protection for techniques and procedures used in law enforcement investigations or prosecutions, whereas the second clause separately protects guidelines for law enforcement investigations or prosecutions if their disclosure could reasonably be expected to risk circumvention of the law." *Id.* (cleaned up) "Furthermore, the government 'must show that the records contain law-enforcement techniques and procedures that are generally unknown to the public." *Id.* (cleaned up). And like the other exemptions, "[t]he proper assertion of 7(E) goes a long way to show the risk of foreseeable harm from disclosure." *Kendrick*, 2022 WL 4534627, at *10.

           i.     ICE

ICE properly withheld information under Exemption 7(E). The Pineiro declaration states that ICE withheld "case numbers, Person Identification numbers, Subject Identification numbers, names of investigatory operations, event numbers, URLs, and names of law enforcement databases queried." Pineiro Decl. ¶ 94. The *Vaughn* index details that ICE applied Exemption 7(E) to "case numbers, names of investigatory operations, the FBI number, Event numbers, and names of law enforcement databases queried and URLs[.]" *See, e.g.*, ICE *Vaughn* at 1. This information, if disclosed, would reveal law enforcement techniques, procedures, or guidelines, and case law supports this position.

In *Rojas-Vega*, ICE withheld "internal URLs, case numbers, case categories, subject identification numbers, case identification numbers, and internal identifying codes and departure statuses." *Rojas-Vega*, 302 F. Supp. 3d at 310. There, like here, the declarant stated, "[t]he manner by which ICE employees label cases, access databases, and maintain information regarding a case 'is both a law enforcement technique and procedure that is not commonly known to the public[.]" *Id.* at 311. The Court found that Exemption 7(E) applied. In *Ortiz v. Dep't of Just.*, ICE withheld "external system identification numbers, and other law enforcement agency database case numbers, or identifiers, means of access to intra-agency databases to include case file numbers, event numbers, internal codes, computer function commands, identification numbers, and other law enforcement codes and numeric references[.]" *Ortiz v. Dep't of Just.*, 67 F. Supp. 3d 109, 123 (D.D.C. 2014). The Court likewise found that Exemption 7(E) applied. *Id.*

In *Parker*, ICE withheld "sensitive database and event codes, identification numbers, law enforcement system URLs, internal website links, record identification numbers, event numbers, category codes, TECS codes, method codes, file numbers, . . . status codes, internal agency codes, case numbers, program codes, and system codes[,]" and this Court found that the information fell under Exemption 7(E). *Parker*, 238 F. Supp. 3d at 100. Notably, the *Parker* declarant was the same declarant as the one in this case: Fernando Pineiro. In sum, the information withheld by ICE in this case pursuant to Exemption 7(E) would reveal law enforcement techniques, procedures, or guidelines if disclosed.

ICE has successfully shown, further, that disclosure of its withheld information under Exemption 7(E) could disclose risk circumvention of the law. "This information, used for the purpose of indexing, storing, locating, and retrieving law enforcement sensitive information is not commonly known and could also be used to decipher the meaning of codes, navigate within the

law enforcement system, and compromise the integrity of the data by allowing for the deletion or alteration of information." Pineiro Decl. ¶ 95. "This potential to circumvent detection and manipulate law enforcement sensitive information could place law enforcement officers and the public at risk." *Id.* "In addition, disclosure of this information would allow third-parties or bad actors a blueprint of what law enforcement officers use to take enforcement steps." *Id.* "In addition, release of this information could reveal techniques and/or procedures for law enforcement investigations or prosecutions and/or disclose guidelines for law enforcement investigations or prosecutions." *Id.*

In *Parker*, this Court found that statements similar to the ones above, by the same declarant, were sufficient to show a risk of the circumvention of law. *Parker*, 238 F. Supp. 3d at 100. There, like here, Pineiro stated that disclosure "'could be used by persons seeking improper access to law enforcement data' to navigate law enforcement databases and possibly even 'breach into sensitive law enforcement systems' and manipulate data." *Id.* "The Court agree[d] that disclosing this information could reasonably be expected to create a risk of circumvention by revealing how ICE's databases work and rendering them more vulnerable to manipulation." *Id.*; *see also Rojas-Vega*, 302 F. Supp. 3d at 311 (finding statement from declarant that disclosure "could assist unauthorized parties in deciphering the meaning of the codes and numbers, gaining improper access to law enforcement databases, and [could] assist in the unauthorized party's navigation of the law enforcement database" sufficient for Exemption 7(E)).

ICE applied Exemption 7(E) correctly, and, moreover, having shown that Exemption 7(E) properly applies, it is likewise true that the agency reasonably foresees harm that would follow from release of this information. In *Kendrick*, for example, the Court found that database information, information collection and analysis, and internal web addresses, among other things,

were properly withheld based on the foreseeable harm if disclosed. *See Kendrick*, 2022 WL 4534627, at *9. As indicated above, ICE withheld the same types of information here. *See* Pineiro Decl. ¶ 94 ("ICE withheld "case numbers, Person Identification numbers, Subject Identification numbers, names of investigatory operations, event numbers, URLs, and names of law enforcement databases queried."). Thus, ICE has shown foreseeable harm. *Kendrick*, 2022 WL 4534627, at *10 ("The proper assertion of 7(E) goes a long way to show the risk of foreseeable harm from disclosure.").

ii.   USCIS

USCIS also applied redactions under Exemption 7(E). USCIS applied redactions under Exemption 7(E) to five groups of documents: (1) TECS records, (2) records from a non-federal entity database containing law enforcement information on individuals, (3) the US-VISIT Arrival Departure Information System, (4) the Customs and Border Protection NNSV Database, and (5) screen-prints of FBI identification record queries. All were applied properly.

a.   TECS

"TECS is a federal law enforcement computer-based system owned and operated by the Department of Homeland Security (DHS), Customs and Border Protection (CBP) component." USCIS Ex. 13 - *Vaughn* ¶ 10. "Through the TECS database, law enforcement users are able to input, access, and/or maintain law enforcement, inspection, intelligence-gathering, and operational records." *Id.*

"Disclosure of TECS codes and law enforcement information and remarks concerning Plaintiff and related petitioners and other individuals appearing in Plaintiff's immigration records, would reveal law enforcement techniques and procedures, and enable individuals to circumvent the law." *Id.* "Access to information in TECS by unauthorized individuals would enable them to ascertain law enforcement information about them and use that information to tailor their

applications, petitions, and immigration interviews, in such a manner as to avoid law enforcement scrutiny and obtain immigration benefits, including admission to the United States, that they may not be eligible for." *Id.* "Such activities, enabled by information they would gain from TECS disclosures, would pose a national security risk, it would frustrate and impede law enforcement investigations, and impair the government's ability to properly grant immigration benefits pursuant to applicable U.S. immigration law and otherwise enforce U.S. immigration law." *Id.* "For these reasons the information redacted from the TECS database screen-prints that are compiled into Plaintiff's immigration records in this case is appropriately exempt from FOIA disclosure pursuant to Exemption 7(E)." *Id.*

Case law supports redaction of information from TECS under Exemption 7(E). *See Mezerhane de Schnapp v. USCIS*, 67 F. Supp. 3d 95, 101 (D.D.C. 2014) (finding that TECS database records and printouts are law enforcement techniques, procedures, and guidelines for law enforcement and thus are exempt from disclosure pursuant to Exemption 7(E); upholding USCIS's Exemption 7(E) redactions of TECS database screen-prints (citing with approval *Skinner v. DOJ*, 806 F. Supp. 2d 105, 116 (D.D.C. 2011))).

> b.   Records from a Non-Federal Entity Database Containing Law Enforcement Information on Individuals

Records from a non-federal entity database containing law enforcement information on individuals was also redacted under Exemption 7(E). "Federal law enforcement officers contacted this non-federal entity to request copies of the entity's database records that record vital statistics and criminal history of individuals." *Id.* ¶ 13. "Officers needed this information in order to properly vet and adjudicate immigration applications and petitions submitted on behalf of Plaintiff, in order to confirm and verify information submitted by these individuals with their applications that were

submitted to USCIS." *Id.* "Records from the same database appear on ppl. 40-43 and 131-138 of Plaintiff Emilio Gutierrez Soto's immigration records." *Id.*

"The information sought, the database queries conducted, and the entity that provided them to federal law enforcement, are all techniques and procedures for law enforcement investigations that are exempt from disclosure pursuant to Exemption 7(E)." *Id.* "Disclosure of this information to Plaintiff and other unauthorized individuals would give them insight into certain federal law enforcement techniques and procedures, including law enforcement sources and information derived from those sources, thus enabling Plaintiff and others the ability to tailor their interactions with and submissions to USCIS and other agencies and avoid detection of disqualifying information, thereby obtaining govt. benefits, including immigration benefits, for which they may not be eligible, and thus circumvent the law and frustrate and impede law enforcement investigations." *Id.* Therefore the information on these pages is exempt from disclosure pursuant to Exemption 7(E).

c.      US-VISIT Arrival Departure Information System

"DHS established the U.S. Visitor and Immigrant Status Indicator Technology (US-VISIT) computer database to collect, maintain, and share data on selected foreign nationals entering and exiting the United States at air, sea, and land ports of entry (POEs)." *Id.* ¶ 21. "These data, including biometric identifiers like digital fingerprints, are to be used to screen persons against watch lists, verify visitors' identities, and record arrival and departure." *Id.*

"Exemption 7(E) was applied to partially redact these US-VISIT database records to withhold US-VISIT database query results, officer comments/observations, and the US-VISIT system URL." *Id.* "The US-VISIT database is utilized by immigration officers, including CBP officers, to screen foreign nationals entering and exiting the United States. US-VISIT was queried by law enforcement officers and records generated from those queries were compiled into Plaintiff

Emilio Gutierrez Soto's immigration records." *Id.* "US-VISIT records in the form of screen-prints from the database, appear on various pages of Plaintiff's immigration records, collated here by page number." *Id.* "Information stored in US-VISIT allows officers to review law enforcement intelligence on individuals and make determinations whether the individuals can enter the United States." *Id.* "Officer comments/observations are entered into USVISIT as well." *Id.* "This information was redacted from the records produced to Plaintiff in this case." *Id.*

"FOIA disclosure of this sensitive law enforcement information contained in US-VISIT to Plaintiff or others would disclose law enforcement techniques and procedures utilized during law enforcement investigations, thus it is exempt from disclosure pursuant to Exemption 7(E)." *Id.* "Access to this information, including the URL of the US-VISIT system, would enable individuals to circumvent the law, conceal or alter information about themselves in order to illicitly obtain immigration benefits, including admission, breach the US-VISIT system, illicitly obtain law enforcement intelligence, and thus pose a national security risk." *Id.* Accordingly, this information was properly withheld under Exemption 7(E).

        d.      Customs and Border Protection (CBP) NNSV Database

"USBP (Border Patrol) agents are required to perform record checks during intake and processing of encountered individuals." USCIS Ex. 14 – *Vaughn* ¶ 5. "The NNSV microservice provides users with a single interface for retrieving National Crime Information Center (NCIC) data, such as criminal history, vehicle crossing data, and wants and warrants data." *Id.* "In addition, it enables users to retrieve National Law Enforcement Telecommunication System (NLETS) data, such as driver's license data, driver history, and U.S. state warrants and warrant data. USBP agents have access to NCIC and Nlets to see the query/retrieve the results. CBP uses any derogatory

information found during these queries to determine how to process the encountered individual, as well as to populate appropriate forms related to the individual." *Id.*

"NNSV query screen-prints appear on these pages and law enforcement sensitive information is withheld from the screen-prints pursuant to Exemptions 7(C) and 7(E)." *Id.* "CBP officers may query the NNSV database when they encounter individuals who are not U.S. citizens or lawful permanent residents, as was done in this case when CBP officers encountered Plaintiffs." *Id.* "Information stored in NNSV is utilized to help CBP officers determine the identity of encountered individuals, such as Plaintiffs in this instance, and to determine whether the individuals pose a national security risk, whether there are any warrants or criminal detainers on the encountered individuals, to verify background information on encountered individuals, and review any law enforcement intelligence information pertaining to the encountered individuals." *Id.* "Use of the NNSV law enforcement database and its storehouse of law enforcement and intelligence information relevant to immigration adjudications and investigations is a law enforcement technique and procedure utilized in law enforcement investigations, which are conducted routinely during immigration enforcement encounters, immigration benefits adjudications, and related immigration proceedings." *Id.*

"NNSV database queries were conducted on Plaintiffs by CBP officers in this case and they compiled the NNSV query results, which reveal sensitive law enforcement information, remarks, instructions to officers, intelligence, law enforcement sources, and database codes, into Plaintiffs' immigration records." *Id.* "NNSV queries and screen-prints, and the respective NNSV query results, are collated here by page number, denoting where the NNSV screen-print appears in Plaintiffs' immigration records, as produced to Plaintiffs." *Id.*

"Exemption 7(E) affords protection to law enforcement information that would disclose techniques and procedures for law enforcement investigations or prosecutions, and disclosure of the above-described law enforcement information and remarks concerning individuals listed would reveal law enforcement techniques and procedures; its disclosure would enable individuals to circumvent the law and impede enforcement of U.S immigration and criminal laws." *Id.* Thus, this information was properly withheld under Exemption 7(E).

 e. Screen-Prints of FBI Identification Record Queries

"Exemption 7(E) was applied to partially redact these FBI Identification Record database screen-print records to withhold the specific database query results depicted and described in these records." *Id.* ¶ 6. "Exemption 7(E) affords protection to law enforcement information that 'would disclose techniques and procedures for law enforcement investigations or prosecutions.'" *Id.*

"The FBI Identity Record or History, aka 'rap sheet' lists information taken from fingerprint submissions kept by the FBI and related to arrest history of individuals compiled in the FBI Identity Record computerized database" *Id.*

"Disclosure of the law enforcement information, such as the database query results, and law enforcement remarks concerning Plaintiff and other individuals appearing in Plaintiffs' immigration records, such as individuals who submitted I-864 affidavits of support, as listed in the FBI identification Record database screen-prints, would reveal law enforcement techniques and procedures, and access to such sensitive law enforcement information would enable individuals to circumvent the law and frustrate and impede enforcement of U.S. criminal laws as well as U.S. immigration laws." *Id.* Thus, this information, too, was properly withheld per Exemption 7(E).

 f. Foreseeable Harm

USCIS likewise satisfies the foreseeable harm requirement for all these withholdings. As stated in *Kendrick*, "The proper assertion of 7(E) goes a long way to show the risk of foreseeable

harm from disclosure." *Kendrick*, 2022 WL 4534627, at *10. In *Kendrick*, the Court found that database information, information collection and analysis, and internal web addresses, among other things, were properly withheld based on the foreseeable harm that would result if they were disclosed. *Id.* Here, the TECS system, non-federal database, US-VISIT Arrival Departure Information System, NNSV Database, and screen-prints of FBI identification record queries are like the database, information collection and analysis, and other information the disclosure of which the *Kendrick* Court found would lead to foreseeable harmed if disclosed. So too here.

## III.    Defendants Reasonably Segregated All Nonexempt Information

When an agency demonstrates that a record is exempt, it is "entitled to a presumption that [it] complied with the obligation to disclose reasonably segregable material." *Perioperative Servs. & Logistics, LLC v. Dep't of Veterans Affs.*, 57 F.4th 1061, 1068-69 (D.C. Cir. 2023) (citation omitted). Here, both ICE and USCIS attest to having performed a line-by-line review and released all non-exempt information, which is sufficient. *See* Pineiro Decl. ¶¶ 96-98; USCIS Ex. 13 – *Vaughn*; USCIS Ex. 14 – *Vaughn*. *See also Porup v. CIA*, 997 F.3d 1224, 1239 (D.C. Cir. 2021) (finding the agency carried its burden of demonstrating it released all segregable portions of documents through a declaration attesting that the agency "conducted a page-by-page and line-by-line review, and released all reasonably segregable, non-exempt information" and the agency "determined that no additional information may be released without divulging information that . . . falls within the scope of one or more FOIA exemptions."

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' Motion for Summary Judgment.

Date:   May 3, 2023

Respectfully submitted,

MATTHEW M. GRAVES, D.C. Bar #481052
United States Attorney

BRIAN P. HUDAK
Chief, Civil Division

By:   */s/ Sam Escher*
    SAM ESCHER, D.C. Bar #1655538
    Assistant United States Attorney
    601 D Street N.W.
    Washington, D.C. 20530
    (202) 252-2531
    Sam.Escher@usdoj.gov

*Counsel for United States of America*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL PRESS CLUB JOURNALISM INSTITUTE, et al., | |
| Plaintiffs, | |
| v. | Civil Action No. 18-2932 (RC) |
| U.S. IMMIGRATION AND CUSTOM ENFORCEMENT, et al., | |
| Defendants. | |

**[PROPOSED] ORDER**

UPON CONSIDERATION of Defendants' motion for summary judgment, and the entire

record herein, it is hereby

ORDERED that Defendants' motion is GRANTED; and it is further

ORDERED that summary judgment be entered for Defendants.


SO ORDERED:




_____          _____
Date                                         RUDOLPH CONTRERAS
                                             United States District Judge