UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL PRESS CLUB JOURNALISM INSTITUTE, et al., | |
| Plaintiffs, | |
| v. | Civil Action No. 18-2932 (RC) |
| U.S. IMMIGRATION AND CUSTOM ENFORCEMENT, et al., | |
| Defendants. | |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY
JUDGMENT AND OPPOSITION TO PLAINTIFFS'
CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION........................................................................................................... 1

I.    ICE is Entitled to Summary Judgment as to Its Search for Text Messages and as
      to the Portion of Plaintiffs' Request for "Mechanisms Used to Limit or Block
      Phone Calls".......................................................................................................... 1

      A.    ICE is Entitled to Summary Judgment for Its Search for Text Messages ..............1

      B.    The Part of Plaintiffs' FOIA Request Seeking Mechanisms Used to Limit
            or Block Phone Calls Is Not Reasonably Described.................................................5

II.   Plaintiffs Misunderstand the Purpose of a Declaration and a *Vaughn* Index, and
      Fail to Credit the Presumption of Good Faith Afforded a Declaration ........................... 12

III.  Defendants Have Properly Applied Redactions Under the Deliberative Process
      Privilege, the Attorney Client Privilege, and Exemptions 6 and 7(C).............................. 20

      A.    Deliberative Process Privilege ...............................................................................20

      B.    Attorney Client Privilege ......................................................................................25

      C.    Exemptions 6 and 7(C) .........................................................................................29

            1.    Law Enforcement Threshold....................................................................... 30

            2.    Balancing the Interests................................................................................. 31

IV.   The Government Has Shown That Its Withholdings Under the Deliberative
      Process Privilege Would Cause Foreseeable Harm if Disclosed...................................... 38

V.    Summary Judgment Should Be Granted to the Government for the Records
      Inadvertently Released but Clawed Back ...................................................................... 42

CONCLUSION ............................................................................................................. 44

## TABLE OF AUTHORITIES

**CASES**

*Advancement Project v. Dep't of Homeland Sec.*,
549 F. Supp. 3d 128 (D.D.C. 2021) ................................................................ passim

*Afshar v. Dep't of State*,
702 F.2d 1125 (D.C. Cir. 1983) .......................................................... 36

*Am. Ctr. for L. & Just. v. Dep't of Homeland Sec.*,
573 F. Supp. 3d 78 (D.D.C. 2021) ............................................ 5, 6, 8, 18

*Anand v. Dep't of Health & Hum. Servs.*,
Civ. A. No. 21-1635 (CKK), 2023 WL 2646815 (D.D.C. Mar. 27, 2023).................................. 32

*Boyd v. Dep't of Just.*,
475 F.3d 381 (D.C. Cir. 2007) .......................................................... 1, 5

*Brody v. Dep't of Just.*,
Civ. A. No. 22-5043, 2023 WL 1511679 (D.C. Cir. Feb. 3, 2023) ................................ 8

*Callaway v. Dep't of Treasury*,
824 F. Supp. 2d 153 (D.D.C. 2011) .......................................................... 38

*Cancino Castellar v. Mayorkas*,
Civ. A. No. 17-0491 (BAS) (AHG), 2021 WL 3678440 (S.D. Cal. Aug. 19, 2021) ................... 4

*Cato Inst. v. Dep't of Def.*,
Civ. A. No. 21-1223 (JEB), 2023 WL 3231445 (D.D.C. May 3, 2023)........................ 6, 8, 11, 12

*Cause of Action Inst. v. Dep't of Just.*,
330 F. Supp. 3d 336 (D.D.C. 2018) .......................................................... 28

*Coastal States Gas Corp. v. Dep't of Energy*,
617 F.2d 854 (D.C. Cir. 1980) .......................................................... 21

*Competitive Enter. Inst. v. Dep't of State*,
Civ. A. No. 17-2032 (APM), 2022 WL 4547959 (D.D.C. Aug. 10, 2022) ................................ 23

*Competitive Enter. Inst. v. EPA*,
12 F. Supp. 3d 100 (D.D.C. 2014) .......................................................... 15

*Competitive Enter. Inst. v. EPA*,
232 F. Supp. 3d 172 (D.D.C. 2017) .......................................................... 25

*CREW v. Dep't of Just.*,
58 F.4th 1255 (D.C. Cir. 2023) .......................................................... 36, 38

*CREW v. Dep't of Just.*,
854 F.3d 675 (D.C. Cir. 2017) ......................................................................... 30

*Ctr. for Immigr. Stud. v. USCIS*,
628 F. Supp. 3d 266 (D.D.C. 2022) ................................................................... 6

*Daily Caller v. Dep't of State*,
152 F. Supp. 3d 1 (D.D.C. 2015) ................................................................ 19, 43

*Dale v. IRS*,
238 F. Supp. 2d 99 (D.D.C. 2002) ..................................................................... 6

*Delaney, Migdail & Young, Chartered v. IRS*,
826 F.2d 124 (D.C. Cir. 1987) ......................................................................... 15

*Dillon v. Department of Justice*,
444 F. Supp. 3d 67 (D.D.C. 2020) ................................................................... 33

*Eddington v. Dep't of Def.*,
35 F.4th 833 (D.C. Cir. 2022) .......................................................................... 19

*Elec. Priv. Info. Ctr. v. Dep't of Just.*,
18 F.4th 712 (D.C. Cir. 2021) .......................................................................... 34

*Emuwa v. Dep't of Homeland Sec.*,
Civ. A. No. 20-1756 (TNM), 2022 WL 1451430 (D.D.C. May 9, 2022) ............................. 39, 40

*Fish & Wildlife Serv. v. Sierra Club, Inc.*,
141 S. Ct. 777 (2021) ........................................................................ 20, 21, 23

*Gallant v. NLRB*,
26 F.3d 168 (D.C. Cir. 1994) ........................................................................... 17

*Howard v. United States*,
435 F. Supp. 3d 198 (D.D.C. 2020) ................................................................... 17

*Isiwele v. Dep't of Health & Human Servs.*,
85 F. Supp. 3d 337 (D.D.C. 2015) ................................................................... 32

*Jud. Watch, Inc. v. FDA*,
449 F.3d 141 (D.C. Cir. 2006) ............................................................... 14, 15, 16

*Keys v. Dep't of Just.*,
830 F.2d 337 (D.C. Cir. 1987) .................................................................... 13, 15

*Khatchadourian v. Def. Intel. Agency*,
453 F. Supp. 3d 54 (D.D.C. 2020) ................................................................... 14

*Leopold v. ICE*,
560 F. Supp. 3d 189 (D.D.C. 2021) .................................................................... 9, 10

*Morley v. CIA*,
508 F.3d 1108 (D.C. Cir. 2007) ................................................................. 14, 16, 17

*NARA v. Favish*,
541 U.S. 157 (2004) ........................................................................................ 29, 34

*Oglesby v. Dep't of Army*,
920 F.2d 57 (D.C. Cir. 1990) .................................................................................. 1

*Parker v. ICE*,
238 F. Supp. 3d 89 (D.D.C. 2017) ........................................................................ 29

*Parker v. ICE*,
289 F. Supp. 3d 32 (D.D.C. 2017) .......................................................................... 4

*Peay v. Dep't of Just.*,
Civ. A. No. 04-1859 (CKK), 2006 WL 1805616 (D.D.C. June 29, 2006) .................. 37

*Petroleum Info. Corp. v. Dep't of Interior*,
976 F.2d 1429 (D.C. Cir. 1992) ............................................................................ 21

*Petrucelli v. Dep't of Just.*,
153 F. Supp. 3d 355 (D.D.C. 2016) ....................................................................... 32

*Pinson v. Dep't of Just.*,
313 F. Supp. 3d 88 (D.D.C. 2018) ........................................................................ 29

*Pinson v. Dep't of Just.*,
61 F. Supp. 3d 164 (D.D.C. 2015) ................................................................... 17, 31

*Prison Legal News v. Samuels*,
787 F.3d 1142 (D.C. Cir. 2015) ............................................................................ 29

*Reps. Comm. for Freedom of Press v. FBI*,
Civ. A. No. 17-1701 (RC), 2022 WL 13840088 (D.D.C. Oct. 21, 2022) .................... 37

*Reps. Comm. for Freedom of the Press v. FBI*,
3 F.4th 350 (D.C. Cir. 2021) ......................................................................... passim

*Rojas-Vega v. ICE*,
302 F. Supp. 3d 300 (D.D.C. 2018) ...................................................................... 18

*Rojas-Vega v. USCIS*,
132 F. Supp. 3d 11 (D.D.C. 2015) ........................................................................ 24

*Roseberry-Andrews v. Dep't of Homeland Sec.*,
299 F. Supp. 3d 9 (D.D.C. 2018) ................................................................. 30

*SafeCard Servs., Inc. v. SEC*,
926 F.2d 1197 (D.C. Cir. 1991) ........................................................ 19, 20, 33

*Shapiro v. Dep't of Just.*,
40 F.4th 609 (D.C. Cir. 2022) .................................................................. 1, 4

*Spataro v. Dep't of Just.*,
279 F. Supp. 3d 191 (D.D.C. 2017) ............................................................ 14

*Truitt v. Dep't of State*,
897 F.2d 540 (D.C. Cir. 1990) .................................................................... 5

*Wilson v. FCC*,
Civ. A. No. 21-0895 (RMM), 2022 WL 4245485 (D.D.C. Sept. 15, 2022) ................................ 43

*Wolf v. CIA*,
473 F.3d 370 (D.C. Cir. 2007) .................................................................. 38

*Yeager v. DEA*,
678 F.2d 315 (D.C. Cir. 1982) ............................................................... 5, 10

**STATUTES**

5 U.S.C. § 552 .......................................................................... 5, 8, 29

**RULES**

Fed. R. Civ. P. 56 ......................................................................... 1

Fed. R. Evid. 201 .......................................................................... 4

**REGULATIONS**

6 C.F.R. § 5.3 ............................................................................. 6

## INTRODUCTION

U.S. Immigration and Customs Enforcement ("ICE") and U.S. Citizenship and Immigration Services ("USCIS") (collectively, "Defendants") respectfully submit this reply in support of their motion for summary judgment and opposition to National Press Club Journalism Institute and Kathy Kiely's ("Plaintiffs'") cross motion for partial summary judgment under Federal Rule of Civil Procedure ("Rule") 56.

**I.      ICE is Entitled to Summary Judgment as to Its Search for Text Messages and as to the Portion of Plaintiffs' Request for "Mechanisms Used to Limit or Block Phone Calls"**

**A.      ICE is Entitled to Summary Judgment for Its Search for Text Messages**

"To prevail on summary judgment, an 'agency must show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested,' which it can do by submitting '[a] reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched.'" *Shapiro v. Dep't of Just.*, 40 F.4th 609, 612-13 (D.C. Cir. 2022) (citations omitted). "In a FOIA case, a district court is not tasked with uncovering 'whether there might exist any other documents possibly responsive to the request,' but instead, asks only whether 'the search for [the requested] documents was adequate.'" *Id.* at 613 (citation omitted). "[T]he fact that a particular document was not found does not demonstrate the inadequacy of a search." *Boyd v. Dep't of Just.*, 475 F.3d 381, 391 (D.C. Cir. 2007). "There is no requirement that an agency search every record system[,]" only the systems that are "reasonably expected to produce the information requested." *Oglesby v. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990).

Plaintiffs advance two arguments regarding ICE's search for text messages. First, Plaintiffs contend that ICE has not adequately explained its methodology for searching for text messages.

*See* Pls.' Cross Mot. at 20-23, ECF No. 54. Second, Plaintiffs contend that ICE failed to show that its employees, in fact, searched for text messages. *Id.* at 19-20. Both arguments fail.

Regarding the methodology for searching for text messages, the declarations of Richard Clark and Fernando Pineiro explain the methodology in detail, and, to the extent that there is any confusion, the supplemental declaration of Pineiro clarifies that confusion. Starting with the declaration of Richard Clark, before May 1, 2023, "the only means through which ICE could access an employee's text messages was with the cooperation of the employee or through a forensic analysis of the specific device." Clark Decl. ¶ 12, ECF No. 52-3; *see also* Pineiro Decl. ¶ 21 ("[T]he search is accomplished by the custodian of the i-phone[.]"), ECF No. 52-2. Because of that constraint, "ICE discourages employees from utilizing text messages to create records." Clark Dep. ¶ 14. "Given the overarching policy that discourages the creation of records via text message, coupled with instructions on how to appropriately preserve them should they coincidentally be created, federal records would only exist on employee phones for a brief and transitory amount of time." *Id.* ¶ 16. "Additionally, during the timeframe in question, to prevent the possibility of a data breach resulting from residual information which may have temporarily resided upon a mobile phone, it was standard practice at ICE to factory reset/securely wipe/destroy and delete all contents of mobile phone devices as they were being taken out of service." *Id.* ¶ 17.

That said, "[d]uring the month of June 2020, the parties negotiated and agreed to a list of custodians and search terms for supplemental searches pertaining to text messages and e-mails." Pineiro Decl. ¶ 52; *see also* Suppl. Pineiro Decl. ¶ 5. "Plaintiffs identified 14 individuals by name[1]

---

[1]     Of the fourteen individuals Plaintiffs identified by name to conduct searches, four were no longer ICE employees and searches of their returned and wiped government issued iPhones was not feasible. *See* Suppl. Pineiro Decl. ¶ 8. The former ICE employees included: Ronald Vitiello, Thomas Homan, an Enforcement and Removal Operations ("Removal Operations") officer and an

to conduct searches of their government issued iPhones for text messages concerning Emilio Gutierrez and Oscar Gutierrez." Suppl. Pineiro Decl. ¶ 7. "In addition, Plaintiff requested ICE task the ICE's Congressional Liaison Office and Assistant Health Service Administrator who work for ICE Health Services Corps ("Health Corps") at the El Paso Processing center to search their government issued iPhones for potentially responsive text messages." Pineiro Decl. ¶ 55. Based on Plaintiff's request, ICE identified and tasked twelve individuals in the Congressional Liaison Office and three Health Corps officials to perform the two types of searches.[2] *Id.*

All tasked custodians were instructed "to perform a manual review of their government issued iPhone for text messages from January 1, 2017 for the terms: 'Emilio Gutierrez-Soto' 'Emilio Gutierrez Soto' 'Oscar Gutierrez-Soto' and 'Oscar Gutierrez Soto' and complete a standard form documenting and certifying their search for responsive records." Suppl. Pineiro Decl. ¶ 10; *see also* Pineiro Decl. ¶ 56. "Any responsive text messages were to be screen shot and forwarded to the ICE FOIA office for processing and release to the Plaintiffs." Suppl. Pineiro Decl. ¶ 10; *see also* Pineiro Decl. ¶ 56.

The details above adequately demonstrate the methodology for searching for text messages. Plaintiffs assert that ICE has not identified who was "tasked" with conducting a search of each iPhone, but that ignores that the declarations specifically state that the custodian of each iPhone was tasked with performing a search of their own government-issued iPhone. *See* Pineiro

---

immigration trial attorney in ICE's Office of the Principal Legal Advisor ("Legal Advisor"). *Id.* The remaining ten individuals whom Plaintiffs identified by name were Removal Operations officers and Legal Advisor attorneys. *Id.*

[2]     Plaintiffs indicate in their cross motion and opposition that they are not contesting the search for text messages of the Congressional Liaison(s) and Health Services Corps' Assistant Health Service Administrator. *See* Pls.' Cross Mot. at 22 n.11. ICE nonetheless provides this information for background to show the comprehensiveness of its searches.

Decl. ¶ 21, 56; Suppl. Pinerio Decl. ¶ 7; Clark Dep. ¶ 12. It does not appear that Plaintiffs are confused as to who those custodians were; they listed them in their cross motion and opposition brief, and they are also listed in a June 15, 2020, email that Plaintiffs attached to their filing.[3] *See* Pls.' Cross Mot. at 21; *see also* Email from Adam Marshall (June 15, 2020), ECF No. 53-4 at 98. Plaintiffs question what repositories were searched and how they were searched. It is obvious that, to search for text messages on an iPhone, the user opens the messages app and types in the search terms in the search bar at the top of the app.[4] *See* Suppl. Pineiro Decl. ¶ 7. Here, the custodians were instructed to search for "Emilio Gutierrez-Soto," "Emilio Gutierrez Soto," "Oscar Gutierrez-Soto," and "Oscar Gutierrez Soto." Pineiro Decl. ¶ 56; Suppl. Pineiro Decl. ¶ 10. This methodology for searching for text messages on an iPhone was both "reasonably expected to produce the information requested," *see Shapiro*, 40 F.4th at 612, and clearly stated in the declarations. *Cf. Parker v. ICE*, 289 F. Supp. 3d 32, 39-40 (D.D.C. 2017) (finding it adequate for an ICE agent to search his own Microsoft Outlook email account).

Plaintiffs further argue that ICE has not demonstrated that the listed custodians performed a search of their government issued iPhones. While it can be easily inferred from the original Pineiro declaration that the custodians performed a search of their government issued iPhones and discovered no records, to the extent that any confusion could remain, the supplemental Pineiro

---

[3]     Although Plaintiffs have published the names of the custodians, ICE declines to identify them by name here. *See Cancino Castellar v. Mayorkas*, Civ. A. No. 17-0491 (BAS) (AHG), 2021 WL 3678440, at *4 (S.D. Cal. Aug. 19, 2021) (in redacting the names of law enforcement officers from a public docket, finding specific prejudice and harm).

[4]     The Court can also take judicial notice of how to perform a search for text messages on an iPhone. *See* Fed. R. Evid. 201. Here is a link to the Apple website, should Plaintiffs argue that the manner of searching iPhone text messages is subject to reasonable dispute: https://support.apple.com/en-us/HT213747 ("1. In Messages, open your list of conversations. 2. Swipe down to reveal the search field. 3. Enter what you want to find and tap search.").

declaration clarifies that confusion. The custodians were instructed to "complete a standard form documenting and certifying their search for responsive records." Suppl. Pineiro Decl. ¶ 10. "The custodian was instructed that if he/she located potentially responsive text messages, they were to provide a screen shot of the text message(s) to the ICE FOIA office for processing." Pineiro Decl. ¶ 56; *see also* Suppl. Pineiro Decl. ¶ 10. Pineiro reviewed the search forms, which showed that all 25 individuals searched their government issued iPhones using at least the four terms provided. Suppl. Pineiro Decl. ¶ 11. From reviewing the search forms and having not received any screen shots of text messages, Pineiro determined that "no responsive text messages were located from these searches." Suppl. Pineiro Decl. ¶ 11.

Although Plaintiffs may be disappointed or surprised that no responsive text messages were found, "the fact that a particular document was not found does not demonstrate the inadequacy of a search." *Boyd v. Dep't of Just.*, 475 F.3d 381, 391 (D.C. Cir. 2007). Indeed, the fact that no such texts were located is intuitive, as that confirms that ICE employees in fact were avoiding using texting to conduct their jobs, just as ICE has instructed. *See* Clark Decl. ¶¶ 14-17. For the foregoing reasons, ICE is entitled to summary judgment on its search for text messages.

## B.    The Part of Plaintiffs' FOIA Request Seeking Mechanisms Used to Limit or Block Phone Calls Is Not Reasonably Described

A request must reasonably describe the records sought. 5 U.S.C. § 552(a)(3)(A). A request "reasonably describes" agency records when it "would be sufficient to enable a professional employee of the agency who was familiar with the subject area of the request to locate the record with a reasonable amount of effort." *Am. Ctr. for L. & Just. v. Dep't of Homeland Sec.*, 573 F. Supp. 3d 78, 81 (D.D.C. 2021) (quoting *Truitt v. Dep't of State*, 897 F.2d 540, 545 n.36 (D.C. Cir. 1990) (cleaned up). "The linchpin inquiry is whether the agency is able to determine precisely what records are being requested." *Yeager v. DEA*, 678 F.2d 315, 326 (D.C. Cir. 1982) (cleaned

up). "A request that vaguely describes the requested documents does not suffice." *Ctr. for Immigr. Stud. v. USCIS*, 628 F. Supp. 3d 266, 271 (D.D.C. 2022). And "[b]road, sweeping requests lacking specificity are not sufficient." *Dale v. IRS*, 238 F. Supp. 2d 99, 104 (D.D.C. 2002).

Under DHS regulations, "[i]f after receiving a request, a component determines that it does not reasonably describe the records sought, the component should inform the requester what additional information is needed or why the request is otherwise insufficient." 6 C.F.R. § 5.3(b). Further, "[i]f a request does not adequately describe the records sought, DHS may at its discretion either administratively close the request or seek additional information from the requester." 6 C.F.R. § 5.3(c).

In this District, some courts treat the failure to notify a requester of an unreasonably described request as nearly dispositive on summary judgment, while others treat it as merely a factor in the analysis of whether the request was reasonably described. *See Cato Inst. v. Dep't of Def.*, Civ. A. No. 21-1223 (JEB), 2023 WL 3231445, at *5 (D.D.C. May 3, 2023) ("Courts in this district, moreover, sometimes consider an agency's violation of its own notice requirement as merely a factor in the summary-judgment analysis, while others treat it as nearly dispositive."); *see also Am. Ctr. for L. & Just.*, 573 F. Supp. 3d at 88 ("A request by the Government to narrow the scope of a FOIA request might be 'permissible.' It might even be preferable. But nothing in FOIA requires such an action." (citation omitted)).

Here, Plaintiffs argue that ICE is not entitled to summary judgment on the part of their request seeking "any mechanisms used to limit or block phone calls[.]" Plaintiffs repeatedly assert that their request was clear, that the government knew that it was clear, and that the government failed to demonstrate that it adequately searched pursuant to their allegedly clear request. Plaintiffs

argue that emails between the parties further show that ICE understood the request. Plaintiffs

misapprehend the record. ICE directs the Court to this passage from an email on June 24, 2020:

> In terms of item 4 of the request, ICE has advised that it has no responsive records
> based on its understanding of that request. As previously stated in a prior email,
> that request is not drafted clearly. ICE has stated its understanding of that request
> to the best it can discern what you are requesting, and you have not asserted that
> ICE's understanding [is] incorrect. Based on its understanding of the request, ICE
> has conducted what it considers to be a reasonable search. If you would like to
> revise item 4 of the request to make it clearer as to what specific documents you
> are seeking (for instance, are you seeking production of any written policies that
> may exist at ICE facilities in El Paso that address the issue of detainee phone calls?),
> ICE would be willing to consider such a revised request provided it falls within the
> parameters of the existing scope of item 4.

*See* Email of June 24, 2020, ECF No. 53-4, at 101.

The joint status reports filed with the Court further show that for months, despite conferring

about the issue, the parties did not agree on the meaning of that part of the request. *See* Jt. Status

Reps. (June 26, 2020 - Mar. 2, 2021), ECF Nos. 25 to 32 ("The parties are still conferring on the

issue raised by Plaintiffs with respect to ICE's search for records responsive to the second prong

of their request."). Ultimately, they reached an impasse and could not resolve the meaning of "any

mechanisms used to limit or block phone calls." Jt. Status Rep. of May 5, 2021, ECF No. 33 ("As

to the other issues about which the parties had been conferring as referenced in paragraph 6 of the

last status report, the parties have not been able to reach resolution of those issues.").

Further, although Plaintiffs allege that the email record shows that ICE understood their

request, the Court can look at the record itself and see otherwise. The record is rife with questions

from the government seeking clarification and statements showing the government did not

comprehend the request. *See* Email of June 24, 2020, ECF No. 53-4, at 101; Email of June 4, 2020,

ECF No. 53-4, at 96 ("If there is some specific mechanism that you believe exists, and you can

provide a name or description of it, please let me know and ICE can then try to formulate a

supplemental search using that information."); Email of May 14, 2020, ECF No. 53-4, at 93 ("If you intended to convey something else in this request, please advise.").

Frustratingly, when ICE told Plaintiffs that the request was not clear, they responded in essence that it was the agency that needed to figure out what Plaintiffs sought, not Plaintiffs who needed to submit a reasonably described request, as "the D.C. Circuit does 'not require technical precision in FOIA requests[.]'" Email from Adam Marshall (June 15, 2020), ECF No. 53-4 at 98.

But that is not the law, and the law is clear: the burden falls on Plaintiffs to reasonably describe their request. *See* 5 U.S.C. § 552(a)(3)(A); *see also Brody v. Dep't of Just.*, Civ. A. No. 22-5043, 2023 WL 1511679, at *1 (D.C. Cir. Feb. 3, 2023) ("FOIA places the burden of submitting a reasonably drafted request on the requester. . . . [The plaintiff], not the agency, should have used 'common sense' when drafting the request, or redrafted it when the agency advised him of its overbreadth. He did not."). Here, the part of Plaintiffs' request about "any mechanisms used to limit or block phone calls" was not reasonably described, and the Agency had no duty to search for records in response to it but attempted to do so anyway.

Critically, Plaintiffs' repeated insistence that this part of their request is clear does little to clarify what could constitute "any mechanisms used to limit or block phone calls." According to Merriam-Webster, a "mechanism" is either "a piece of machinery" or "a process, technique, or system for achieving a result." *See* Mechanism, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/mechanism (last visited July 5, 2023). Therefore, Plaintiffs seemed to be seeking documents about "a piece of machinery" or "a process, technique, or system for" limiting or blocking phone calls. *Cf. Cato Inst.*, 2023 WL 3231445, at *3 (looking up "pursuant to" in the Merriam-Webster Dictionary); *Am. Ctr. for L. & Just.*, 573 F. Supp. 3d at 86

(citing definitions of "representative" and "official" in Black's Law Dictionary); *Leopold v. ICE*, 560 F. Supp. 3d 189, 200 (D.D.C. 2021) (citing definition of "action" in Black's Law Dictionary).

With that guidance, Plaintiffs could be seeking anything. For example, phones may contain software on them that allows a user to limit or block a call. Are Plaintiffs asking for records about software to block calls to the numbers, person, or firm listed in their request? Some phones, like landlines, can have a blocker attached to them to limit or block calls. Are Plaintiffs asking for records about hardware attached to the phones at the facility that could limit or block calls to the numbers, person, or firm listed? If Plaintiffs are not requesting records about technology, as prior government counsel alluded to in his email to Plaintiffs on June 24, 2020, a written policy about phone calls could be responsive. For example, if there is a written policy limiting phone calls to fifteen minutes, or forbidding phone calls after 9:00 p.m., would that be responsive to Plaintiffs' request if it limited or blocked phone calls to the numbers, person, or firm in the request? Cost, further, can be an impediment to making phone calls. *See* Katrina vanden Heuvel, *The Staggeringly High Price of a Prison Phone Call*, Wash. Post (Nov. 30, 2021), https://www.washingtonpost.com/opinions/2021/11/30/staggeringly-high-price-prison-phone-call/. Do Plaintiffs want financial records for the facility? What about maintenance records? A broken phone limits or blocks a person's ability to make a phone call.

Frustratingly, a record need not even mention phones to be responsive to Plaintiffs' request as Plaintiffs now interpret it. Imagine a policy mandating detainees have breakfast between 8:00 a.m. and 10:00 a.m. That policy would mention nothing about phone calls. But if detainees are required to have breakfast between 8:00 a.m. and 10:00 a.m., that would prevent them from being able to make a phone call during that time. A record with no reference or mention of a phone call, therefore, could still be responsive to "any mechanisms used to limit or block phone calls."

"Mechanisms," as used in this context, is so vague to be susceptible to too many interpretations and meanings to have allowed the Agency "to determine precisely what records are being requested." *Yeager*, 678 F.2d at 326. The Agency was left trying to guess—as the email records show—what, exactly, Plaintiffs wanted. Plaintiffs' request, therefore, was not reasonably described, and the Agency had no duty to search, but they did.

Plaintiffs' request is comparable to the request in *Leopold*, 560 F. Supp. 3d at 198-202, where the Court concluded that "immigrant enforcement actions" was too vague to be reasonably described. The description— "immigrant enforcement actions"—would not enable an employee reviewing photographs, audio recordings, or video footage to be able to determine, precisely, whether what they were reviewing was responsive to the request. *Id.* The Court was left asking more questions, much like the government has just described above. *See id.* at 200 ("Does the term include footage of an ICE official walking down the hall to deliver formal papers to migrant, to transport a group of migrants to a bus that effectuates their removal, or to bring a migrant to a hearing on a pending asylum application? Does the word 'action' connote any form of interaction between an ICE employee and a migrant?"). Without more, neither the agency nor the Court could determine, precisely, what the plaintiff wanted, as ICE could not do here for "any mechanisms used to limit or block phone calls."

Plaintiffs will undoubtedly argue that the government has waived this argument. They will cite to email correspondence, as they already have, and argue that the government knew what Plaintiffs were requesting (which the government disputes). But such arguments fail. Such waiver arguments are routinely raised by plaintiffs in this District and are just as routinely rejected.

For example, in *Leopold*, the plaintiffs argued that ICE waived any argument that the request did not reasonably describe the records sought by "failing to raise it at the administrative

stage, or in its Answer, or otherwise raising it until after the parties spent over a year negotiating over the scope of a reasonable search." *Id.* at 200. But the Court noted how ICE consistently maintained that it was not obligated to respond to an unreasonably described request and how the plaintiffs were unable to point to any authority holding that a FOIA defendant must present, before summary judgment, its legal theories for failing to respond to a request. *Id.* at 200-01. Here, as in *Leopold*, the government consistently inquired with Plaintiffs about the unclear part of their FOIA request, as the emails and joint status reports show for months. Plaintiffs cannot claim surprise.

Further, Plaintiffs' assertions that "ICE's counsel (1) made clear that ICE knew what records Plaintiffs sought, and (2) claimed that ICE did not have any responsive records" misses the mark on the relevant inquiry for whether a request is reasonably described under FOIA. In *Leopold*, the plaintiffs insisted that ICE's vagueness arguments should fail because the agency did not offer "any evidence or supporting statements of fact showing that ICE did not understand the request." Here, Plaintiffs are falsely asserting the opposite, in that they contend that ICE did understand what Plaintiffs were requesting. But as the Court said in *Leopold*:

> This argument fails because it misapprehends the nature of the vagueness test as set out in *Krohn* and *Irons*: The relevant question is not whether, as a factual matter, agency officials are confused about the meaning of the request. Instead, courts analyze vagueness by focusing on the *language* of the FOIA request and ask whether the *description* is so broad that it would stymie a reasonable agency official attempting to identify responsive records.

*Id.* at 201 (citations omitted). Plaintiffs and the government disagree about the record, but regardless of who said what when, the only thing clear about Plaintiffs' request for "any mechanisms used to limit or block phone calls" is that it is unclear and not reasonably described.

By way of further example, in *Cato Institute v. Department of Defense*, Civ. A. No. 21-1223 (JEB), 2023 WL 3231445 (D.D.C. May 3, 2023), after the defendants moved for summary judgment because the plaintiff's request was not reasonably described, the plaintiff argued that the

defendants' argument was "inconsistent with their pre-litigation position," that "neither [of two military branches] said anything to suggest that [the request] was unclear," and a third branch already "offered to process the request if [the plaintiff] narrowed it[.]" *Cato Inst.*, 2023 WL 3231445, at *5. After noting that the plaintiff failed to clarify what the consequence would be, the Court ultimately found that all three branches informed the plaintiff one way or another that the request was unreasonably described. *Id.* Specifically, the Court said:

> This offer to "begin processing" a reinterpreted, narrowed-down request, however, does not constitute a concession that [the plaintiff's] request was otherwise reasonably described. . . . The offer at most represents a good-faith effort to guess at what records could be responsive to [the plaintiff's] unintelligible request—a project no agency need undertake. If every agency that attempted to clarify a request thereby "obligate[d]" itself to fulfilling it, that "nothing-or-all approach" would give agencies "a strong incentive to . . . refuse to make any effort to provide what they reasonably can."

*Cato Inst.*, 2023 WL 3231445, at *6. If the offer to "begin processing" a reinterpreted, narrowed-down request in *Casto Institute* was not a waiver, then none of the statements made here by prior government counsel about having performed a reasonable search and finding no responsive documents support waiver. Rather, they are "good-faith effort[s] to guess at what records could be responsive to [Plaintiff's] unintelligible request—a project no agency need undertake." *Id.*

In any event, as the email record shows, ICE has performed a good faith search for responsive records. If a request is unintelligible, as this part of Plaintiffs' request was, and Plaintiffs take the view that an Agency needs somehow to read the requester's mind to discern what the requester really wants because "the D.C. Circuit does not require technical precision," then the Agency need not respond. ICE is entitled to summary judgment on this part of the request.

## II.   Plaintiffs Misunderstand the Purpose of a Declaration and a *Vaughn* Index, and <u>Fail to Credit the Presumption of Good Faith Afforded a Declaration</u>

Plaintiffs state throughout their brief that the Agency's declarations and *Vaughn* index are vague, conclusionary, generic, and deficient. They complain about how the Agency uses the same

language several times, and they are not able to understand the redactions. Plaintiffs misunderstand the purpose of a declaration and a *Vaughn* index, and fail to accord the presumption of good faith that is afforded to a declaration.

A declaration and a *Vaughn* index, along with the released portions of the records themselves, are meant to be used in tandem—not just individually—to justify redactions. A declaration, for example, may explain more generally the qualifications of the declarant, the personal knowledge of the declarant, the redactions applied, and the rationale for those declarations. The *Vaughn* index may contain descriptions and explanations about specific redactions tailored to specific documents and withholdings. And the released portions of the documents themselves provide further context about an agency's withholding decisions. Together, they inform the Court and requesters of the rationale for an agency's decisions.

The D.C. Circuit repeatedly has explained this concept. For example:

> Seizing on the distinction between these two approaches, Judicial Watch asserts that the FDA claimed exemptions only in sweeping and conclusory generalities. We disagree. The FDA explained itself through *commonalities*, not *generalities*. Unsurprisingly, among thousands of withheld documents, certain topics and exemptions arose on multiple occasions. The index tied each individual document to one or more exemptions, and the . . . declaration linked the substance of each exemption to the documents' common elements. No rule of law precludes the FDA from treating common documents commonly. The FDA's index/affidavit combination does not resemble the general assertions of privilege that we have rejected in the past.

> And we do not fault the FDA for using the language of the statute as part of its explanation for withholding documents. As long as it links the statutory language to the withheld documents, the agency may even "parrot" the language of the statute. *Landmark Legal Found. v. IRS*, 267 F.3d 1132, 1138 (D.C. Cir. 2001). There are only so many ways the FDA could have claimed Exemptions 4, 5, and 6 for the thousands of documents generated during mifepristone's approval. *See id.* ("It is not the agency's fault that thousands of documents belonged in the same category, thus leading to exhaustive repetition."). Again, our focus is on the functions served by the *Vaughn* index: to organize the withheld documents in a way that facilitates litigant challenges and court review of the agency's withholdings. *See Keys v. Dep't of Just.*, 830 F.2d 337, 349 (D.C. Cir. 1987). The FDA's decision to tie each document to one or more claimed exemptions in its index and then

summarize the commonalities of the documents in a supporting affidavit is a legitimate way of serving those functions.

*Jud. Watch, Inc. v. FDA*, 449 F.3d 141, 147-48 (D.C. Cir. 2006) (emphases in original) (cleaned up). The D.C. Circuit similarly held:

> The . . . *Vaughn* index contains many of the same categories as in *Judicial Watch*, including an identification number, the document's subject, and the date. Although the CIA has not matched each redaction with a specific exemption, its *Vaughn* index does identify the exemptions claimed for each individual document. In *Judicial Watch* the index and the agency affidavit worked in tandem, the court validating the index because it "tied each individual document to one or more exemptions, and the [agency's] declaration linked the substance of each exemption to the documents' common elements." *Id.* at 147. The released portion of the document supplements the *Vaughn* index, so that "[t]he released content of the documents served to illuminate the nature of the redacted material." *Id.* at 145. As described below in discussing several of the claimed FOIA exemptions, the Dorn Declaration is less fulsome in tying together the exempted documents and justifying their withholding. Still, the descriptions of the documents in the *Vaughn* index, while categorical and with little variation from page to page, convey enough information for Morley and the court to identify the records referenced and understand the basic reasoning behind the claimed exemptions. Summary judgment was therefore appropriate on the adequacy of the CIA's *Vaughn* index.

*Morley v. CIA*, 508 F.3d 1108, 1123 (D.C. Cir. 2007).

Since these cases were decided, courts in this District consistently have applied this approach to FOIA cases. *See, e.g.*, *Khatchadourian v. Def. Intel. Agency*, 453 F. Supp. 3d 54, 73-75 (D.D.C. 2020) (applying approach to 850 records totaling 5,000 pages); *Kowal v. Dep't of Just.*, 490 F. Supp. 3d 53, 68 (D.D.C. 2020) ("[I]n looking at the ATF's *Vaughn* index alongside its declaration and the redacted documents from its supplemental response to Kowal, the nature of the redacted material becomes clear."); *Spataro v. Dep't of Just.*, 279 F. Supp. 3d 191, 206 (D.D.C. 2017) (finding a *Vaughn* index unnecessary because the two declarations, along with the annotations within the documents produced, were sufficient enough to satisfy the agency's burden). The D.C. Circuit recently reaffirmed these principles. *Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 368 (D.C. Cir. 2021) (citing *Morley* and finding that an FBI declaration,

in combination with produced portions of redacted emails, adequately demonstrated the deliberative process privilege). Thus, "the materials provided by the agency may take any form so long as they give the reviewing court a reasonable basis to evaluate the claim of privilege." *Delaney, Migdail & Young, Chartered v. IRS*, 826 F.2d 124, 128 (D.C. Cir. 1987).

Applying these principles to this case, Plaintiffs' arguments plainly lack merit. Plaintiffs argue that the declarations and *Vaughn* index are vague, conclusory, generic, and deficient; that the declaration was merely lifted from another case; and that one sentence in the *Vaughn* index appears more than thirty times. *See* Pls.' Cross Mot. at 26-31. But there are more than 3,000 records at issue here, all with similar redactions. "Unsurprisingly, among thousands of withheld documents, certain topics and exemptions arose on multiple occasions." *Jud. Watch, Inc.*, 449 F.3d at 147. "There are only so many ways [ICE] could have claimed Exemptions . . . for the thousands of documents generated during [Plaintiffs' request]." *Id.* If Plaintiffs are upset about the number of repetitive descriptions, they only have themselves to blame; they refused to narrow the scope of their request at all throughout this litigation. And although Plaintiffs may seek otherwise, the Agency is not going to "engage in 'a sort of phony individualization (meaningless variations of language at each invocation of a specific exemption).'" *Competitive Enter. Inst. v. EPA*, 12 F. Supp. 3d 100, 115 (D.D.C. 2014) (quoting *Keys v. Dep't of Just.*, 830 F.2d 337, 349 (D.C. Cir. 1987)). That would benefit neither of the parties nor the Court.

Plaintiffs attempt to point out "numerous" purported errors and argue that the purported errors make the declarations and *Vaughn* index deficient. They suggest that the Agency never should have made these purported errors under the time frame afforded to engage in summary judgment briefing. There are several problems with this argument. First, the government notes the irony of Plaintiffs' position. Plaintiffs handpick specific examples of alleged mistakes to argue that

the Agency's work as a whole was deficient. It is a representative sample argument. When the government is justifying their redactions, the argument goes, the government must justify each one, but when Plaintiffs contest a withholding, they need only identify a few purported errors to show the redactions as a whole were deficient. Plaintiffs cannot have their cake and eat it too. If the government cannot rely on a representative sample to justify their withholdings, Plaintiffs cannot rely on a representative sample to contest them.

Second, the purported errors that Plaintiffs cite are meaningless. For example, Plaintiffs protest "most glaringly" that Exhibits 25 and 26 attached to their declaration do not contain bates numbers, so Plaintiffs cannot connect the documents to the *Vaughn* index. But by examining the documents themselves, it can be clearly seen that Exhibit 25 contains a litigation report from the Chief Counsel in El Paso, Texas, addressed to an Assistant United States Attorney in El Paso, Texas, dated March 26, 2018. It is obvious that a litigation report is protected from disclosure for all the civil discovery privileges that exist under Exemption 5. If Plaintiffs contend that they do not understand what Exemption 5 is—which is doubtful—they can examine the Pineiro declaration. *See* Pineiro Decl. ¶¶ 67-76. Plaintiffs' experienced counsel cannot seriously maintain that they do not understand why there were redactions or withholdings from a litigation report because there is no corresponding entry on a *Vaughn* index. *See Morley*, 508 F.3d at 1123 ("[T]he released content of the documents served to illuminate the nature of the redacted material." (quoting *Jud. Watch, Inc.*, 449 F.3d at 145)); *Reps. Comm.*, 3 F.4th at 368 (citing *Morley* and finding that an FBI declaration, in combination with produced portions of redacted emails, adequately established the deliberative process privilege).

Exhibit 26 is no different. Upon examining Exhibit 26, one can see that it is an email dated April 20, 2018, about a "draft" "pleading" where the author, an Assistant United States Attorney

in the El Paso Division of the Western District of Texas, "is really looking to see if the content of the argument is right or if [the reader has] any comments." The subject line of the email—FW: Guitierrez.Soto MTD.MSJ—clearly shows the document was a motion to dismiss or a motion for summary judgment. The attachment line of the email—MTD.Gutierrez Soto.docx—shows that the attachment was the motion to dismiss or motion for summary judgment. Plaintiffs cannot credibly feign ignorance about why there were Exemption 5 withholdings for this document or the ones accompanying it because they do not correspond to the *Vaughn* index. *See Morley*, 508 F.3d at 1123 (redactions explained by context); *Reps. Comm.*, 3 F.4th at 368.

None of the other exhibits Plaintiffs cite help their argument, either. They argue that four pages produced in April 2022 were left out of the *Vaughn* index. But if the Court were to look at those four pages, which contain only redactions under Exemptions 6 and 7(C), it becomes obvious that they were applied correctly because they cover the names and contact information of agency personnel. *See Pinson v. Dep't of Just.*, 61 F. Supp. 3d 164, 185 (D.D.C. 2015) ("[T]he law of this Circuit makes clear that Exemption 6 can, in fact, extend to the names of agency personnel."); *see also Gallant v. NLRB*, 26 F.3d 168, 172-73 (D.C. Cir. 1994) (a "'court's primary focus must be on the substance, rather than the form, of the information supplied by the government to justify withholding requested information,'" including review of the records themselves).

They argue that they cannot determine why redactions were applied to Exhibits 28-31 because they appear to have overlapping bates numbers. But again, when you read the actual documents, the redactions are obvious. For example, Exhibit 28 is a warrant of removal/deportation for Oscar Gutierrez-Soto. Signatures have been redacted under Exemptions 6 and 7(C), such as the signature of the immigration officer on page 102. *See Howard v. United States*, 435 F. Supp. 3d 198, 205 (D.D.C. 2020) ("[R]edaction of the signatures is hardly

controversial."). Event numbers have been redacted under Exemption 7(E), like the event number also on page 102. *See Rojas-Vega v. ICE*, 302 F. Supp. 3d 300, 310-11 (D.D.C. 2018) (finding internal URLs, case numbers, case categories, subject identification numbers, case identification numbers, and internal identifying codes and departure statuses properly redacted under Exemption 7(E)). Again, Plaintiffs cannot credibly contend that they cannot determine why redactions were applied or withholdings were made because of overlapping bates numbers.

Most frustrating, the exhibits that Plaintiffs use to argue that the Agency's declarations and *Vaughn* index are "manifestly deficient" consist largely, sometimes entirely, of redactions that Plaintiffs are not contesting. For example, Plaintiffs indicated in their cross motion and opposition that they are not contesting redactions for signatures, phone numbers, the work product doctrine, and Exemption 7(E). *See* Pls.' Cross Mot. at 12 n.7. As discussed earlier, Exhibit 25 is a litigation report and Exhibit 26 pertains to a draft motion to dismiss or motion for summary judgment, both of which clearly fall within the work product doctrine. The redactions on Exhibit 28, further, contain almost entirely signatures, contact information, and events numbers, which Plaintiffs also are not contesting. Thus, these exhibits have no relevance to the lawsuit now but for the fact that some do not have bates numbers or have overlapping bates numbers, and Plaintiffs are using them to argue that the declarations and *Vaughn* index are deficient. Plaintiffs are claiming to be prejudiced by documents that—by their own admission—are moot in this lawsuit.

Third, despite Plaintiffs' attempts to characterize as a failure the quality of ICE's work in the amount of time allotted, government counsel vehemently contests the characterization. As the Court is most certainly aware, "[c]ourt dockets in this district overflow with [FOIA] matters." *Am. Ctr. for L. & Just.*, 573 F. Supp. 3d at 79. "Many of those cases seek reams of records, requiring massive efforts from defendant agencies." *Id.* "And "[n]onprofit FOIA plaintiffs," like Plaintiffs

here, "create much of that backlog." *Id.* at 83. Nonprofits like Plaintiffs "have everything to gain and little to lose from posing broad, complicated FOIA requests." *Id.* at 84. Government agencies are doing the best that they can with the limited resources that they have. ICE and USCIS have done a commendable job producing the records, declarations, and *Vaughn* indices in this case in the time allotted. Plaintiffs' contention that the declarations and *Vaughn* indices that the government produced in this case were deficient "[d]espite taking more than eight months to prepare," Pls.' Cross Mot. at 27, ignores the herculean effort that the Agencies have done here, the at times Sisyphean efforts agencies make to respond to FOIA requests, and the burdens that entities like Plaintiffs here have created in our District under FOIA, *see generally Am. Ctr. for L. & Just.*, 573 F. Supp. 3d at 82-84.

Lastly, it is settled that a relatively detailed and non-conclusory declaration, like the ones submitted in this case, is afforded a presumption of good faith. *Eddington v. Dep't of Def.*, 35 F.4th 833, 837-41 (D.C. Cir. 2022) (quoting *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991)). A plaintiff cannot rebut that presumption with "purely speculative claims about the existence and discoverability of the request," like Plaintiffs are trying to do here. *Id.* (cleaned up).

Plaintiffs point out a typo or two in the Pineiro declaration, arguing that the typos make it "manifestly deficient." The relevance of these typos is unclear to the government. There is no question whose asylum is at issue in this case. There is no question whose records the declarations are about. If Plaintiffs' position is that a few typos in a declaration render it "manifestly deficient," the argument is meritless. It is to be expected when you are tasked with so much work on such a limited time frame with so few resources, and Plaintiffs are unwilling to negotiate. *See Daily Caller v. Dep't of State*, 152 F. Supp. 3d 1, 14 (D.D.C. 2015) ("Requiring the agency to process and produce these materials under an abbreviated deadline raises a significant risk of inadvertent

disclosure of records properly subject to exemption under FOIA."). In any event, the D.C. Circuit

would agree that a few errors in a declaration does not rebut the presumption of good faith:

> Finally, SafeCard's claim that there are "troubling inconsistencies" in the SEC affidavits and briefs refers us only to trivial matters, such as typographical errors and minor ambiguities undeserving of extended treatment here. Much is made, for example, of the appearance that the SEC created two inconsistent *Vaughn* indices, one for the district court and one for the Appellant, although the SEC adequately explained the matter as a simple confusion between the final and the penultimate versions of the same index. This apparent mix-up and a small collection of other technical failings support neither the allegation that the SEC's search procedures were inadequate, nor an inference that it acted in bad faith.

*SafeCard Servs.*, 926 F.2d at 1202.

For the foregoing reasons, the government's declarations and *Vaughn* index were not

"manifestly deficient." They are perfectly in line with decades of D.C. Circuit precedent and case

law in this District. And the declarations are afforded a presumption of good faith.

## III. Defendants Have Properly Applied Redactions Under the Deliberative Process Privilege, the Attorney Client Privilege, and Exemptions 6 and 7(C)

Plaintiffs argue that ICE has not applied redactions appropriately under Exemption 5 for

the deliberative process privilege and the attorney client privilege, as well as Exemptions 6 and

7(C). Again, they have handpicked exhibits that they contend support their arguments, and they

use their samples of handpicked exhibits to argue that ICE's redactions as a whole were inadequate.

For the reasons below, ICE applied redactions appropriately for the deliberative process privilege,

the work product doctrine, and Exemptions 6 and 7(C).

### A. Deliberative Process Privilege

"To protect agencies from being 'forced to operate in a fishbowl,' the deliberative process

privilege shields from disclosure 'documents reflecting advisory opinions, recommendations and

deliberations comprising part of a process by which governmental decisions and policies are

formulated[.]" *Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 785 (2021) (citations

omitted). "The privilege is rooted in 'the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news.'" *Id.* "To encourage candor, which improves agency decisionmaking, the privilege blunts the chilling effect that accompanies the prospect of disclosure." *Id.*

"To fall under the deliberative process privilege, a document must be predecisional and deliberative." *Advancement Project v. Dep't of Homeland Sec.*, 549 F. Supp. 3d 128, 136 (D.D.C. 2021). "A document is predecisional if it was 'prepared in order to assist an agency decisionmaker in arriving at his decision,' rather than to support a decision already made." *Id.* (quoting *Petroleum Info. Corp. v. Dep't of Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992)). "It is deliberative if 'it reflects the give-and-take of the consultative process.'" *Id.* (quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980)). "There is considerable overlap between these two prongs because a document cannot be deliberative unless it is predecisional." *Sierra Club*, 141 S. Ct. at 786.

Plaintiffs advance several arguments about why ICE did not apply deliberative process privilege redactions appropriately to the documents in question, but each fails. For example, one of Plaintiffs' arguments advance is that ICE withheld material that is inherently factual and not deliberative. To support this assertion, Plaintiffs cite a December 2017 email in which an Assistant Field Office Director "clarifies the procedural history [of] Emilio Gutierrez-Soto's request for asylum as it relates to his detention status and suggests information that should be included in future press releases." Pls.' Cross Mot. at 35; ICE *Vaughn* Index at 57, ECF No. 52-4. Plaintiffs argue that any portions of an email that "clarify the procedural history" are purely factual, not deliberative, and cannot be withheld under the deliberative process privilege. That is wrong.

The applicable *Vaughn* index entry states: "These emails between ICE PA and ERO contemplate whether certain information from the Immigration Judge's opinion from an active immigration removal hearing concerning the denial of Mr. Gutierrez-Soto's asylum application should be disclosed in an ICE Press Release." ICE *Vaughn* Index at 57. As this Court noted in *Advancement Project*, 549 F. Supp. 3d at 139-40:

> But because an agency's public relations efforts "often require a prudent selection and presentation of factual information," divulging even "facts" from ICE's communications plans "would in all likelihood reveal the agency's deliberations about how to present those facts." ICE was entitled to withhold documents created as it planned how to message the visa sanction decision in response to inquiries from the media, Congress, and an interested nonprofit.

*Id.* (cleaned up). Thus, even if facts about the procedural history are present, ICE properly withheld them under the deliberative process privilege because, under the reasoning of *Advancement Project*, the agency was trying to decide what to put in future press releases. Plaintiffs challenge no other documents on this basis, and Plaintiffs cannot base a broader challenge on this entirely appropriate withholding.

Next, Plaintiffs argue that ICE "made essentially no effort to satisfy the key feature of the deliberative process privilege by identifying the relation between the author and recipients of the documents." Pls.' Cross Mot. at 35-36 (cleaned up). In the same paragraph, Plaintiffs acknowledge that ICE provided descriptive information for numerous entries, such as official titles, thus contradicting the argument they just made. *See id.* Plaintiffs then argue that, even when titles are revealed, they fail to reveal "the nature of the decisionmaking authority vested in the participants." *Id.* This argument likewise is in error.

The plaintiffs in *Reporters Committee* advanced the same argument, and the D.C. Circuit rejected it with the same rationale that ICE has been advancing: the declarations, *Vaughn* index, and the released portions of the documents work in tandem to support withholdings:

> The News Organizations mount only a limited challenge to the withholding of these documents, arguing that the government has insufficiently explained their deliberative nature and failed to identify the decisionmaking authority vested in their authors. . . . We disagree. The primary Hardy declaration, in combination with produced portions of the redacted emails, adequately demonstrate that the documents constituted candid advice about whether and how FBI policies should or should not change. . . . And the decisionmaking authority of the persons at issue is evident from the record.

*Reps. Comm.*, 3 F.4th at 368 (citations omitted).

The exhibits that Plaintiffs cite provide no support. For example, Plaintiffs cite email communications between a Removal Operations Acting Assistant Field Office Director and an ERO Officer in Charge. Pls.' Cross Mot. at 36 (citing ICE *Vaughn* Index at 29). They also cite email communications between ERO Assistant Field Office Directors and ICE Public Affairs Officers. *See* Pls.' Cross Mot. at 36 (citing ICE *Vaughn* Index at 52). The difference in authority between an Acting ERO Assistant Field Office Director, ERO Officer-in-Charge, and Public Affairs Officer is readily apparent. The matters they handle, likewise, are readily apparent. *Cf. Reps. Comm.*, 3 F.4th at 368 ("[T]he decisionmaking authority of the persons at issue is evident from the record.").

Plaintiffs argue that ICE does not identify a decision in numerous documents that allows them to determine whether the deliberative process privilege applies. Pls.' Cross Mot. at 34, 37. But the government is not required to identify a decision. *Sierra Club*, 141 S. Ct. at 786 ("Sometimes a proposal dies on the vine. That happens in deliberations—some ideas are discarded or simply languish." (citation omitted)); *see Competitive Enter. Inst. v. Dep't of State*, Civ. A. No. 17-2032 (APM), 2022 WL 4547959, at *4 (D.D.C. Aug. 10, 2022) ("[N]o case requires an agency to disclose whether the decisionmaker came to a final decision. What the agency must identify is the deliberative process involved.").

Moreover, the exhibits Plaintiffs cite do not support their position. For example, Plaintiffs cite an email from an Acting Field Office Director to a Legal Advisor attorney about why Mr. Gutierrez-Soto's health information was withheld or disclosed in response to an inquiry from Congressman Beto O'Rourke. *See* ECF No. 53-6 at 252-53; ECF No. 52-4 at 58-59. In that email, the Acting Field Office Director expresses his opinion about Mr. Gutierrez-Soto's health status. *See* ECF No. 52-4 at 58-59. The *Vaughn* index further indicates, and Plaintiffs acknowledge, that the redactions were made under the attorney client privilege as well, so the document redactions still would have been made even if the deliberative process privilege did not apply. *See* Pls.' Cross Mot. at 37 n.18; *see also Rojas-Vega v. USCIS*, 132 F. Supp. 3d 11, 17 (D.D.C. 2015) ("But even if the deliberative process privilege does not apply, it is apparent that the same information is protected under the attorney work product privilege. For example, the events giving rise to certain inter-agency communications pertained to the government's positions with regard to plaintiff's immigration proceedings and his habeas petition."), *aff'd* 650 F. App'x 36 (D.C. Cir. 2016).

Plaintiffs also contend that other deliberations, even if they relate to a final decision, were not predecisional. *Id.* at 38. Plaintiffs appear to take issue with an email sent by an Acting Field Office Director on December 7, 2017, at 9:05 a.m. When the Acting Field Office Director sent the email, Plaintiffs argue, the Director made a final decision to deny Emilio and Oscar Gutierrez-Soto's applications to stay their removal. The same email contains a redacted portion under the deliberative process privilege. Plaintiffs argue that this redacted portion must not be predecisional because a final decision had already been made to deny Emilio and Gutierrez-Soto's applications to stay their removal. The implication is that the redacted portion of the email is a deliberation about whether to deny Emilio and Oscar Gutierrez-Soto's applications to stay their removals contained in the same email when the decision was made, so it cannot be predecisional.

But what Plaintiffs—tellingly—gloss over, which the *Vaughn* index clearly states, is that this email chain is between ICE employees about "steps on what to take next, after the final stay order had been ruled on, as deliberation in what the agency should do next in the case." ICE *Vaughn* Index at 162. The ICE *Vaughn* index clearly describes these deliberations as pertaining to future possible decisions or actions in the matter, not the decision to deny the stay that had just been rendered. Plaintiffs either gloss over or ignore language in the *Vaughn* index directly refuting their argument.

Plaintiffs try to save their argument by stating that the communication is likely not deliberative because it is from a supervisor to subordinates. Pls.' Cross Mot. at 38. This time, however, Plaintiffs have no difficulty identifying "the relation between the author and recipients of the documents." Pls.' Cross Mot. at 35-36 (cleaned up). In any event, it is not the law that a communication from a supervisor to a subordinate must be nondeliberative:

> Instead, the News Organizations contend that these emails fall outside of the privilege's protection because they were sent from Director Comey to his subordinates rather than vice versa. That is incorrect. There is no such directional precondition to protection under the deliberative process privilege. True, we have said that Exemption 5 is generally "designed to protect subordinates' advice to superiors[.]" But at the end of the day, the key to whether a document is deliberative is whether it is part of the "give-and-take" of the "consultative process." And when such an internal agency dialogue is underway, communications by both the giver and the taker can fall within the privilege.

*Reps. Comm.*, 3 F.4th at 364 (citations omitted).

In sum, all of Plaintiffs' arguments about the deliberative process privilege fail.

## B.        Attorney Client Privilege

"The attorney-client privilege protects confidential communications between an attorney and [a] client relating to a legal matter for which the client has sought professional advice." *Competitive Enter. Inst. v. EPA*, 232 F. Supp. 3d 172, 184 (D.D.C. 2017) (cleaned up). "The purpose of the privilege is to ensure that a client's confidences are protected, encouraging clients

to be honest with their attorneys." *Id.* "In the context of FOIA, the agency is the client and the agency's lawyers are the attorneys for the purposes of attorney-client privilege." *Id.* (cleaned up). *Id.*

Plaintiffs advance two challenges to ICE's invocation of the attorney client privilege. First, Plaintiffs argue that ICE makes "no showing with respect to <u>any</u> withholding to prove that the information withheld was confidential." Pls.' Cross Mot. at 39 (emphasis in original). Second, Plaintiffs argue that ICE failed to show that securing legal advice was a primary purpose of any of the withheld communications. *Id.* Both arguments fail.

Starting with the first: Plaintiffs argue that ICE did not properly assert the attorney client privilege because the Pineiro declaration "fails to even mention this essential element" of confidentiality. *Id.* Plaintiffs are incorrect:

> ICE applied (b)(5) withholdings to protect from disclosure information e-mail communications that are protected by the attorney-client privilege. These are *confidential* communications (1) between ICE attorneys and client ICE ERO deportation officers and (2) between AUSAs and client ICE employees. These communications routinely concern Emilio and Oscar Gutierrez-Soto's administrative removal proceeding and the pending habeas case, and during which the ICE [Legal Advisor] attorney or the AUSA provide *confidential* advice to the client concerning recommended actions, legal decisions, and draft court filings.

Pineiro Decl. ¶ 68 (emphases added), ECF No. 52-2.

> ICE also applied Exemption (b)(5) to protection from disclosure documentation subject to the attorney-client privilege because it contains *confidential* communications between an attorney and his or her client(s) related to a legal matter for which the client sought professional legal advice. In the case at hand, clients are ERO officers PA officers conferring with ICE attorneys who provide legal advice relating to custody of Emilio and Oscar Gutierrez and the current status of their immigration proceedings and habeas litigation.

Pineiro Decl. ¶ 75 (emphasis added), ECF No. 52-2.

Despite Plaintiffs arguing "[t]he Pineiro Declaration . . . fails to even mention this essential element," these excerpts clearly show otherwise. And if the Court and Plaintiffs were to examine

the *Vaughn* index and the released portions of the documents in tandem, the Court and Plaintiffs could easily see that the communications were confidential, i.e., there were no third parties present to break the privilege.

Regarding the second argument—that ICE failed to show that securing legal advice was a primary purpose of any of the withheld communications—the excerpts above from the Pinerio declaration similarly refute the argument. The declaration excerpts clearly show that the communications and redactions under the attorney client privilege centered around things such as Emilio and Oscar Gutierrez-Soto's administrative removal proceeding, their pending habeas case, legal decisions, and draft court filings. *Id.* ¶ 68.

The *Vaughn* index similarly shows that the communications were about legal matters, despite Plaintiffs' claim that the index offers insufficient information for ICE to assert the privilege. The Court can see by examining the *Vaughn* index that ICE has properly asserted the privilege throughout. For example, the first time that the privilege was asserted was on page 12. One of the sentences reads: "This email communication from [Office of the Principal Legal Advisor] attorney to client [Enforcement and Removal Operations] Assistant Field Office Director is an explanation of the Interim [Board of Immigration Appeal]'s order as it impacts continued detention of Emilio Gutierrez-Soto." *See* ICE *Vaughn* Index at 12. The first entry about the attorney client privilege shows a communication between an attorney and a client about a legal matter: Emilio Gutierrez-Soto's detention and removal. Plaintiffs argue that ICE offers little information in the *Vaughn* index to show that legal advice was the primary purpose of the communications. To the contrary, it is hard to imagine what else the primary purpose of this communication was if not to convey legal advice.

Plaintiffs try to defeat the attorney client privilege by citing to an email and arguing that ICE did not apply the privilege correctly to the email. The email was between multiple Office of the Principal Legal Advisor attorneys, an Enforcement and Removal Operations Assistant Field Office Director, an Enforcement and Removal Operations Officer in Charge, and an ICE Public Affairs Officer. *See* ICE *Vaughn* Index at 77. Plaintiffs argue: "the fact that an agency attorney explained a court order to public affairs officers drafting a public statement does not make that explanation privileged." Pls.' Cross Mot. at 40.

But again, that is not what the *Vaughn* index says. The entry reads, "This email communication from [a Legal Advisor] attorney to client [a Removal Operations] Assistant Field Office Director is an explanation of the Court's Summary Judgement order." *See* ICE *Vaughn* Index at 77. Thus, this is a communication about a "Court's Summary Judgment Order" from an agency attorney to an agency employee to provide legal advice, and thus it is protected by the privilege. Of course, it is entirely appropriate, necessary, and typical for agency counsel to provide legal advice to non-lawyer agency staff about how to act in light of a judicial ruling. And to the extent that Plaintiffs try to argue that having a Public Affairs Officer on the email waives the privilege, it does not:

> [T]he privilege remains intact so long as dissemination does not extend beyond those on a "need to know" basis. Those within this ambit can extend beyond the organization's employees to, for example, public-relations or government-affairs consultants outside of the organization. If disclosure to a public-relations firm may not vitiate the privilege, there can be little doubt that OLA's presence on the email chain here does not breach confidentiality. OLA is an organization within the executive branch, and the matter at issue concerned an agency's response to congressional correspondence, which is directly in OLA's wheelhouse. The disclosure of communications to OLA thus did not waive the privilege.

*Cause of Action Inst. v. Dep't of Just.*, 330 F. Supp. 3d 336, 351 (D.D.C. 2018) (citations omitted).

For the foregoing reasons, ICE properly asserted the attorney client privilege.

### C.      Exemptions 6 and 7(C)

Exemption 6 protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). "The exemption has been interpreted broadly to protect 'bits of personal information, such as names and addresses.'" *Pinson v. Dep't of Just.*, 313 F. Supp. 3d 88, 110 (D.D.C. 2018) (quoting *Prison Legal News v. Samuels*, 787 F.3d 1142, 1147 (D.C. Cir. 2015)). "The information in the file 'need not be intimate' for the file to satisfy the standard, and the threshold for determining whether information applies to a particular individual is minimal." *Id.* (quotations omitted). "Private information must also implicate a 'significant privacy interest' to trigger protection." *Id.* "This standard, however, 'means less than it might seem,' as a significant interest is 'anything greater than a de minimis privacy interest.'" *Id.* "Something, even a modest privacy interest, outweighs nothing every time under the balancing test." *Id.* (cleaned up).

Exemption 7(C) protects "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy[.]" 5 U.S.C. § 552(b)(7)(C). "A court first determines if there is a privacy interest in the information to be disclosed, and then balances the individual's privacy interest against the public interest, considering only the public interest that focuses on the citizen's right to be informed about what their government is up to[.]" *Parker v. ICE*, 238 F. Supp. 3d 89, 99 (D.D.C. 2017) (citations and internal quotation marks omitted). "It is a FOIA requester's obligation to articulate a public interest sufficient to outweigh an individual's privacy interest, and the public interest must be significant." *Id.* (citing *NARA v. Favish*, 541 U.S. 157, 172 (2004)).

When an agency asserts a redaction under both Exemptions 6 and 7(C), the court typically only analyzes the redactions under Exemption 7(C) because "it provides broader privacy

protection than Exemption 6 and thus establishes a lower bar for withholding material.'" *Citizens for Resp. & Ethics in Wash. ("CREW") v. Dep't of Just.*, 854 F.3d 675, 681 (D.C. Cir. 2017).

        1.    *Law Enforcement Threshold*

Plaintiffs assert that ICE failed to demonstrate that withheld records were compiled for law enforcement purposes. Yet this entire case is about the immigration enforcement and removal proceedings of two people. There are thousands of documents pertaining to these proceedings that were produced, described in the Pineiro declaration, and described in the *Vaughn* index. Plaintiffs revert to their refrain of challenging the adequacy of the declarations and *Vaughn* index, this time as to how much detail is given about the law enforcement purpose. Again, however, considered in tandem, the declaration, the *Vaughn* index, and the released portion of the document readily show that the subject records were compiled for a law enforcement purpose.

Plaintiffs state that ICE is relying almost entirely on the premise that it is a law enforcement agency, so its records must be compiled for a law enforcement purpose. They state that ICE is "focusing on a single *Vaughn* entry" and a "cursory declaration" to how that records were compiled for a law enforcement purpose. That is wrong. As a law enforcement agency, ICE is entitled to deference when it asserts that its records were compiled for a law enforcement purpose. *Advancement Project*, 549 F. Supp. 3d at 144 ("ICE's central mission is to enforce immigration law, so its claims about the purpose of withheld records deserve deference."); *Roseberry-Andrews v. Dep't of Homeland Sec.*, 299 F. Supp. 3d 9, 31 (D.D.C. 2018) ("As an initial matter, this Court concludes, consistent with many other decisions in this Circuit, that ICE is a law enforcement agency."). The cited "single *Vaughn* entry" provides just one example of how to determine that a record was compiled for a law enforcement purpose. Again, comparing the declaration, the *Vaughn* index, and the document at issue, Plaintiffs will be able to see, amongst the thousands of records produced in this case, that a record was compiled for a law enforcement purpose.

The only category of information that Plaintiffs suggest might not have been compiled for a law enforcement purpose are responses to media and congressional inquiries. But the responses to media and congressional inquiries still pertain to the immigration enforcement proceedings of Emilio and Oscar Gutierrez-Soto, which are law enforcement proceedings. In any event, if it were not a law enforcement matter, the same information still would be exempt under Exemption 6.

2.  *Balancing the Interests*

Plaintiffs state that ICE fails to identify any privacy interests and cannot do so for high level officials "whose identities are known to the public." This is wrong, as ICE showed in its opening brief (at 23-26, 31-33), in which ICE cited the declaration, *Vaughn* index, and case law.

Briefly, "ICE recognizes that [the] federal employees [referenced in the responsive records who assist ICE with its law enforcement mission] have privacy interests in not becoming targets of harassment by individuals who may begrudge them and in remaining free of interference in the performance of their duties by persons who are currently of interest to law enforcement or who oppose the ICE mission." Pineiro Decl. ¶ 88. "Public identification of these employees could also result in them being subjected to personal requests for access to law enforcement information or requests for information about ongoing or closed investigations." *Id.* ¶ 89. "Names, phone numbers, and email addresses of non-ICE individuals, such as [Justice Department] attorneys, were also redacted from the responsive documentation" because "disclosure of such third-party information could constitute an unwarranted invasion of personal privacy and similarly subject these individuals to harassment, and undue public attention." *Id.* ¶ 90. These are significant privacy interests under both Exemptions 6 and 7(C), as ICE previously explained.

Case law, further, supports the redactions ICE made under Exemptions 6 and 7(C). *See Pinson*, 61 F. Supp. 3d at 185 ("[T]he law of this Circuit makes clear that Exemption 6 can, in fact, extend to the names of agency personnel."); *Anand v. Dep't of Health & Hum. Servs.*, Civ. A. No.

21-1635 (CKK), 2023 WL 2646815, at *22 (D.D.C. Mar. 27, 2023) ("It is well settled that law enforcement personnel and government employees have a substantial interest in anonymity."); *Petrucelli v. Dep't of Just.*, 153 F. Supp. 3d 355, 362 (D.D.C. 2016) ("Considering an individual's 'strong interest in not being associated unwarrantedly with alleged criminal activity,' a government agency is not at liberty to disclose the name of or identifying information about an individual referenced in law enforcement records, even if the requester already knows, or is able to guess, the individual's identity[.]"); *Isiwele v. Dep't of Health & Human Servs.*, 85 F. Supp. 3d 337, 359 (D.D.C. 2015) ("USCIS properly redacted under exemption 6 'personally identifiable information pertaining to third parties,' which, if disclosed, 'would pose an unwarranted invasion' of personal privacy and that has no discernible public interest.").

Plaintiffs do not appear to genuinely challenge that names and identifying information withheld from the records produced are exempt under Exemptions 6 and 7(C). Plaintiffs appear to argue instead that ICE only balanced the interests between two groups of individuals: ICE employees and non-ICE individuals, and ICE should have done more. They provide the names of three individuals who they contend are high-level and publicly known throughout Emilio and Oscar Gutierrez-Soto's proceedings. They also provide the names of six others who "[t]here is reason to believe" were withheld and are allegedly high-level officials. Because Plaintiffs allegedly know three high-level officials involved in Emilio and Oscar Gutierrez-Soto's proceedings, and "[t]here is reason to believe" six others were involved as well, all 6 and 7(C) withholdings for the thousands of records produced in this case involving the countless names and identifying information involved should be disclosed. That argument substantially overreaches.

Beginning with the argument that ICE only divided its redactions into two groups and therefore applied categorical exemptions for one of them, that is an inaccurate representation of

how ICE applied redactions under 6 and 7(C), and ignores that the D.C. Circuit allows categorical exemptions for private citizens who are not government employees. *See SafeCard Servs.*, 926 F.2d at 1206. When viewing the declaration, *Vaughn* index, and documents together, it is apparent that ICE first identified the individual in the document, determined the individual's privacy interests, asked whether there would be a public interest in disclosing that person's identifying information (which there almost never was any), and then balanced the interests before deciding whether to disclose the information. The Court can see that sometimes ICE considered the privacy interests of third parties like reporters and congressional offices (who may be categorically exempt), *see, e.g.*, ICE *Vaughn* Index at 2, and at other times considered the privacy interests of DOJ employees, *see, e.g.*, ICE *Vaughn* Index at 107. These redactions were done on an individual basis.

Plaintiffs' belief that ICE applied improper categorical withholdings appears to stem from the same faulty reasoning that the plaintiff had in *Dillon v. Department of Justice*, 444 F. Supp. 3d 67, 96-101 (D.D.C. 2020). There, a plaintiff argued that the FBI used a per se rule where it redacted every mention of the name or identifying information of a federal employee in an categorical approach that purportedly is improper. *Id.* at 100. This Court disagreed. While it could be inferred that the FBI performed categorical withholdings because many similarly situated government employees were redacted similarly, the FBI performed the requisite steps of determining whether there was a privacy interest for the specific individual, then whether there was a countervailing public interest, and then balanced those interests. ICE did the same here. And if redactions for FBI employees, non-FBI government employees, and third parties merely mentioned in a record were properly withheld in *Dillon*, they were also properly withheld here for ICE employees, non-ICE government employees, and third parties merely mentioned in these records. *Id.*

Plaintiffs, further, have not borne their burden to show how reversing the withholdings for these individuals on the thousands of pages at issue would advance a significant public interest. *Elec. Priv. Info. Ctr. v. Dep't of Just.*, 18 F.4th 712, 718 (D.C. Cir. 2021) ("Once the agency shows that the 'privacy concerns addressed by Exemption 7(C) are present,' the party seeking disclosure must show 'that the public interest sought to be advanced is a significant one, an interest more specific than having the information for its own sake,' and that 'the information is likely to advance that interest.'" (quoting *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 172 (2004)). True, Plaintiffs allege that DHS and ICE retaliated against Emilio and Oscar Gutierrez-Soto after Emilio Gutierrez-Soto publicly criticized ICE and the government while accepting an award from Plaintiffs. But Plaintiffs have not met their burden under *Favish* to demonstrate that production of the withheld information for the individuals on the thousands of pages at issue in this case would advance an asserted public interest.

"If the asserted public interest is 'to show that responsible officials acted negligently or otherwise improperly in the performance of their duties," as Plaintiffs are contending here, "the requester must produce evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred.'" *Elec. Priv. Info. Ctr.*, 18 F.4th at 718. Plaintiffs cite documents that clearly do not support their assertion that ICE acted wrongfully, and they state only in conclusory fashion that "the public has an overwhelming interest in knowing" the information withheld. That is wholly insufficient. *See Favish*, 541 U.S. at 175 ("Allegations of government misconduct are easy to allege and hard to disprove, so courts must insist on a meaningful evidentiary showing." (cleaned up)). Plaintiffs also cite a Western District of Texas decision where the court denied a motion for summary judgment because it found, after drawing all reasonable inferences in a light most favorable to the nonmovant, that the evidence "could"

establish that Emilio and Oscar Gutierrez-Soto were retaliated against for criticizing the government. But whatever the merits of that decision may be, it speaks about the Department of Homeland Security and ICE only in general terms in no way justifies the disclosures of the specific names and identifying information of the ICE and non-ICE individuals on the thousands of records at issue in this case.

If the Court were to find that disclosing the names and identifying information of the individuals on those thousands of pages did advance a public interest, then the Court would have to balance such public interest against the certain, foreseeable harm to the privacy interests of the individuals in the documents. As stated in ICE's opening motion, the risks to ICE employees and non-ICE government employees are neither remote nor speculative.

In today's political climate, for example, it does not matter what level of public office one is involved in; threats regrettably have become the new norm. *See* Hannah Allam, *Study: At All Levels of Public Office, Threats Now Come with the Job*, Wash. Post (May 26, 2023 at 7:20 p.m.), https://www.washingtonpost.com/national-security/2023/05/26/local-officials-intimidation/. Prosecutors routinely face threats from those who oppose them. *See* Perry Stein and Devlin Barrett, *Prosecutors in Trump Classified Documents Case Are Facing Threats*, Wash. Post (July 6, 2023 at 5:56 p.m.), https://www.washingtonpost.com/national-security/2023/07/06/trump-documents-case-prosecutor-threats/. The public "jokes" now about murdering law enforcement on social media. *See* Antonia Noori Farzan, *He Offered $500 On Twitter to Anyone Who Killed an ICE Agent. He Was Joking, A Jury Ruled*, Wash. Post (Dec. 9, 2019 at 3:26 a.m.), https://www.washingtonpost.com/nation/2019/12/09/brandon-ziobrowski-ice-agent-twitter-threat/. The risks for the individuals named in these documents are real, foreseeable, and serious.

Lastly, Plaintiffs argue that ICE failed "to account for the divergent privacy interests between high-ranking officials and rank-and-file officers and administrators." Pls.' Cross Mot. at 44. They argue that the names of three individuals are in the public domain and "[t]here is reason to believe" that the names of six others were improperly withheld because their names are also in the public domain and the alleged individuals are "high-ranking, public-facing, and/or publicly linked with Gutierrez's detention and treatment." This argument likewise fails.

Regarding Plaintiffs' position that ICE failed "to account for the divergent privacy interests between high-ranking officials and rank-and-file officers and administrators," Plaintiffs ignore the names of the high-ranking officials that ICE did disclose. For example, the following high-level names were disclosed in the cited documents: (1) Thomas Blank - Chief of Staff of ICE - 2019-ICLI-00014B 4A; 2019-ICLI-00014B- 574; (2) Thomas Homan - Deputy Director of ICE - 2019-ICLI-00014B 80A; (3) Kirstjen Neilson - Secretary of Homeland Security ICE - 2019-ICLI-00014B 80A; (4) Letica Zamarripa - Public Affairs Officer/Spokeswoman ICE - 2019-ICLI-00014 4590 (not disclosed because she is high ranking, but because her job requires her to be public facing); (5) Peter Edge - 20019-ICLI-00014 625A; (6) Matthew Albence - 20019-ICLI-00014 625A- 640A. It may be that Plaintiffs disagree with ICE's determinations of names to withhold depending on rank and individual circumstances, but that does not mean that ICE failed to consider "the divergent privacy interests between high-ranking officials and rank-and-file officers and administrators." To the contrary, it certainly did.

Regarding Plaintiffs' arguments about the public domain, under the public domain doctrine, Plaintiffs must "point to specific information in the public domain that appears to duplicate that being withheld." *CREW v. Dep't of Just.*, 58 F.4th 1255, 1271 (D.C. Cir. 2023) (quoting *Afshar v. Dep't of State*, 702 F.2d 1125, 1130 (D.C. Cir. 1983)) (cleaned up). "Prior

disclosure of similar information does not suffice; instead, the *specific* information sought by the plaintiff must already be in the public domain by official disclosure." *Id.* (emphasis in original). Plaintiffs have not met their burden here.

For example, citing Exhibit 41 to the Marshall declaration, Plaintiffs argue that all redactions for Acting Field Office Director William P. Joyce should be lifted because "[j]ust days earlier . . . Joyce gave an attributed press statement regarding Gutiérrez's detention." Yet Exhibit 41 is not an "attributed press statement." It is a newspaper article in which Joyce's name appears. *See* ECF No. 53-6 at 277. As this Court has said before, "[n]ews reports associating an individual with an investigation do not waive an individual's privacy interest in that investigation." *Reps. Comm. for Freedom of Press v. FBI*, Civ. A. No. 17-1701 (RC), 2022 WL 13840088, at *4 (D.D.C. Oct. 21, 2022); *see also Peay v. Dep't of Just.*, Civ. A. No. 04-1859 (CKK), 2006 WL 1805616, at *3 (D.D.C. June 29, 2006) ("Plaintiff has not sustained his burden of production by proffering the newspaper articles and pointing to the specific information he claims is in the public domain."). Plaintiffs cite Exhibit 12 as well and identify it as an open letter from free press advocates to Joyce, but it likewise is a letter contained in a newspaper article, *see* ECF No. 53-4 at 72, and in any event correspondence from the public to the government does not constitute a prior disclosure by the government. Thus, Plaintiff has not shown that this information is in the public domain.

For Deputy Field Office Director Diane Witte, Plaintiffs point to "public court dockets and [identification] in the press," but, again, news reports do not waive a person's privacy interests. *Reps. Comm.*, 2022 WL 13840088, at *4. Further, a person does not waive one's privacy rights by participating in litigation. *Id.* ("It is established . . . that individuals do not waive their privacy rights merely by testifying at trials." (cleaned up) (quoting *Peay*, 2006 WL 1805616, at *3)); *cf.*

*Callaway v. Dep't of Treasury*, 824 F. Supp. 2d 153, 165 (D.D.C. 2011) (collecting cases in which plaintiffs produced excerpts from trial transcripts and other public documents but still did not satisfy the public domain exception). This is especially so if the person is named as a defendant, as a person generally cannot control whether they are named in a lawsuit. Further, if information appears in a court docket, like Pacer, the information is usually only available to those with an account, which restricts the ability of others to access the information and contradicts the idea that the information is available to the public. In sum, all the exhibits Plaintiffs cite for Witte likewise do not carry their burden.

The same goes for Chief Counsel Elias Gastelo and the others that Plaintiffs assert "[t]here is reason to believe" have been improperly redacted for allegedly already being in the public domain. Plaintiffs' citations are to things like newspaper articles or litigation documents.

In any event, even if these sources were adequate for Plaintiffs to carry their burden, they have not shown the requisite specificity for any of the records. At most, Plaintiffs cite to a document or two which may reveal a person's title at some point in their career. To the extent that ICE has revealed a person's title at some time, such a disclosure does constitute a waiver of all the person's privacy interests and the matters they worked on in that role. *CREW*, 58 F.4th at 1271 ("Prior disclosure of similar information does not suffice; instead, the *specific* information sought by the plaintiff must already be in the public domain by official disclosure." (emphasis in original) (quoting *Wolf v. CIA*, 473 F.3d 370, 378 (D.C. Cir. 2007))).

## IV.   The Government Has Shown That Its Withholdings Under the Deliberative Process Privilege Would Cause Foreseeable Harm if Disclosed

Plaintiffs state: "ICE does not—indeed, it scarcely even attempts to—demonstrate compliance with FOIA's 'foreseeable harm' provision" for its deliberative process privilege redactions. Pls.' Cross Mot. at 48. Plaintiffs again are wrong. Plaintiffs overlook Defendant's

opening brief (at 17-18), and more specifically, the discussion of *Emuwa v. Department of Homeland Security*, Civ. A. No. 20-1756 (TNM), 2022 WL 1451430 (D.D.C. May 9, 2022) and *Advancement Project*, 549 F. Supp. 3d at 136-42.

In *Emuwa*, the plaintiffs sought asylum documents called Assessments to Refer from the Department of Homeland Security. *Emuwa*, 2022 WL 1451430, at *1. Those documents contain an asylum officer's impressions after an asylum interview and recommendation on whether asylum should be granted. *Id.* The only issue before the Court was whether disclosing those documents would cause foreseeable harm. *Id.* at *3-5. The Court ultimately held that disclosing such documents would cause foreseeable harm. *Id.*

The Court credited the agency's declarant, who also submitted a declaration in this case for USCIS. *Id.* She explained that asylum officers needed to feel free "to provide candid assessments of the evidence and eligibility criteria to their supervising officials." *Id.* at *3. "Asylum officers . . . expect that only those within USCIS will view the analysis portions of the Assessments." *Id.* (cleaned up). She elaborated that disclosing that analysis would impact USCIS's "ability to make sound judgments on asylum applications," "temper . . . discussions," and "seriously impair USCIS's mission in adjudicating those petitions." *Id.* Asylum officers needed to focus on "the substance of the information they are providing," not whether their impressions "may at some point be made publicly available." *Id.* "More, bad actors could leverage the internal deliberations of asylum officers 'to tailor asylum applications and testimony in a favorable, but fraudulent, manner.'" *Id.* These "robust explanations," the Court found, were enough to carry the burden on foreseeable harm. *Id.*

Here, this entire case involves the same type of information: asylum for two individuals. *See* Compl. ¶¶ 3, 17, 19-20, 24, 27, 30 (ECF No. 1). It is not difficult to see how information that

would cause foreseeable harm if disclosed in one case would cause foreseeable harm if disclosed in another case involving the same kind of information. The government, for example, described how emails exchanged between ERO officers were withheld because they contemplated whether Emilio Gutierrez-Soto's request for parole should be granted. ICE *Vaughn* Index at 17. The information was withheld because its release "would discourage the expression of candid opinions and inhibit the free and frank exchange of information and ideas between agency personnel resulting in a chilling effect on intra- and inter-agency communications." *Id.* And, as elaborated in the government's opening motion, if individuals "within an agency were unable to freely discuss such matters, they would not be able to reach an informed decision about the best course of action for an individual's request for parole. A dangerous person could be granted asylum in the United States, or a safe person might be denied parole." Defs.' Mot. at 18. The whole system would suffer. That is reasonably foreseeable harm. *Cf. Emuwa*, 2022 WL 1451430, at \*3-5.

In its opening motion (at 17-18), the government also discussed *Advancement Project* and the deliberative process privilege for press information. In *Advancement Project*, the plaintiff submitted a FOIA request after the Department of Homeland Security and the State Department issued a press release announcing visa sanctions against four countries. 549 F. Supp. 3d at 134. The plaintiff contested, among other things, withholdings about ICE's strategy for communicating with the media about the visa sanctions. *Id.* at 139. This Court, relying on a declaration by Fernando Pineiro, the same person who submitted a declaration for ICE in this case, found that "[d]etermining how to explain an agency decision in response to inquiries from the press, Congress, or members of the public is itself a privileged deliberative process." *Id.* More importantly for this discussion, this Court noted how "ICE satisfied the FOIA Improvement Act's foreseeable harm requirement." *Id.* "It reasonably concluded that disclosure would discourage the

expression of candid opinions and chill intra- and inter-agency communications." *Id.* (cleaned up). "That is exactly the kind of harm Exemption 5 is meant to prevent." *Id.*

*Reporters Committee* shows the foreseeable harm that would occur if ICE were ordered to disclose deliberations about press releases and inquiries from Congress. There, FBI Director James Comey sent a letter to the editor of the New York Times defending against the widespread criticism that the Bureau received for its policy of impersonating journalists in criminal investigations. 3 F.4th at 359. Not only did the D.C. Circuit find that the deliberative process privilege applied to emails discussing proposed changes to the letter before it was sent to the New York Times, *id.* at 362-64, but the D.C. Circuit found that the context and purpose of the communications made the foreseeable harm "manifest," *id.* at 372.

Here, there was likewise much information in response to congressional and press inquiries that was withheld under the deliberative process privilege. *See* Defs. Mot. at 16 (citing Pinerio Decl. ¶ 71) ("ICE withheld pre-decisional, deliberative internal discussions, deliberations, and recommendations regarding Emilio and Oscar Gutierrez-Soto's detention status in response to congressional inquiries, immigration proceedings, and habeas litigation."). Plaintiffs acknowledged that "multiple members of Congress inquired into Gutiérrez's detention, including then-Representative Beto O'Rourke, then-Representative Steve Pearce, Senator Martin Heinrich, and then-Senator Tom Udall." Pls.' Cross Mot. at 14. They add: "[f]ree press advocates, including Plaintiffs, the Committee to Protect Journalists, and PEN America called on ICE to release Gutiérrez, as did the bishop of El Paso." *Id.*

Here, ICE similarly would suffer foreseeable harm in its future public communications if the withheld material from this matter were disclosed. ICE's declaration detailed how "release of the draft material would serve to profoundly chill the decision-making process across ICE because

it would discourage the expression of candid opinions and inhibit the free and frank exchange of information and ideas between agency personnel, and also ensure personnel would be less inclined to produce and circulate materials for the consideration and comment of their peers." Pineiro Decl. ¶ 74. ICE's *Vaughn* index supports these assertions about foreseeable harm, document by document, in a focused and concrete way. *See, e.g.*, ICE *Vaughn* Index at 16, ECF No. 52-4. This Court, further, found that disclosure of similar information would cause foreseeable harm in *Advancement Project*, and the D.C. Circuit likewise found so in *Reporters Committee*.

In this case, the deliberative process privilege allowed the spokesperson or the ultimate drafter of the press release to ask questions and get accurate information from those whom he or she needed to get information from to inform the public. *See* Defs.' Mot. at 17-18. If personnel at ICE were not allowed to talk freely about a case because of fear that their internal communications and deliberations would become public, Plaintiffs—and the public—likely would not have gotten press releases and communications from the agency with as much detail as they did, because agency employees would not have been able freely to discuss the matter. *Id.* at 18. That is a foreseeable harm, and it was explained to Plaintiffs in the government's opening motion.

For the foregoing reasons, the government satisfied its burden of showing that disclosure of the records withheld under the deliberative process privilege would cause foreseeable harm.

V.     **Summary Judgment Should Be Granted to the Government for the Records Inadvertently Released but Clawed Back**

Plaintiffs misconstrue the circumstances regarding the inadvertent disclosure of documents that the Agency clawed back. While it is generally true there is no longer a case or controversy when an agency discloses records under FOIA, when an agency inadvertently discloses records under FOIA but claws them back, there is still an ongoing case and controversy regarding those inadvertently disclosed records. *See Wilson v. FCC*, Civ. A. No. 21-0895 (RMM), 2022 WL

4245485, at *14-16 (D.D.C. Sept. 15, 2022) ("Ms. Wilson and her counsel shall not disclose, disseminate, or make use of the Inadvertent Disclosure."). That is the situation with these records.

Plaintiffs do not advance any new arguments for this group of records. They argue the same things that they argued before: the agency improperly applied the deliberative process privilege and incorrectly determined that the material redacted would cause foreseeable harm if disclosed. Rather than repeat itself, the government reincorporates its earlier arguments. As best as the government can surmise, Plaintiffs included this section under a mistaken understanding of the law that inadvertent disclosure under FOIA renders a case moot, which is incorrect. *See Wilson*, 2022 WL 4245485, at *14-16 ("Ms. Wilson and her counsel shall not disclose, disseminate, or make use of the Inadvertent Disclosure.").

That said, the government makes a few brief points on this issue. One, Plaintiffs are again making a representative sample argument by providing an example that they argue should be extrapolated to all the documents inadvertently disclosed. Plaintiffs do not deserve such an accommodation and they have not shown that they should be relieved of their burdens of proof. Two, the government had to process thousands of records in this case under a limited timeframe. Under such circumstances, inadvertent disclosures regrettably can happen. *See Daily Caller*, 152 F. Supp. 3d at 14 ("Requiring the agency to process and produce these materials under an abbreviated deadline raises a significant risk of inadvertent disclosure of records properly subject to exemption under FOIA."). Three, if Plaintiffs contest that a document inadvertently disclosed then clawed back should not have been withheld under FOIA, the proper procedure is not to unilaterally publish the inadvertently disclosed and disputed document, as Plaintiffs did here. Plaintiffs owe a continuing duty to this Court to honor the litigation process and to allow this Court

43

to resolve disputed matters in the first instance. Their failure to do so here is both highly irregular and entirely inappropriate.

## CONCLUSION

For the foregoing reasons, the Court should enter summary judgment in favor of Defendants and deny Plaintiffs' cross motion.

Date:   July 24, 2023

Respectfully submitted,

MATTHEW M. GRAVES, D.C. Bar #481052
United States Attorney

BRIAN P. HUDAK
Chief, Civil Division

By:   /s/ Sam Escher
        SAM ESCHER, D.C. Bar #1655538
        Assistant United States Attorney
        601 D Street N.W.
        Washington, D.C. 20530
        (202) 252-2531
        Sam.Escher@usdoj.gov

*Counsel for United States of America*