**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| NATIONAL PRESS CLUB JOURNALISM INSTITUTE, *et al.*, | : | | |
| | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 18-2932 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 52, 53 |
| | : | | |
| UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT, *et al.*, | : | | |
| | : | | |
| | : | | |
| Defendants. | : | | |

## MEMORANDUM OPINION

GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT; GRANTING IN PART AND DENYING IN PART PLAINTIFFS' CROSS-MOTION FOR
PARTIAL SUMMARY JUDGMENT

## I.  INTRODUCTION

Plaintiffs National Press Club Journalism Institute and Kathy Kiely (collectively,

"Plaintiffs") bring this action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552,

against Defendants United States Immigration and Customs Enforcement ("ICE") and the United

States Department of Homeland Security (collectively, "Defendants").  Plaintiffs seek to compel

disclosure of records pertaining to two individuals—Emilio and Oscar Gutierrez-Soto—as well

as mechanisms used to block or limit calls from detainees at ICE facilities in El Paso, Texas.

Defendants' motion for summary judgment and Plaintiffs' cross-motion for partial summary

judgment are now ripe for review.  For the reasons stated below, the Court grants in part and

denies in part Defendants' motion, and grants in part and denies in part Plaintiffs' cross-motion.

## II.  BACKGROUND

In 2008, Emilio and Oscar Gutierrez-Soto sought asylum in the United States.  *See* Pls.'
Mem. Opp'n Defs.' Mot. Summ. J. & Supp. Pls.' Cross-Mot. Partial Summ. J. ("Pls.' Opp'n"),
ECF No. 53-1, at 1.  Emilio had been a journalist in Mexico, where he "reported on corruption
and abuses by the Mexican military."  *Id.* at 4.  "[A]fter receiving a tip that the military wanted
him dead," Emilio fled the country with his son, Oscar.  *Id.*  Following their flight from Mexico,
the Gutierrez-Sotos lived in New Mexico for the better part of nine years.  *Id.*  Then, in July
2017, an immigration judge denied their asylum claims.  *Id.*  In December of that same year, ICE
arrested the pair and "attempted to deport them."  *Id.*  Although the Board of Immigration
Appeals granted an emergency stay of removal, ICE detained the Gutierrez-Sotos for the next
several months at a facility in El Paso.  *Id.* at 4–5.  The Gutierrez-Sotos eventually filed habeas
petitions, *see Gutierrez-Soto v. Sessions*, 317 F. Supp. 3d 917 (W.D. Tex. 2018), and were
released from detention on July 26, 2018 before their claims were fully adjudicated.  Pls.' Opp'n
at 5–6.

On May 18, 2018—while the Gutierrez-Sotos were still in ICE custody—Plaintiffs filed a
FOIA request seeking two categories of records.  Compl., Ex. A, Freedom of Information Act
Request ("FOIA Request"), ECF No. 1-1, at 1.  The first category included "[a]ll records,
including but not limited to emails, memos, text messages, and other communications, since
January 1, 2017, that mention Emilio Gutierrez-Soto (aka Emilio Gutierrez Soto) or his son,
Oscar Gutierrez-Soto (aka Oscar Gutierrez Soto)."  *Id.*  The second category included "[a]ll
records of ICE facilities and/or personnel in El Paso, Texas, including but not limited to
communications (e.g., emails, memos, text messages) and any mechanisms used to limit or block
phone calls from detainees at ICE's El Paso facilities, since March 1, 2018, that mention or

2

contain" the name of the Gutierrez-Sotos' attorney, his law firm, or two specific phone numbers.
*Id.*

ICE acknowledged receipt of Plaintiffs' FOIA request on June 14, and it also referred a portion of the request to United States Immigration and Citizenship Services ("USCIS").  Pls.' Statement Material Facts & Response Defs.' Statement Material Facts ("Pls.' SMF"), ECF No. 53-2, at ¶¶ 15, 16.  On July 17, Plaintiffs filed an administrative appeal, *id.* ¶ 18, which USCIS denied, *id.* ¶ 20, and to which ICE responded by remanding Plaintiffs' FOIA request for further processing, *id.* ¶ 19.  On December 13, Plaintiffs filed this lawsuit, asking the Court to order Defendants to conduct a reasonable search for responsive records and to disclose all non-exempt, responsive records to Plaintiffs.  *See* Compl., ECF No. 1, at 13.

Following the initiation of Plaintiffs' lawsuit, Defendants began processing records responsive to Plaintiffs' FOIA request.  *See* Joint Status Report, ECF No. 9, at 2 (stating that productions began on December 17, 2018).  Over the course of the next three and a half years, Defendants continued to produce responsive records.  *See* Joint Status Report, ECF No. 41, at 1 (reporting that last production was made on July 21, 2022).  The parties also negotiated over the scope of Plaintiffs' request.  As relevant here, one topic of negotiation centered on Plaintiffs' request for records relating to mechanisms used to limit or block phone calls from detainees at ICE's El Paso facilities.  *See* Joint Status Report, ECF No. 25, at 2 ("The parties are still conferring on the issue raised by Plaintiffs with respect to ICE's search for records responsive to the second prong of their request.").  They were not, however, able to make significant progress on that front.  *See* Joint Status Report, ECF No. 33, at 3 ("As to the other issues about which the parties had been conferring . . . , the parties have not been able to reach resolution of those issues.").

Ultimately, ICE processed approximately 12,000 pages of responsive records, of which "174 pages of ICE records were withheld in full and approximately 3,000 pages . . . were withheld in part."  Defs.' Statement Material Facts ("Defs.' SMF"), ECF No. 52-1, at ¶ 9. USCIS produced approximately 3,000 pages of records, of which 16 pages were withheld in full and 121 were withheld in part.  *Id.* ¶ 10.

Defendants moved for summary judgment that they had conducted reasonable searches and properly withheld information under FOIA exemptions 5, 6, 7(C), and 7(E).  *See generally* Defs.' Mot. Summ. J. ("Defs.' Mot."), ECF No. 52.  Plaintiffs opposed and cross-moved for partial summary judgment that Defendants did not conduct reasonable searches and that ICE did not properly withhold certain records and information.  *See generally* Pls.' Opp'n.  The motions are fully briefed.  *See* Defs.' Reply Supp. Mot. Summ. J. & Opp'n Pls.' Cross-Mot. Partial Summ. J. ("Defs.' Reply"), ECF No. 55; Pls.' Reply Supp. Cross-Mot. Partial Summ. J. ("Pls.' Reply"), ECF No. 57.

## III.  LEGAL STANDARD

Congress enacted FOIA to permit citizens to discover "what their government is up to." *U.S. Dep't of Just. v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989) (quoting *EPA v. Mink*, 410 U.S. 73, 105 (1973) (Douglas, J. dissenting)).  FOIA operates via several steps.  First, upon an agency's receipt of a request that "reasonably describes" the records being sought, 5 U.S.C. § 552(a)(3)(A), the agency must "conduct[] a search reasonably calculated to uncover all relevant documents."  *Weisberg v. U.S. Dep't of Just.*, 705 F.2d 1344, 1351 (D.C. Cir. 1983).  Then, FOIA requires the agency to disclose responsive records revealed by the search, unless material in the records falls within one of FOIA's nine statutory exemptions.  5 U.S.C. § 552(b); *see also Jud. Watch, Inc. v. U.S. Dep't of Def.*, 847 F.3d 735,

738 (D.C. Cir. 2017) ("The Act requires government agencies to make information available upon request, unless the information is protected by one of nine statutory exemptions." (internal quotation marks omitted)).

"FOIA cases typically and appropriately are decided on motions for summary judgment." *Pinson v. Dep't of Just.*, 236 F. Supp. 3d 338, 352 (D.D.C. 2017) (quoting *Defs. of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009)). A court addressing a motion for summary judgment in a FOIA suit is to review the matter de novo. *See* 5 U.S.C. § 552(a)(4)(B); *Life Extension Found., Inc. v. IRS*, 915 F. Supp. 2d 174, 179 (D.D.C. 2013). In general, summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one capable of affecting the substantive outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if there is enough evidence for a reasonable factfinder to return a verdict for the non-movant. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). In a FOIA case, "summary judgment is appropriate if there are no material facts genuinely in dispute and the agency demonstrates 'that its search for responsive records was adequate, that any exemptions claimed actually apply, and that any reasonably segregable non-exempt parts of records have been disclosed after redaction of exempt information.'" *Prop. of the People, Inc. v. Office of Mgmt. and Budget*, 330 F. Supp. 3d 373, 380 (D.D.C. 2018) (quoting *Competitive Enter. Inst. v. EPA*, 232 F. Supp. 3d 172, 181 (D.D.C. 2017)).

The reviewing court may grant summary judgment based on the record and agency declarations if "the agency's supporting declarations and exhibits describe the requested documents and 'the justifications for nondisclosure with reasonably specific detail, demonstrate

that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'" *Pronin v. Fed. Bureau of Prisons*, No. 17-cv-1807, 2019 WL 1003598, at *3 (D.D.C. Mar. 1, 2019) (quoting *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (internal citation omitted)). An agency's "[c]onclusory and generalized allegations of exemptions" are not sufficient justification. *Morley v. CIA*, 508 F.3d 1108, 1114–15 (D.C. Cir. 2007) (internal citations omitted); *see also Pinson v. Dep't of Just.*, 313 F. Supp. 3d 88, 106 (D.D.C. 2018). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Scudder v. CIA*, 254 F. Supp. 3d 135, 140 (D.D.C. 2017) (quoting *Jud. Watch, Inc. v. U.S. Dep't of Def.*, 715 F.3d 937, 941 (D.C. Cir. 2013) (internal citations omitted)). A reviewing court should respect an agency's expertise and not "overstep the proper limits of the judicial role in FOIA review." *Hayden v. Nat'l Sec. Agency/Cent. Sec. Serv.*, 608 F.2d 1381, 1388 (D.C. Cir. 1979).

## IV. ANALYSIS

Defendants first move for summary judgment on the ground that they conducted an adequate search for records responsive to Plaintiffs' FOIA request. Plaintiffs no longer contest the adequacy of Defendants' search for records responsive to their request for records mentioning the Gutierrez-Sotos. They do, however, object to the adequacy of Defendant ICE's search for records regarding mechanisms used to limit or block calls in the agency's El Paso facilities. For the reasons set forth below, the Court concludes that ICE has not conducted an adequate search for such records.

Second, Defendants move for summary judgment regarding their application of certain FOIA exemptions. Plaintiffs do not challenge USCIS's application of various exemptions, but

they do challenge many of ICE's withholdings.  Specifically, Plaintiffs argue that ICE improperly invoked the deliberative process and attorney-client privileges of Exemption 5, as well as Exemptions 6 and 7(C).  As explained below, the Court finds that ICE has not sufficiently justified its application of the Exemptions at issue.

Finally, the Court finds that ICE may continue to assert that certain documents it inadvertently disclosed to Plaintiffs are exempt from disclosure.  Accordingly, the Court grants in part and denies in part Defendants' motion for summary judgment and grants in part and denies in part Plaintiffs' cross-motion for summary judgment.

### A.  The Adequacy of Defendants' Searches

Defendants seek summary judgment on the ground that their search for responsive records was reasonable and adequate with respect to both of Plaintiffs' FOIA requests.  An agency responding to a FOIA request must conduct an adequate search; that is, a search "reasonably calculated to uncover all relevant documents." *Hodge v. FBI*, 703 F.3d 575, 579 (D.C. Cir. 2013) (quoting *Morley*, 508 F.3d at 1114).  The adequacy of a search is generally "determined not by the fruits of the search, but [rather] by the appropriateness of [the search's] methods." *Id.* (quoting *Iturralde v. Comptroller of the Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003)); *see also Ryan v. FBI*, 174 F. Supp. 3d 486, 490–91 (D.D.C. 2016) ("'There is no requirement that an agency seek every record system,' rather a search may be reasonable if it includes all systems 'that are likely to turn up the information requested.'" (quoting *Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990))).  In other words, at summary judgment, the pertinent question is not "whether there might exist any other documents possibly responsive to the request," but rather "whether 'the *search* for [the requested] documents was

*adequate*.'" *In re Clinton*, 973 F.3d 106, 116 (D.C. Cir. 2020) (quoting *Weisberg v. U.S. Dep't of Just.*, 745 F.2d 1476, 1485 (D.C. Cir. 1984)).

The adequacy of an agency's search for documents requested under FOIA "is judged by a standard of reasonableness and depends, not surprisingly, upon the facts of each case." *Weisberg*, 745 F.2d at 1485.  To demonstrate the adequacy of its search, "the agency may rely upon reasonably detailed, nonconclusory affidavits [or declarations] submitted in good faith." *Id.*  The affidavits or declarations should "explain the scope and method of [the agency's] search 'in reasonable detail.'" *Leopold v. CIA*, 177 F. Supp. 3d 479, 486 (D.D.C. 2016) (quoting *Perry v. Block*, 684 F.2d 121, 127 (D.C. Cir. 1982)).  What is more, they should "set[] forth the search terms and the type of search performed, and aver[] that all files likely to contain responsive materials (if such records exist) were searched." *Oglesby*, 920 F.2d at 68.  Unless there is evidence to the contrary, "such affidavits or declarations are sufficient to show that an agency complied with FOIA." *Leopold*, 177 F. Supp. 3d at 486.  On the other hand, if "the record leaves substantial doubt as to the sufficiency of the search, summary judgment for the agency is not proper." *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990); *see Leopold v. Dep't of Just.*, 130 F. Supp. 3d 32, 40 (D.D.C. 2015) ("Summary judgment based on affidavits is not warranted, however, if the affidavits are 'controverted by either contrary evidence in the record [or] by evidence of agency bad faith.'" (quoting *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981))).

1.  Plaintiffs' Request for Records Mentioning Mr. Gutierrez-Soto or His Son

Defendants first move for summary judgment on the ground that they conducted an adequate search for documents responsive to Plaintiffs' request for "[a]ll records, including but not limited to emails, memos, text messages, and other communications, since January 1, 2017,

that mention Emilio Gutierrez-Soto (aka Emilio Gutierrez Soto) or his son, Oscar Gutierrez-Soto (aka Oscar Gutierrez Soto)."  FOIA Request at 1; *see* Defs.' Mot. at 2–8.  Plaintiffs initially challenged one aspect of Defendants' motion, claiming that ICE had failed to conduct an adequate search for text messages responsive to their request.  *See* Pls.' Opp'n at 9–14.  More specifically, Plaintiffs contended that ICE had failed to show that it conducted *any* search for responsive text messages and, even if it had, that ICE had failed to explain its methodology for conducting such a search.  *Id.*

In response, ICE submitted a declaration setting forth additional details regarding its search for text messages.  *See* Suppl. Decl. of Fernando Pineiro ("Suppl. Pineiro Decl."), ECF No. 55-2, at 2–4.  The supplemental declaration provided further information as to the specific methods used to search for texts and confirmed that individuals tasked with conducting the search had in fact complied.  *See id.*  In light of this additional information, Plaintiffs no longer "contest the sufficiency of Defendants' search for text messages."  Pls.' Reply at 5.

The Court has reviewed the affidavits and declarations submitted by Defendants.  Having done so, the Court concludes that both ICE and USCIS conducted an adequate search for documents responsive to Plaintiffs' request for records that mention Mr. Gutierrez-Soto and his son.  *See Tokar v. U.S. Dep't of Just.*, 304 F. Supp. 3d 81, 93 (D.D.C. 2018) (explaining that, even where adequacy of agency's search is uncontested, "courts have an independent duty to determine whether the agency's search for responsive records was adequate").  Accordingly, the Court will grant Defendants summary judgment as to the adequacy of their search for records responsive to this aspect of Plaintiffs' FOIA request.

2.  Plaintiffs' Request for Records of Mechanisms to Limit or Block Phone Calls

*a.  Vagueness*

Whereas the parties agree that Defendants conducted an adequate search for records responsive to Plaintiffs' first request for documents, they hotly contest the adequacy of Defendants' search for documents responsive to Plaintiffs' request for "[a]ll records of ICE facilities and/or personnel in El Paso, Texas, including but not limited to communications (e.g., emails, memos, text messages) and any mechanisms used to limit or block phone calls from detainees at ICE's El Paso facilities, since March 1, 2018, that mention or contain" the name of the Gutierrez-Sotos' attorney, his law firm, or two specific phone numbers.  FOIA Request at 1. The locus of the parties' dispute centers on the phrase "any mechanisms used to limit or block phone calls."  ICE contends that this phrase is irreconcilably vague.  *See* Defs.' Reply at 8–10. As a result, ICE avers that it was "unable to reasonably ascertain the records" that the Plaintiffs are seeking and, that being so, was not obligated to conduct a search for such documents.  Defs.' Mot. at 6.

ICE's argument for summary judgment is premised on the rule that an agency is only obligated to search for and release records "if it receives a request that '*reasonably describes* such records.'"  *Evans v. Fed. Bureau of Prisons*, 951 F.3d 578, 583 (D.C. Cir. 2020) (emphasis added) (quoting 5 U.S.C. § 552(a)(3)(A)).  The D.C. Circuit has explained that a request reasonably describes records if it enables "the agency . . . to determine precisely what records are being requested."  *Id.* (quoting *Kowalczyk v. Dep't of Just.*, 73 F.3d 386, 388 (D.C. Cir. 1996)); *see also Am. Ctr. for L. & Just. v. U.S. Dep't of Homeland Sec.*, 573 F. Supp. 3d 78, 81 (D.D.C. 2021) ("[A] request 'reasonably describes' agency records when it 'would be sufficient [to enable] a professional employee of the agency who was familiar with the subject area of the

request to locate the record with a reasonable amount of effort.'" (quoting *Truitt*, 897 F.2d at 545 n.36)).  Because FOIA requires a reasonable description of the records being sought, "[a] request that vaguely describes the requested documents does not suffice" to trigger the agency's duty to search for records.  *Ctr. for Immigr. Stud. v. U.S. Citizenship & Immigr. Servs.*, 628 F. Supp. 3d 266, 271 (D.D.C. 2022).

FOIA places the initial burden of drafting a reasonably descriptive request on the plaintiff.  *See Corley v. Dep't of Just.*, 998 F.3d 981, 989 (D.C. Cir. 2021).  That said, FOIA does not require that plaintiffs state their requests for records with "technical precision."  *Inst. for Just. v. Internal Revenue Serv.*, 941 F.3d 567, 572 (D.C. Cir. 2019).  To the contrary, this Circuit's case law makes clear that agencies must construe FOIA requests "liberally."  *Id.* (quoting *Nation Mag., Washington Bureau v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995)).  This is in keeping with longstanding precedent explaining that "federal agencies may not use the 'reasonably describes' requirement to deny the public access to responsive records."  *Pub. Emps. for Env't Resp. v. U.S. EPA*, 314 F. Supp. 3d 68, 74 (D.D.C. 2018).  That being so, the mere fact that a request is "poorly defined" will not absolve an agency of its duty to search for responsive records.  *Leopold*, 130 F. Supp. 3d at 43; *see LaCedra v. Exec. Off. for U.S. Att'ys*, 317 F.3d 345, 348 (D.C. Cir. 2003).  In a similar vein, "a [FOIA] request certainly should not fail where the agency knew or should have known what the requester was seeking all along."  *Inst. for Just.*, 941 F.3d at 572; *Truitt*, 897 F.2d at 544 (explaining that once an "agency becomes reasonably clear as to the materials desired, FOIA's text and legislative history make plain the agency's obligation to bring them forth").

When, as here, an agency challenges a FOIA request on vagueness grounds, the court must "focus[] on the *language* of the . . . request" itself.  *Leopold v. U.S. Immigr. & Customs*

*Enf't*, 560 F. Supp. 3d 189, 201 (D.D.C. 2021).  In doing so, the court must assess "whether the *description* [of the records sought] is so broad that it would stymie a reasonable agency official attempting to identify responsive records."  *Id.*  This involves "a highly context-specific inquiry." *Nat'l Sec. Couns. v. CIA*, 898 F. Supp. 2d 233, 278 (D.D.C. 2012).

With these principles in mind, the Court turns back to the issue at hand.  ICE contends that the phrase "mechanisms used to limit or block phone calls" is vague because the word "mechanisms," when read in context, is "susceptible to too many interpretations and meanings." *See* Defs.' Reply at 8–10.  In ICE's view, the term "mechanisms" could be read to encompass "anything."  *Id.* at 9.  It could, for example, include technological methods of blocking or limiting calls—such as software or hardware that would allow users to limit or restrict calls from specific numbers or individuals.  *See id.*  And it could also include written policies, such as a policy "limiting phone calls to fifteen minutes," or a policy requiring detainees to eat their meals within set windows of time (on the theory that detainees could not make phone calls during those windows).  *See id.*

ICE's attempt to manufacture ambiguity in this way is unconvincing.  Agencies must interpret FOIA requests reasonably, and they may not rely on "unreasonable reading[s] of a FOIA request" to argue that a "request is deficient."  *See Gun Owners of Am., Inc. v. FBI*, 594 F. Supp. 3d 37, 44 (D.D.C. 2022) ("An agency's claim that it is hopelessly torn between a reasonable and an unreasonable reading of a FOIA request will not support a conclusion that the request is deficient.").  Reasonably construed and read in context, it is clear that Plaintiffs' request for records relating to "mechanisms used to limit or block phone calls" does not sweep as broadly as ICE suggests it could.  To the contrary, the term "mechanisms"—when read in this context—has a technical connotation, suggesting that the Plaintiffs seek records relating to the

physical and technological means that ICE utilizes to restrict calls to or from detainees in its El

Paso detention facilities.  *See Mechanism*, Oxford English Online Dictionary,

https://www.oed.com/dictionary/mechanism_n (last visited Dec. 28, 2023) (defining

"mechanism" as "[t]he structure or operation of a machine or other complex system").

       This is made plain through the examples that Plaintiffs provided to ICE in the course of

the parties' negotiations over the scope of Plaintiffs' request.  For example, Plaintiffs cited a U.S.

Government Accountability Office ("GAO") report in which GAO investigators reported that

their telephone "number was blocked or otherwise restricted" when they tried calling twelve

different ICE facilities.  *See* Pls.' Opp'n, Ex. 19, ECF No. 53-4, at 99.  The report explained that

"[t]ypical problems" encountered by the investigators included "voice prompt[s] stating"

variously that their number was restricted, that they were calling from an "invalid" number, or

that "calls to [the specific ICE facility's telephone] number ha[d] been blocked by the telephone

service provider."  *Id.*  Viewed from a slightly higher level of generality, any tools or devices

employed by ICE's El Paso facilities (or the third-party telephone service providers with which

they contract) that enable those facilities to identify and block a specific subset of calls would

fall within Plaintiffs' request.

       In addition to the GAO report, Plaintiffs pointed ICE to articles from news organizations

that discussed the fact that ICE "strictly prohibit[s]" "three-way calling and call forwarding"

from ICE facilities, and that ICE blocks calls from detainees to 1-800 numbers.  *Id.*  Finally,

Plaintiffs cited ICE's own Performance-Based National Detention Standards which, among other

things, suggest that ICE has the ability to "limit the duration of [detainee] calls by rule or

automatic cut-off."  *See* Pls.' Opp'n, Ex. 22, ECF No. 53-4, at 182.  These examples further

illustrate that Plaintiffs seek records relating to any of the physical or technological means by which the ICE facilities in El Paso may limit or block detainee calls.

There is evidence in the record that suggests that ICE officials shared this basic understanding of the types of records Plaintiffs were seeking.  At one point, a "Deputy Field Office Director" within the El Paso field office stated that he was not "aware of a *telephone service operation manual* that could be reviewed to verify whether detainee's [sic] calls can be limited or blocked."  Suppl. Pineiro Decl. ¶ 19 (emphasis added).  Despite the official's lack of awareness as to whether such a manual existed, the fact that he referenced a potential "telephone service operation manual" indicates his understanding of the type of information sought by Plaintiffs: that is, information relating to the technical operation of the phone systems in use within the El Paso facilities.  *See Inst. for Just.*, 941 F.3d at 572 ("[A] [FOIA] request certainly should not fail where the agency knew or should have known what the requester was seeking all along.").

To the extent there is any ambiguity in the Plaintiffs' request, it would seem to stem from the fact that the Plaintiffs have not identified *specific* mechanisms by which ICE may restrict telephone calls.  *See* Pls.' Opp'n, Ex. 18, ECF No. 53-4, at 96 (email to Plaintiffs stating "If there is some specific mechanism that you believe exists, and you can provide a name or description of it, please let me know and ICE can then try to formulate a supplemental search using that information").  But just as courts do not require plaintiffs to possess knowledge of the specific ways in which federal agencies store information, *see Inst. for Just.*, 941 F.3d at 572, Plaintiffs here were not required to have special knowledge regarding the mechanisms that ICE may employ to block or limit detainee phone calls.  It is ICE—not Plaintiffs—that has a better understanding of the phone systems in place and how those systems may or may not be modified

so as to restrict communications.  Likewise, it is ICE—not Plaintiffs—that has a better sense of the sources in which information regarding the agency's ability to restrict detainees' calls may be located.

Finally, it is important to note that Plaintiffs do not seek records relating to "mechanisms used to limit or block phone calls" generally, but rather records fitting that description that *also* "mention or contain" the name of the Gutierrez-Sotos' attorney, his law firm, or two specific phone numbers.  FOIA Request at 1.  This added context and specificity illustrates the unreasonableness of at least some of ICE's purported examples of ambiguity.  For instance, ICE argues that Plaintiffs' request is ambiguous because it could encapsulate policies regarding detainees' mealtimes.  *See* Defs.' Reply at 9.  But ICE does not even begin to explain how a policy regarding when detainees consume breakfast, lunch, or dinner would fit within the context of a request for records relating to specific names and phone numbers.

For all of the above reasons, the Court finds that "the description [of the records sought by Plaintiffs] is [not] so broad that it would stymie a reasonable [ICE] official attempting to identify responsive records."  *Leopold*, 560 F. Supp. 3d at 201 (emphasis deleted).  In other words, Plaintiffs' request was sufficiently clear to trigger ICE's duty to search for responsive records.

### b.  Good Faith Search

In the alternative, ICE cursorily asserts that, despite the alleged vagueness of Plaintiffs' request, it "performed a good faith search for responsive records" and determined that there were no records responsive to Plaintiffs' request.  Defs.' Reply at 12.  The Court disagrees.

When an agency concludes that there are no responsive records to a plaintiff's request for information, it may still "prevail[] on summary judgment if it shows that it made 'a good faith

effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested.'" *Isiwele v. U.S. Dep't of Health*, 209 F. Supp. 3d 352, 355 (D.D.C. 2016) (quoting *Oglesby*, 920 F.2d at 68).

Here, the evidence and affidavits show that ICE officials did "ma[k]e inquiries within the El Paso field office" in an effort to unearth information "concerning any mechanisms used by that office to limit or block phone calls of detainees." *See* Pls.' Opp'n, Ex. 18, ECF No. 53-4, at 96. However, according to the agency's declarant, those "inquiries" were limited to a "brief conversation" in which an official in the El Paso field office "explained [that] the telephone service [in that office] is provided by a third-party contractor and he wasn't aware of a telephone service operation manual that could be reviewed to verify whether detainee's [sic] calls can be limited or blocked." Suppl. Pineiro Decl. ¶ 19. ICE does not cite—and the Court has not found—case law to suggest that a "brief conversation" with one official is sufficient to discharge the agency's duty to conduct a good faith search for responsive records.

Consequently, the Court finds that ICE has failed to demonstrate that it conducted a good faith search for records responsive to Plaintiffs' request. ICE's motion for summary judgment regarding the adequacy of its search for this component of Plaintiffs' request is, therefore, denied.

## B. The FOIA Exemptions Applied by Defendants

Defendants applied a number of FOIA exemptions to withhold all or parts of responsive records. Plaintiffs do not object to USCIS's invocation of those exemptions. *See* Pls.' Opp'n at 3 n.7. Nor do they contest ICE's decision to withhold records pursuant to the attorney work product privilege of Exemption 5, *see* 5 U.S.C. § 552(b)(5), or Exemption 7(E), *see id.* §

552(b)(7)(E).  *See* Pls.' Opp'n at 3 n.7.[1]  Plaintiffs do, however, oppose ICE's withholding of

documents based on the deliberative process and attorney-client privileges of Exemption 5, as

well as ICE's decision to withhold certain information pursuant to Exemptions 6 and 7(C).  The

Court concludes that ICE's *Vaughn* index,[2] *see* Decl. of Fernando Pineiro, Ex. A., ICE *Vaughn*

Index ("ICE *Vaughn* Index"), ECF No. 52-4, and declarations are insufficient to justify its use of

the contested exemptions, and therefore denies ICE summary judgment on those grounds.

When a plaintiff challenges an agency's decision to withhold responsive records, the

burden falls to the agency to demonstrate "that any responsive records that were not provided

were properly withheld pursuant to one of nine express statutory exemptions." *Tokar*, 304 F.

Supp. 3d at 89; *see Citizens for Resp. & Ethics in Washington v. U.S. Dep't of Just.*, 746 F.3d

1082, 1088 (D.C. Cir. 2014).  The agency may carry that burden by submitting affidavits that

"describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the

information withheld logically falls within the claimed exemption, and are not controverted by

either contrary evidence in the record nor by evidence of agency bad faith." *Larson*, 565 F.3d at

862 (quoting *Miller v. Casey*, 730 F.2d 773, 776 (D.C. Cir. 1984)).  At the summary judgment

stage, the agency must offer more than "vague, conclusory affidavits, or those that merely

paraphrase the words of a statute." *Tokar*, 304 F. Supp. 3d at 89 (quoting *Church of Scientology*

*of Cal., Inc. v. Turner*, 662 F.2d 784, 787 (D.C. Cir. 1980)).  Instead, when an agency invokes an

---

[1] The Court has independently examined the declaration and *Vaughn* index filed to justify USCIS's exemptions, *see* Decl. of Cynthia Munita, ECF No. 52-17; USCIS *Vaughn* Index, ECF No. 52-30, as well as ICE's submissions in support of its attorney work product privilege and Exemption 7(E) withholdings.  Having done so, the Court is satisfied that USCIS and ICE properly applied the respective exemptions, and it will grant summary judgment to Defendants as to those withholdings.

[2] A *Vaughn* index, named after the case *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), is an itemized list that correlates each document subject to withholdings with the applied exemptions and the justification for non-disclosure.

exemption, "it must submit affidavits that provide 'the kind of detailed, scrupulous description [of the withheld documents] that enables a District Court judge to perform a de novo review.'" *Brown v. FBI*, 873 F.Supp.2d 388, 401 (D.D.C. 2012) (quoting *Church of Scientology*, 662 F.2d at 786).

### 1.  Exemption 5

ICE has withheld a significant number of records pursuant to FOIA Exemption 5. Exemption 5 permits the withholding of "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5).  This exemption protects documents "normally privileged in the civil discovery context," *Jud. Watch, Inc. v. U.S. Dep't of Just.*, 365 F.3d 1108, 1113 (D.C. Cir. 2004), such as materials shielded by the attorney-client privilege, the attorney work product privilege and "what is sometimes called the 'deliberative process' privilege," *U.S. Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001).  In other words, Exemption 5 covers "those documents, and only those documents, normally privileged in the civil discovery context." *Loving v. U.S. Dep't of Def.*, 550 F.3d 32, 37 (D.C. Cir. 2008) (quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975)).  The two Exemption 5 privileges at issue in this case are the deliberative process privilege and the attorney-client privilege.

### a.  Threshold Issue

As a threshold issue, Exemption 5 only covers records that are "inter-agency or intra-agency memorandums or letters."  5 U.S.C. § 552(b)(5).  The Supreme Court has explained that, for Exemption 5 to apply to a document, the "source [of the withheld document] must be a Government agency." *Klamath Water Users*, 532 U.S. at 8.  Plaintiffs have identified one record—2019-ICLI-00014 4931—that they argue is not covered by Exemption 5 because it is an

email that was sent from the office of a former congressman.  *See* Pls.' Opp'n at 23; *see also* Pls.' Opp'n, Ex. 34, ECF No. 53-6, at 247.  In its reply brief, ICE makes no mention of this document.  The Court finds that ICE has not shown that the document's "source [was] a Government agency," *Klamath Water Users*, 532 U.S. at 8, and, therefore, the document was improperly withheld to the extent it was withheld pursuant to Exemption 5.

Besides this specific document, Plaintiffs have not asserted that any other specific documents fail to pass over the Exemption 5 threshold.  The Court can therefore turn to the question of whether ICE properly withheld materials under the deliberative process and attorney-client privileges incorporated by Exemption 5.

### b.  Deliberative Process Privilege

ICE relies on the deliberative process privilege to justify many of its withholdings.  Plaintiffs make several arguments challenging that reliance.  Because the Court finds that ICE's *Vaughn* index is inadequate, it cannot reach the question of whether the material has been properly withheld under the deliberative process privilege.  Instead, the Court directs ICE to revise its *Vaughn* index, taking into account the issues addressed here.

The deliberative process privilege "covers 'documents reflecting advisory opinions, recommendations, and deliberations comprising part of a process by which governmental decisions and policies are formulated.'"  *Klamath Water Users*, 532 U.S. at 8 (quoting *Sears, Roebuck & Co.*, 421 U.S. at 150).  The privilege is intended "to enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government."  *Id.* at 9 (internal citation and quotation marks omitted).  The privilege "rests on the obvious realization that officials will not communicate candidly among themselves if each

remark is a potential item of discovery and front page news." *Id.* at 8–9; *see also Dow Jones & Co. v. U.S. Dep't of Just.*, 917 F.2d 571, 573–74 (D.C. Cir. 1990).

For the deliberative process privilege to apply, a court must first determine whether the exempt document is both predecisional and deliberative. *Access Reports v. U.S. Dep't of Just.*, 926 F.2d 1192, 1194 (D.C. Cir. 1991). "A document is predecisional if it was 'generated before the adoption of an agency policy.'" *Jud. Watch, Inc. v. U.S. Dep't of Just.*, 20 F.4th 49, 54 (D.C. Cir. 2021) (quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980)). "[A] document is deliberative if it 'reflects the give-and-take of the consultative process,'" *Access Reports*, 926 F.2d at 1195 (quoting *Coastal States*, 617 F.2d at 866), "by which the decision itself is made," *Jowett, Inc. v. U.S. Dep't of the Navy*, 729 F. Supp. 871, 875 (D.D.C. 1989) (quoting *Vaughn v. Rosen*, 523 F.2d 1136, 1144 (D.C. Cir. 1975)). Put another way, a document is "deliberative" if it "is intended to facilitate or assist development of the agency's final position on the relevant issue." *Nat'l Sec. Archive v. CIA*, 752 F.3d 460, 463 (D.C. Cir. 2014). The "key question" in determining whether the material is deliberative in nature "is whether disclosure of the information would 'discourage candid discussion within the agency.'" *Access Reports*, 926 F.2d at 1195 (quoting *Dudman Commc'ns Corp. v. U.S. Dep't of Air Force*, 815 F.2d 1565, 1567–68 (D.C. Cir. 1987)).

"The need to describe each withheld document when Exemption 5 is at issue is particularly acute because 'the deliberative process privilege is so dependent upon the individual document and the role it plays in the administrative process.'" *New Orleans Workers' Ctr. for Racial Just. v. U.S. Immigr. & Customs Enf't*, 373 F. Supp. 3d 16, 50 (D.D.C. 2019) (quoting *Pub. Emps. for Env't Resp. v. EPA*, 213 F. Supp. 3d 1, 11 (D.D.C. 2016)). Under the deliberative process privilege, "unlike other exemptions where the agency declaration and

*Vaughn* index may be read in conjunction to provide an adequate justification for application of an exemption to a class or category of records, to sustain its burden of showing that records were properly withheld under Exemption 5, an agency must provide in its declaration and *Vaughn* index precisely tailored explanations for each withheld record at issue." *Protect Democracy Project, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 370 F. Supp. 3d 159, 169 (D.D.C. 2019) (quoting *Nat'l Sec. Couns. v. CIA*, 960 F. Supp. 2d 101, 188 (D.D.C. 2013)).  At the very least, the agency invoking the deliberative process privilege must provide information regarding "(1) the nature of the specific deliberative process involved, (2) the function and significance of the document in that process, and (3) the nature of the decisionmaking authority vested in the document's author and recipient." *Hunton & Williams LLP v. U.S. EPA*, 248 F. Supp. 3d 220, 241 (D.D.C. 2017) (quoting *Nat'l Sec. Couns.*, 960 F. Supp. 2d at 189); *see also Senate of P.R. v. U.S. Dep't of Just.*, 823 F.2d 574, 585–86 (D.C. Cir. 1987) (explaining that agency "must establish 'what deliberative process is involved, and the role played by the documents in issue in the course of that process'" (quoting *Coastal States*, 617 F.2d at 868)); *Am. Immigr. Council v. U.S. Customs & Border Patrol*, 590 F. Supp. 3d 306, 324 (D.D.C. 2022) (explaining that agency should also explain "the 'nature of the decisionmaking authority vested in the officer or person issuing the disputed document,'" and the "relative positions in the agency's chain of command occupied by the document's author and recipient" (quoting *Jud. Watch, Inc.*, 20 F.4th at 54)). Here, at least in many instances, ICE's *Vaughn* index and declarations lack detail sufficient to satisfy this burden.

First, for many of the documents described in ICE's *Vaughn* index, ICE has failed to adequately describe "the nature of the specific deliberative process involved." *Nat'l Sec. Couns.*, 960 F. Supp. 2d at 189.  Instead, ICE provides only vague descriptions of the documents' content

and repeats boilerplate and conclusory statements regarding the content's deliberative nature. For example, ICE describes one document as containing "[e]mail communications . . . regarding the status of Emilio Gutierrez-Soto's immigration case and coordination of potential [Enforcement and Removal Operations ("ERO")] actions."  ICE *Vaughn* Index, at 91.  ICE then asserts that the document "is pre-decisional and deliberative" because it "proposes ERO take certain action."  *Id.*  Similarly scant explanations may be found elsewhere in ICE's *Vaughn* index.  *See, e.g.*, *id.* at 89 (withholding an email "propos[ing] that ERO take certain action"); *id.* at 93 (withholding email communications in which ICE officials are "pre-coordinating potential ERO action" and explaining that the redacted information "proposes ERO take certain action"). Elsewhere in its *Vaughn* index, ICE describes emails relating to a "pending decision from immigration court and ERO's response to th[at] court decision."  *Id.* at 73.  To justify its withholding of information under Exemption 5, ICE explains that the redacted information "requests notice of potential agency action."  *Id.*

Put simply, these types of "broad and opaque description[s] of the deliberative process[es] involved do[] not provide the Court with enough detail about whether these documents are deliberative and predecisional."  *Trea Senior Citizens League v. U.S. Dep't of State*, 923 F. Supp. 2d 55, 68 (D.D.C. 2013).  Far from "establish[ing] 'what deliberative process is involved," *Senate of P.R.*, 823 F.2d at 585 (quoting *Coastal States*, 617 F.2d at 868), these meager descriptions give this Court no means by which to assess whether the privilege applies. They "tell[] the court little" if anything, "about the deliberative nature of the information contained in the document[s] in question."  *Jud. Watch, Inc. v. Food & Drug Admin.*, 449 F.3d 141, 152 (D.C. Cir. 2006).  They are, therefore, insufficient.

Second, for many of the documents withheld by ICE, its *Vaughn* index fails to sufficiently describe the "function and significance of the document[s]" in the agency's decisionmaking process. *New Orleans Workers' Ctr.*, 373 F. Supp. 3d at 51–52 (quoting *Hunton & Williams LLP*, 248 F. Supp. 3d at 241). Such context aids the Court in determining whether specific material is predecisional, because "if documents are not a part of a clear 'process' leading to a final decision on the issue, . . . they are less likely to be properly characterized as predecisional." *Coastal States*, 617 F.2d at 868. Rather than provide the Court with this type of context, many of ICE's *Vaughn* index entries provide only vague information regarding the withheld documents' function and significance. For example and as discussed above, ICE withheld components of "[e]mail communications . . . regarding the status of Emilio Gutierrez-Soto's immigration case and coordination of potential ERO actions." ICE *Vaughn* Index, at 91. The relevant entry goes on to state that the emails contain "opinions, conclusions, and recommendations involving a draft document which contains non-final agency decisions" and that, in the emails, "agency contractors, officers and/or employees are making editorial comments, recommendations, or judgments, such as decisions to insert or delete material." *Id.* This is the closest the entry comes to explaining the function and significance of the document. Not only is that language overly vague, it also appears to be repeated across nearly every entry in which ICE invokes Exemption 5. As other courts have explained, "general statement[s] of this sort [are] not sufficient to carry the agency's burden to explain the function and significance of a document in the agency's decisionmaking process." *Pub. Emps. for Env't Resp.*, 213 F. Supp. 3d at 15; *see New Orleans Workers' Ctr.*, 373 F. Supp. 3d at 52 (rejecting as insufficient the agency's assertion that withheld documents contained "internal discussion between agency officers and/or employees[] involving a draft agency document, . . . non-final agency decisions,

options being considered, and recommendations"—an assertion that was repeated for "nearly every other document the defendant has withheld under Exemption 5").

Finally, for at least some of the documents that ICE has chosen to withhold, its *Vaughn* index and supporting declarations, even when viewed together, do not adequately describe the "nature of the decisionmaking authority vested in the office or person issuing the disputed document(s), and the positions in the chain of command of the parties to the documents." *Arthur Andersen & Co. v. IRS*, 679 F.2d 254, 258 (D.C. Cir. 1982) (internal quotation marks and citation omitted). The D.C. Circuit has explained that "[t]he identity of the parties to the memorandum is important" because "a document from a subordinate to a superior official is more likely to be predecisional, while a document moving in the opposite direction is more likely to contain instructions to staff explaining the reasons for a decision already made." *Coastal States*, 617 F.2d at 868. Here, Plaintiffs cite entries in ICE's *Vaughn* index in which ICE simply states that emails contain communications "between ICE employees." ICE *Vaughn* Index, at 162; *see also id.* at 165 (describing emails "between ICE officials"). Entries of that sort are insufficiently specific, as they tell the Court nothing about those employees' decisionmaking authority or their position in the chain of command. *Protect Democracy Project, Inc.*, 370 F. Supp. 3d at 171; *New Orleans Workers' Ctr.*, 373 F. Supp. 3d at 53. It is true—as ICE contends—that many other entries provide more detail, such as information regarding the titles of individuals involved in the communications at issue. *See, e.g.*, ICE *Vaughn* Index, at 83 (describing communications "between ERO Assistant Field Office Directors . . . , Officers in Charge, Deportation Officers, ICE Public Affairs Officers and an OPLA attorney"). While the inclusion of these officials' and employees' titles constitutes a step in the right direction, titles alone do not provide the Court with sufficient information regarding the decisionmaking

24

authority (or lack thereof) that these individuals possess, *see New Orleans Workers' Ctr.*, 373 F. Supp. 3d at 53, or the "role they played in the relevant discussions" such that the Court can "discern whether these communications 'reflect the give and take of the deliberative process,'" *Protect Democracy Project, Inc.*, 370 F. Supp. 3d at 171 (quoting *Nat'l Sec. Couns.*, 960 F. Supp. 2d at 191).

Based on these three overarching deficiencies in the declarations and *Vaughn* index submitted by ICE, the Court concludes "'not that the documents are not exempt as a matter of law, but that the agency has failed to supply' in its *Vaughn* submissions 'the minimal information necessary to make a determination' concerning applicability of the deliberative process privilege." *Elec. Frontier Found. v. U.S. Dep't of Just.*, 826 F. Supp. 2d 157, 173 (D.D.C. 2011) (quoting *Coastal States*, 617 F.2d at 861). Therefore, the Court will deny summary judgment to ICE regarding its Exemption 5 deliberative process privilege determinations. ICE shall supplement its declarations and *Vaughn* index to provide more information regarding "(1) the nature of the specific deliberative process[es] involved, (2) the function and significance of the document[s] in th[ose] process[es], and (3) the nature of the decisionmaking authority vested in the [documents'] author and recipient." *Pub. Emps. for Env't Resp.*, 213 F. Supp. 3d at 18 (quoting *Nat'l Sec. Couns.*, 960 F. Supp. 2d at 189).[3] At this time, the Court will also deny

---

[3] Because the Court finds that ICE has thus far failed to demonstrate that the materials "are covered by the deliberative process privilege," it need not and will not consider whether ICE has adequately demonstrated (as it must) that "it is reasonably foreseeable that release of those materials would cause harm to an interest protected by that privilege." *Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 361 (D.C. Cir. 2021). As the D.C. Circuit has explained, "the foreseeable harm requirement 'impose[s] an independent and meaningful burden on agencies'" seeking to invoke the deliberative process privilege to shield responsive records from production. *Id.* (quoting *Center for Investigative Reporting v. U.S. Customs & Border Prot.*, 436 F. Supp. 3d 90, 106 (D.D.C. 2019)). Although the Court will not address whether ICE's current submissions satisfy that requirement, the Court cautions that, to the extent ICE continues to invoke Exemption 5, it must "must concretely explain how disclosure 'would'—not

without prejudice Plaintiffs' cross-motion for summary judgment regarding ICE's deliberative

process privilege withholdings in relation to document 2019-ICLI-00014B 514 A.  *See* Pls.'

Opp'n at 26.

### c.  Attorney-Client Privilege

ICE has also withheld records, in part or in full, pursuant to the attorney-client privilege.

Plaintiffs challenge these withholdings on two grounds.  First, Plaintiffs allege that ICE has

failed to demonstrate that it has maintained the confidentiality of the purportedly privileged

information.  *See* Pls.' Opp'n at 30.  Second, Plaintiffs argue that ICE has not shown that

securing legal advice was a primary purpose of withheld communications.  *See id.* at 30–31.

Exemption 5 extends to documents protected by the attorney-client privilege, meaning

agencies are not required to disclose privileged material.  "The attorney-client privilege protects

confidential communications from clients to their attorneys made for the purpose of securing

legal advice or services," as well as "communications from attorneys to their clients if the

communications rest on confidential information obtained from the client."  *Tax Analysts v. IRS*,

117 F.3d 607, 618 (D.C. Cir. 1997) (quotation marks and citations omitted).  "In the

governmental context, the 'client' may be the agency and the attorney may be an agency

lawyer."  *Id.*  Where an agency lawyer serves in a mixed capacity that involves responsibilities

both within and "outside the lawyer's sphere," the agency employee's communications will only

be protected to the extent that they involve his or her professional, legal capacity.  *See In re*

*Sealed Case*, 737 F.2d 94, 99 (D.C. Cir. 1984).  The government bears the burden of proving,

through "detailed and specific information," that the withheld information falls within the

---

'could'—adversely impair internal deliberations" and it may not simply rely on "boilerplate and
generic assertions that release of any deliberative material would necessarily chill internal
discussions."  *Id.* at 369–70.

attorney-client privilege.  *See Campbell v. U.S. Dep't of Just.*, 164 F.3d 20, 30 (D.C. Cir. 1998).

For the government to succeed on a motion for summary judgment, it must marshal its

supporting documentation to prove:

> (1) [T]he holder of the privilege is, or sought to be, a client; (2) the person to
> whom the communication is made is a member of the bar or his subordinate and,
> in connection with the communication at issue, is acting in his or her capacity as a
> lawyer; (3) the communication relates to a fact of which the attorney was
> informed by his client, outside the presence of strangers, for the purpose of
> securing legal advice; and (4) the privilege has been claimed by the client.

*Jud. Watch, Inc. v. U.S. Dep't of Homeland Sec.*, 841 F.Supp.2d 142, 153–54 (D.D.C. 2012)

(citing *In re Sealed Case*, 737 F.2d at 98–99).  Moreover, a "fundamental prerequisite to the

assertion of the privilege" is "confidentiality both at the time of the communication and

maintained since."  *Coastal States*, 617 F.2d at 863.

Plaintiffs first challenge ICE's withholdings on the ground that ICE has not adequately

demonstrated that it kept the withheld information confidential.  *See* Pls.' Opp'n at 30.  In

response, ICE points to two paragraphs in the declaration of Fernando Pineiro in support of its

position that the withheld "communications were confidential."  *See* Defs.' Reply at 26–27.  The

first of those paragraphs states, in relevant part, that:

> ICE applied (b)(5) withholdings to protect from disclosure information e-mail
> communications that are protected by the attorney-client privilege. These are
> *confidential* communications (1) between ICE attorneys and client ICE ERO
> deportation officers and (2) between AUSAs and client ICE employees. These
> communications routinely concern Emilio and Oscar Gutierrez-Soto's
> administrative removal proceeding and the pending habeas case, and during
> which the ICE OPLA attorney or the AUSA provide *confidential* advice to the
> client concerning recommended actions, legal decisions, and draft court filings.

Decl. of Fernando Pineiro ("Pineiro Decl."), ECF No. 52-2, at ¶ 68 (emphases added).  The

second states that:

> ICE also applied Exemption (b)(5) to protection from disclosure documentation
> subject to the attorney-client privilege because it contains *confidential*
> communications between an attorney and his or her client(s) related to a legal

> matter for which the client sought professional legal advice. In the case at hand, clients are ERO officers PA officers conferring with ICE attorneys who provide legal advice relating to custody of Emilio and Oscar Gutierrez and the current status of their immigration proceedings and habeas litigation. The privilege applies to the facts that are divulged to the attorney and encompass the opinions given by the attorney based upon, and thus reflecting on those facts.

*Id.* ¶ 75 (emphasis added).  In addition, ICE cites its *Vaughn* index, and argues that it is plain that the withheld communications were confidential because "there were no third parties present [on the communications] to break the privilege."  Defs.' Reply at 26–27.

ICE misapprehends the fundamental thrust of Plaintiffs' argument.  Plaintiffs do *not* assert that the information ICE seeks to withhold was *never* confidential.  Rather, Plaintiffs contend that, even if the information in the communications was initially confidential, ICE has not demonstrated that it *remained so*.  As mentioned above, a party invoking the attorney-client privilege must demonstrate a communication's "confidentiality both at the time of the communication" and that such confidentiality has been "*maintained since*."  *Coastal States*, 617 F.2d at 863 (emphasis added); *see Am. Immigr. Council v. U.S. Dep't of Homeland Sec.*, 950 F. Supp. 2d 221, 244 (D.D.C. 2013) (faulting agency for "not attempt[ing] to prove that the underlying information in each document was initially kept secret and remains so").  An agency may satisfy this burden by "'demonstrat[ing] that confidentiality was expected in the handling of the[] communications [at issue], and that it was reasonably careful to keep this confidential information protected from general disclosure,' not just within the agency, but also among any other individuals outside the agency who needed access to the information."  *Cuban v. S.E.C.*, 744 F. Supp. 2d 60, 79 (D.D.C. 2010) (quoting *Coastal States*, 617 F.2d at 863).

Here, ICE's declaration and *Vaughn* entries say nothing about the steps that the agency took to protect the withheld information from general disclosure.  Nor has ICE attempted to show that "information contained within the records, was relayed to anyone outside the sphere of

those who needed to know the information within the organization." *Id.* at 80.  Without this type

of information, the Court may not conclude that the attorney-client privilege applies.  *See Am.*

*Oversight v. U.S. Gen. Servs. Admin.*, 311 F. Supp. 3d 327, 342 (D.D.C. 2018) (rejecting

agency's invocation of the attorney-client privilege where agency did "not assert or

'demonstrate' that the communications were, and remain, confidential" (quoting *Coastal States*,

617 F.2d at 863)); *Jud. Watch, Inc.*, 841 F. Supp. 2d at 154 (rejecting agency's invocation of the

privilege where agency's "submissions fail[ed] to provide *any* basis for th[e] Court to find that

the confidentiality of the communications at issue has been maintained"); *see also Am. Immigr.*

*Council*, 950 F. Supp. 2d at 244 (explaining that "[t]he confidentiality of a communication is not

something this Court is at liberty to assume").  Accordingly, to the extent ICE seeks to continue

to shield records from production based on an assertion of the attorney-client privilege, it must

provide additional detail regarding the steps it took to reasonably ensure that the information

contained within the documents remained confidential at all times.

Because the Court finds that ICE has not provided sufficient information to assess

whether the attorney-client privilege protects these records from disclosure, the Court need not

reach Plaintiffs' argument that ICE has also failed to show—as it must—that "securing legal

advice was a 'primary purpose' of any of the withheld communications."  Pls.' Opp'n at 30.  As

Plaintiffs correctly note, to be privileged, a communication must be "for the purpose of securing

primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal

proceeding."  *In re Grand Jury*, 475 F.3d 1299, 1304 (D.C. Cir. 2007) (quoting *In re Sealed*

*Case*, 737 F.2d at 98–99).  To invoke the privilege, an agency thus must—at the very least—

"describe with some reasonable level of detail the nature of the legal issue or issues for which

advice was being sought and whether the withheld [communications] seek legal advice, convey

legal advice, or both." *Muttitt v. Dep't of State*, 926 F. Supp. 2d 284, 309 (D.D.C. 2013).  With

these principles in mind, the Court observes that, for at least some of the documents ICE seeks to

withhold, ICE's declarations and *Vaughn* entries do not make it immediately apparent that the

withheld communications relate to the provision of, or request for, legal advice.  *See, e.g.*, ICE

*Vaughn* Index, at 53–54 (withholding communications where "ERO edited draft responses to

questions posed by [a] reporter"); *id.* at 96–97 (withholding communications in which an "ICE

Public Affairs Officer is seeking guidance on how to respond to a media inquiry").  To the extent

that ICE intends to continue to invoke the attorney-client privilege as a basis for withholding

records from production, it should ensure that its submissions provide the Court with sufficient

detail to determine whether "securing legal advice was a 'primary purpose' of the" withheld

communications.  *Cause of Action Inst. v. U.S. Dep't of Just.*, 330 F. Supp. 3d 336, 347 (D.D.C.

2018) (citing *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 759–60 (D.C. Cir. 2014)).

### 2.  Exemptions 6 and 7(C)

ICE argues that it properly invoked Exemptions 6 and 7(C) to withhold "names, initials,

signatures, phone numbers, email addresses, and suite numbers of federal law enforcement

officers and other government employees that are found in the documents."  Defs.' Mot., at 16

(quoting Pineiro Decl. ¶ 87).  It further argues that it properly invoked the same exemptions to

withhold the "[n]ames, phone numbers, and email addresses of non-ICE individuals, such as

DOJ attorneys."  *Id.* (quoting Pineiro Decl. ¶ 90).  Plaintiffs do not contest ICE's withholding of

phone numbers or signatures under these exemptions.[4]  *See* Pls.' Opp'n at 3 n.7.  They do,

however, lodge a number of objections to the remainder of ICE's withholdings.  Specifically,

---

[4] The Court will grant ICE summary judgment regarding its redactions of phone numbers and signatures.

Plaintiffs argue (1) that ICE has not shown that the documents at issue were compiled for a law enforcement purpose, as is necessary to invoke Exemption 7(C), (2) that ICE has not adequately identified the privacy interests at stake that justify its withholdings, and (3) that the public has a high degree of interest in the withheld information.

Exemption 6 protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Exemption 7(C) excludes "records or information compiled for law enforcement purposes . . . to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy." *Id.* § 552(b)(7)(C). Both exemptions require agencies and reviewing courts to "balance the privacy interests that would be compromised by disclosure against the public interest in the release of the requested information." *Beck v. Dep't of Just.*, 997 F.2d 1489, 1491 (D.C. Cir. 1993) (quoting *Davis v. Dep't of Just.*, 968 F.2d 1276, 1281 (D.C. Cir. 1992)).

Although the balancing test is applied to both Exemption 6 and 7(C), "'Exemption 7(C) is more protective of privacy than Exemption 6' and thus establishes a lower bar for withholding material." *Prison Legal News v. Samuels*, 787 F.3d 1142, 1146 n.5 (D.C. Cir. 2015) (quoting *ACLU v. U.S. Dep't of Just.*, 655 F.3d 1, 6 (D.C. Cir. 2011)); *see also U.S. Dep't of Def. v. Fed. Labor Relations Auth.*, 510 U.S. 487, 496 n.6 (1994) ("Exemptions 7(C) and 6 differ in the magnitude of the public interest that is required to override the respective privacy interests protected by the exemptions."). Specifically, "the balance tilts more strongly toward nondisclosure in the context of Exemption 7(C) because 'Exemption 7(C)'s privacy language is broader than the comparable language in Exemption 6 in two respects.'" *Braga v. FBI*, 910 F.Supp.2d 258, 267 (D.D.C. 2012) (quoting *Reporters Comm.*, 489 U.S. at 756). First,

Exemption 6 "encompasses 'clearly unwarranted' invasions of privacy, while Exemption 7(C) omits the adverb 'clearly.'" *Id.* Second, Exemption 7(C) lowers the risk of harm standard from "would" to "could reasonably be expected to" constitute an invasion. *Id.* The differences in the language between the two exemptions reflect Congress's decision to provide the government with "greater flexibility in responding to FOIA requests for law enforcement records or information" than in responding to requests for personnel, medical, and other similar files. *See Reporters Comm.*, 489 U.S. at 777 n.22.

Accordingly, if the documents withheld and information redacted were "compiled for law enforcement purposes," the Court need engage only in an analysis of whether the defendant properly redacted information and withheld documents pursuant to Exemption 7(C). *See People for the Ethical Treatment of Animals v. Nat'l Insts. of Health*, 745 F.3d 535, 541 (D.C. Cir. 2014) (confining its FOIA analysis to Exemption 7(C) because its "privacy language is broader than the comparable language in Exemption 6" (quoting *Reporters Comm.*, 489 U.S. at 756)); *Roth v. U.S. Dep't of Just.*, 642 F.3d 1161, 1173 (D.C. Cir. 2011) (finding "no need to consider Exemption 6 separately [where] all information that would fall within the scope of Exemption 6 would also be immune from disclosure under Exemption 7(C)"); *Rodriguez v. U.S. Dep't of the Army*, 31 F.Supp.3d 218, 231 (D.D.C. 2014). Therefore, as an initial matter, the Court must determine whether Exemption 7 applies to the withholdings in this case.

### a. Exemption 7 Threshold Question

In order to withhold documents under Exemption 7, an agency must, as a preliminary matter, make a threshold showing demonstrating that the "records or information [were] compiled for [a] law enforcement purpose." 5 U.S.C. § 552(b)(7); *see Shapiro v. U.S. Dep't of Just.*, 239 F. Supp. 3d 100, 113 (D.D.C. 2017). Agencies classified as law enforcement agencies,

like ICE in this case, *see Roseberry-Andrews v. Dep't of Homeland Sec.*, 299 F. Supp. 3d 9, 31 (D.D.C. 2018); *see also* Pineiro Decl. ¶¶ 80–83, generally receive a degree of deference when claiming that "their records are eligible for Exemption 7[] protection," *Bartko v. U.S. Dep't of Just.*, 898 F.3d 51, 64 (D.C. Cir. 2018); *see Pratt v. Webster*, 673 F.2d 408, 418 (D.C. Cir. 1982). "This deferential standard of review, however, is not a 'vacuous' one, and it does not authorize a wholesale departure from all evidentiary requirements." *Am. Immigr. Council*, 950 F. Supp. 2d at 245 (quoting *Campbell*, 164 F.3d at 32).

As past decisions make clear, not every document compiled by a law enforcement agency is compiled for a law enforcement purpose. *See, e.g.*, *id.* at 245–46; *Benavides v. Bureau of Prisons*, 774 F. Supp. 2d 141, 146–47 (D.D.C. 2011). That is why, "[t]o determine 'whether records are compiled for law enforcement purposes, this circuit has long emphasized that the focus is on how and under what circumstances the requested files were compiled and whether the files sought relate to anything that can fairly be characterized as an enforcement proceeding." *Clemente v. FBI*, 867 F.3d 111, 119 (D.C. Cir. 2017) (quoting *Jefferson v. Dep't of Just., Off. of Pro. Resp.*, 284 F.3d 172, 176–77 (D.C. Cir. 2002)). An agency bears its burden of showing that records meet Exemption 7's threshold by demonstrating "(1) 'a rational nexus between the investigation and one of the agency's law enforcement duties;' and (2) 'a connection between an individual or incident and a possible security risk or violation of federal law.'" *Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Just.*, 331 F.3d 918, 926 (D.C. Cir. 2003) (quoting *Campbell*, 164 F.3d at 32).

Here, ICE has not sufficiently established that the records and information it seeks to withhold pursuant to Exemption 7 were compiled for a law enforcement purpose. For one thing, the declaration it submits is fatally generic. ICE's declarant states that:

33

> The ICE information at issue in this case was compiled by ICE because it relates to ICE's obligation to enforce the immigration laws of the United States by investigating non U.S. individuals who may be illegally present in the United States, including records of interviews, arrest, booking, detention, removal, and other related investigations. Therefore, all of the ICE emails responsive to Plaintiffs' FOIA request, *which pertain to the detention and removal of Mr. Vidal-Martinez [sic]*, were compiled for law enforcement purposes and meet the threshold requirement of FOIA Exemption (b)(7).

Pineiro Decl. ¶ 83 (emphasis added).  As other courts have held, this type of bald assertion "fails to provide the Court with a "clear understanding of 'how and under what circumstances the requested files were compiled.'"  *New Orleans Workers' Ctr.*, 373 F. Supp. 3d at 56 (rejecting materially similar declaration) (quoting *Am. Immigr. Council*, 950 F. Supp. 2d at 245).  To be sure, Mr. Pineiro's declaration is not *completely* generic; he does "identify a particular individual" and the purported "connection between that individual . . . and a possible security risk or violation of federal law."  *Id.* (quoting *Pratt*, 673 F.2d at 420).  The problem, however, is that the individual he identifies—"Mr. Vidal-Martinez"—is not an individual to whom the documents in this case pertain.

ICE's overly generic declaration regarding the purported law enforcement purpose of the documents at issue is not saved by its *Vaughn* index.  To the contrary, many of ICE's *Vaughn* entries do not adequately demonstrate whether the withheld records or information were compiled for law enforcement purposes.  For example, Plaintiffs note that ICE withheld a number of records relating to inquiries from the press.  *See, e.g.*, ICE *Vaughn* Index, at 19–20 (withholding portions of emails "discussing whether [and how] to respond . . . to a media outlet executive who accused ICE employees of trying to suppress freedom of the press during an interview with Emilio Gutierrez-Soto"); *id.* at 79–80 (redacting information in communications relating "to inquiries from the National Press Club Journalism Institute and Wall Street Journal about Emilio Gutierrez-Soto's detention and immigration case"); *id.* at 83–84 (similar); *id.* at 96–

97 (withholding information in emails "concerning whether ICE has a comment about an article concerning Emilio Gutierrez-Soto").  Because these documents were created primarily to respond to media inquiries, it is not immediately apparent that they were "compiled" for law enforcement purposes as is required for the agency to invoke Exemption 7, *see Pub. Emps. for Env't Resp. v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mexico*, 740 F.3d 195, 203 (D.C. Cir. 2014) ("[T]he term 'compiled' in Exemption 7 requires that a document be created, gathered, or used by an agency for law enforcement purposes at some time before the agency invokes the exemption."), and ICE's *Vaughn* entries do not explain the law enforcement purpose underlying the compilation of these records.

Given these defects in ICE's current submissions, the Court will not examine each of the withheld documents to "attempt to discern for itself whether the documents satisfy Exemption 7's threshold requirement."  *New Orleans Workers' Ctr.*, 373 F. Supp. 3d at 57.  Instead, to the extent ICE seeks to continue to withhold information pursuant to Exemption 7(C), it must supplement its declarations and *Vaughn* index to provide the Court with a clearer picture of whether the records satisfy the exemption's threshold requirements.

*b.  Exemption 6*

Because the Court cannot conclude that ICE has properly withheld the contested information pursuant to Exemption 7(C), the Court will instead consider whether the agency has properly withheld the same information under Exemption 6.

As noted above, Exemption 6 protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5

U.S.C. § 552(b)(6).[5]  To determine whether a withholding under Exemption 6 is proper, courts "balance the private interest involved (namely, the individual's right of privacy) against the public interest (namely . . . to open agency action to the light of public scrutiny)."  *Horowitz v. Peace Corps*, 428 F.3d 271, 278 (D.C. Cir. 2005) (internal quotation marks omitted).  A court must begin by determining "whether disclosure would compromise a substantial, as opposed to a *de minimis*, privacy interest."  *Prison Legal News*, 787 F.3d at 1147 (internal quotation marks omitted).  If there is a substantial privacy interest at stake, the court then balances the privacy right against the public's interest in disclosure.  *Id.*

The D.C. Circuit has explained that "[t]he scope of a privacy interest under Exemption 6 will always be dependent on the context in which it has been asserted."  *Id.* (quoting *Armstrong v. Exec. Off. of the President*, 97 F.3d 575, 581 (D.C. Cir. 1996)); *see Am. Immigr. Laws. Ass'n v. Exec. Off. for Immigr. Rev.*, 830 F.3d 667, 675 (D.C. Cir. 2016) ("Exemption 6 . . . "does not categorically exempt individuals' identities . . . because the 'privacy interest at stake may vary depending on the context in which it is asserted.'" (quoting *Jud. Watch, Inc.*, 449 F.3d at 153)).  The fact that the applicability of Exemption 6 depends heavily on context does not prevent agencies from taking a "categorical approach" to their withholdings.  *WP Co. LLC v. U.S. Dep't of Def.*, 626 F. Supp. 3d 69, 78 (D.D.C. 2022).  If, however, an agency chooses to go the categorical route, it must ensure that the "the categories are sufficiently well-defined and distinct."  *Am. Immigr. Laws. Ass'n*, 830 F.3d at 675.  In delineating different categories, the agency must consider and account for the "differentiated" privacy interests at stake.

---

[5] Plaintiffs do not dispute that the information at issue constitutes "personnel and medical files and similar files" as that phrase has been construed by the D.C. Circuit.  *See Jud. Watch, Inc.*, 449 F.3d at 152–53 (explaining that the phrase encompasses "bits of personal information, such as names and addresses, the release of which would 'create[] a palpable threat to privacy'" (quoting *Carter v. U.S. Dep't of Commerce*, 830 F.2d 388, 391 (D.C. Cir. 1987))).

*100Reporters LLC v. U.S. Dep't of Just.*, 248 F. Supp. 3d 115, 164 (D.D.C. 2017).  These steps help to ensure that, "regardless of any variation among the . . . persons [ultimately] falling within" a specific category, the privacy interests at stake amongst those people will be sufficiently similar such that—when the court proceeds to balance the private and public interests—the balancing analysis will "yield a uniform answer across the entire proffered category."  *Am. Immigr. Laws. Ass'n*, 830 F.3d at 675.

ICE has taken a categorical approach to its Exemption 6 withholdings in this case.  The Court finds, however, that ICE has not defined its categories with sufficient precision, nor has it adequately distinguished the various privacy interests at play.  ICE's declaration explains that it redacted personal information for two categories of individuals.  The first category includes "federal employees"—a broad grouping that includes "federal law enforcement officers and other government employees."  Pineiro Decl. ¶¶ 87, 88.  ICE asserts that these employees "have privacy interests in not becoming targets of harassment by individuals who may begrudge them and in remaining free of interference in the performance of their duties by persons who are currently of interest to law enforcement or who oppose the ICE mission."  *Id.* ¶ 88.  ICE further claims that "[p]ublic identification of these employees could also result in them being subjected to personal requests for access to law enforcement information or requests for information about ongoing or closed investigations."  *Id.* ¶ 89.

The second category includes "third-part[ies]," which, somewhat confusingly, includes "non-ICE individuals, such as DOJ attorneys."[6]  *Id.* ¶ 90.  For these individuals, ICE simply asserts that the disclosure of their personal "information could constitute an unwarranted

_____

[6] It is not clear why Department of Justice attorneys would not also fall into the "federal employees" category.

invasion of personal privacy and similarly subject these individuals to harassment, and undue

public attention." *Id.*

Despite ICE's use of these two general categories in its supporting declaration, the

agency's *Vaughn* index takes a slightly different approach.  It broadly groups individuals into

"ICE employees" or "law enforcement . . . personnel" on the one hand, *see, e.g.*, ICE *Vaughn*

Index, at 18–19, and "third-party individuals" on the other, *see id.*  The former includes, among

others, "ICE deportation Officers, Supervisory Detention Deportation Officers, Assistant Field

Officers, ICE Attorneys, [ICE Health Services Corps] employees," *id.* at 2, "ERO Assistant Field

Office Directors . . . , ICE Public Affairs Officers, . . . OPLA attorney[s]," *id.* at 21, "ICE Office

of Congressional Relations" staff, *id.* at 100, "ERO Field Office Director[s]," *id.* at 130, "ICE

Assistant Chief Counsel[s]," *id.* at 134, and the "ICE Chief Counsel," *id.* at 138.  For the vast

majority of *Vaughn* entries involving this category of individuals, ICE asserts the same, rote

privacy interests:

> [T]he disclosure of the names and contact information of law enforcement ("LE")
> personnel could reasonably be expected to constitute an unwarranted invasion of
> personal privacy by: (1) conceivably subjecting law enforcement personnel to
> harassment and annoyance in conducting their official duties and in their private
> lives; (2) potentially placing them in danger as targets of law enforcement
> investigations may begrudge personnel for an indefinite time period and seek
> revenge; and (3) possibly minimizing their ability to effectively conduct future
> investigations.

*See, e.g.*, *id.* at 36.

As for the "third-party" category, that grouping includes "reporters," "contractors," *id.* at

2, "family members" of the Gutierrez-Sotos, *id.* at 11, "private bar attorneys," "witnesses," *id.* at

14, "immigration judge[s]," *id.* at 28, the "plaintiff's attorney," *id.* at 51, Assistant U.S.

Attorneys, *id.* at 86, and presumably others.  For individuals in this group, ICE repeatedly asserts

that:

> The disclosure of third-party PII could reasonably be expected to constitute an unwarranted invasion of individuals' personal privacy interests in not being associated unwarrantedly with alleged criminal activity; being free from harassment, criticism, intimidation, legal consequences, economic reprisals, embarrassment, undue public attention, physical harm, and derogatory inferences and suspicion; and controlling how communications about them are communicated to others.

*See, e.g.*, *id.* at 15.

Regardless of whether one considers the categories in ICE's declaration or *Vaughn* index, these categorical distinctions are far too generic to convince the Court that ICE has adequately accounted for and "distinguish[ed] the [various] privacy interests at stake." *100Reporters LLC*, 248 F. Supp. 3d at 164. For one thing, within the "federal employees" or "ICE employees" categories, ICE has not differentiated between the interests of line-level, lower-ranking employees and individuals with significantly more authority and public exposure. As this Court has observed previously, individuals in "public, high-level positions" will often have divergent privacy interests from employees in less high-profile roles. *Id.* ICE's Exemption 6 withholdings do not currently account for those differences and, accordingly, are insufficient. *See id.* (explaining that "DOJ ha[d] not differentiated the interests of regular Siemens employees and Board Members," the latter of whom "have different privacy interests based on their public, high-level positions"); *see also New Orleans Workers' Ctr.*, 373 F. Supp. 3d at 60 (rejecting "federal employees" as too broad a category to justify agency's Exemption 6 withholdings).

ICE has also failed to differentiate the privacy interests at stake for the large variety of individuals encompassed by the "third-party" category. As noted above, that category includes, among others, reporters, immigrations judges, and Assistant U.S. Attorneys. Yet, ICE makes no attempt to "distinguish the privacy interests at stake" for these individuals, instead asserting that they all have the identical interest in "in not being associated unwarrantedly with alleged criminal activity; being free from harassment, criticism, intimidation, legal consequences,

economic reprisals, embarrassment, undue public attention, physical harm, and derogatory

inferences and suspicion; and controlling how communications about them are communicated to

others." *See, e.g.*, ICE *Vaughn* Index, at 3. As other courts have held, that is not sufficient. *See*

*New Orleans Workers' Ctr.*, 373 F. Supp. 3d at 63; *Am. Immigr. Laws. Ass'n*, 830 F.3d at 675

(holding that agency could not categorically redact immigration judges' names because, even

amongst immigration judges, "not every judge has the same privacy interests at stake").

      ICE's failure to establish the different privacy interests at stake makes it impossible for

the Court to balance the private interests with the public's interest in knowing "what their

government is up to." *Reporters Comm.,* 489 U.S. at 773. Therefore, the Court must deny

summary judgment with regard to ICE's withholdings under Exemption 6. If ICE intends to

continue to rely on Exemption 6, it will have another opportunity to present further affidavits

justifying its withholdings. Although ICE is not necessarily prohibited from relying on

categorical arguments, it should, at the least, "make a more particularized showing for defined

subgroups." *See Am. Immigr. Laws. Ass'n*, 830 F.3d at 676; *see also Prison Legal News*, 787

F.3d at 1151–52. At this time, Plaintiffs' cross-motion for summary judgment will also be

denied without prejudice on this issue.

### C. Inadvertently Disclosed Records

      The last issue the Court must address concerns certain documents or portions of

documents that ICE inadvertently disclosed during the course of its productions. Despite the

inadvertent disclosure of that information, ICE now seeks to variously assert Exemptions 5, 6,

and 7(C) to withhold the information that has already been disclosed to Plaintiffs. *See* ICE

*Vaughn* Index, at 15–16 (invoking Exemption 5 to withhold information that "was inadvertently

disclosed in a production released in January 2023"); *see id.* at 23 (invoking Exemptions 6 and

7(C) to withhold information in three documents that "was inadvertently released during the December 2020 production").

For their part, Plaintiffs argue that ICE's inadvertent disclosure of this information mooted any dispute over these records, and they contend that ICE's motion for summary judgment should be denied as to these documents on that basis.  *See* Pls.' Opp'n at 42.  Although ICE concedes that an agency's disclosure of records under FOIA generally moots any controversy over the disclosed records, *see Swick v. U.S. Dep't of the Army*, 596 F. Supp. 3d 66, 72 (D.D.C. 2022), ICE contends that the same is not true when an agency *inadvertently* discloses the records in question.  *See* Defs.' Reply at 42.

Although ICE does not say so in so many words, the Court construes ICE's position to be that the inadvertent disclosure of a few documents does not prevent the agency from later asserting that information contained in those documents is exempt from withholding under FOIA.  To the extent that that is ICE's position, the Court agrees.  As other courts in this district have explained, "whether an agency has waived an exemption"—as Plaintiffs essentially contend ICE has done here—depends upon "the nature and circumstances of disclosure."  *Amiri v. Nat'l Sci. Found.*, No. 20-cv-02006, 2021 WL 4438910, at *8 (D.D.C. Sept. 28, 2021).  "Courts generally find that, when an unintended error leads to disclosure, the agency has not waived a FOIA exemption."  *Id.*; *see Kay v. FCC*, 867 F. Supp. 11, 23–24 (D.D.C. 1994) (defendant did not waive Exemption 7(A) by inadvertently disclosing 6 unredacted documents in a 1,474-page release).

Here, ICE has consistently maintained that it mistakenly produced the documents in question.  Moreover, once it realized its error, ICE reprocessed and reproduced redacted versions of those same documents.  *See* ICE *Vaughn* Index, at 15–16, 23.  These facts support the

conclusion that ICE's disclosure was, in fact, inadvertent.  *See Amiri*, 2021 WL 4438910, at *8 (holding that agency's disclosure of records was inadvertent where agency "consistently label[ed]" its disclosure as such and where the agency "released redacted versions of the" mistakenly disclosed documents in a later production).  And Plaintiffs at no point contend otherwise.  All that being so, the Court concludes that ICE may assert that all or part of the mistakenly disclosed documents are exempt from withholding under FOIA.[7]

To be clear, the Court's holding should not be read to suggest that these specific documents (or portions thereof) were lawfully withheld.  As explained above, ICE has not adequately justified its Exemption 5, 6, or 7(C) withholdings, and the Court declines to analyze whether specific documents were properly withheld until ICE has had a chance to provide more fulsome justifications.

## V.  CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (ECF No. 52) is **GRANTED IN PART AND DENIED IN PART** and Plaintiffs' cross-motion for partial summary judgment (ECF No. 53) is **GRANTED IN PART AND DENIED IN PART.** Specifically, Defendants' motion is **GRANTED** to the extent that it is unopposed, **DENIED** regarding ICE's search for documents responsive to Plaintiffs' request for records pertaining to

---

[7] ICE has not moved to limit Plaintiffs' use of the inadvertently disclosed documents, nor has ICE sought to compel the return or destruction of those documents.  It is not immediately clear whether the Court has the authority to take either of these steps.  *Compare Hum. Rts. Def. Ctr. v. U.S. Park Police*, No. 19-cv-1502, 2023 WL 5561602, at *6 (D.D.C. Aug. 29, 2023) (ordering plaintiffs "not to disclose, disseminate, or make use of" mistakenly disclosed information), *with 100Reporters v. U.S. Dep't of State*, 602 F. Supp. 3d 41, 84 (D.D.C. 2022) (noting the absence of "legal authority indicating [whether] the Court has the authority to order that a FOIA recipient return records that were inadvertently released without redactions").  In any event, because ICE has not moved for any relief whatsoever on this front, the Court will not, at this time, limit Plaintiffs' use of the information that was inadvertently disclosed.

mechanisms used to limit or block phone calls in its El Paso facilities, and **DENIED WITHOUT PREJUDICE** regarding its challenged Exemption 5, 6, and 7(C) withholdings. Plaintiffs' motion is **GRANTED** regarding document 2019-ICLI-00014 4931 and **DENIED WITHOUT PREJUDICE** in all other respects.  Defendant ICE is **ORDERED** to conduct a search reasonably calculated to uncover all relevant documents regarding Plaintiffs' remaining FOIA request.  Defendant ICE is also **ORDERED** to either supplement its declarations and *Vaughn* index to justify its Exemption 5, 6, and 7(C) withholdings or release the documents.  The parties are **ORDERED** to submit a proposed schedule for further proceedings within two weeks of the issuance of this opinion.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  December 28, 2023                                             RUDOLPH CONTRERAS
                                                                                               United States District Judge